# United States District Court

CENTRAL DISTRICT OF CALIFORNIA

In re: JAMIE LYNN GALLIAN,

Debtor

JAMIE LYNN GALLIAN,

Appellant

v.

HOUSER BROS. CO., DBA RANCHO DEL REY MOBILE HOME ESTATES,

Appellee.

District Court Case Number 8:23-cv-00961-WLH

Bankruptcy Court Case Number 8:21-bk-11710-SC

Bankruptcy Court Adversary Number 8:21-ap-01097-SC

Chapter 7

**UNPUBLISHED AUTHORITY IN SUPPORT OFAPPELLEE'S RESPONSIVE BRIEF**

D. EDWARD HAYS, #162507
ehays@marshackhays.com
LAILA MASUD, #311731
lmasud@marshackhays.com
BRADFORD N. BARNHARDT, #328705
bbarnhardt@marshackhays.com
MARSHACK HAYS WOOD LLP
870 Roosevelt, Irvine, California 92620
Telephone: (949) 333-7777; Facsimile: (949) 333-7778

Attorneys for Appellee,
HOUSER BROS. CO.

TO THE HONORABLE WESLEY L. HSU, UNITED STATES DISTRICT JUDGE, APPELLANT, AND ALL INTERESTED PARTIES

Appellee ("Appellee") Houser Bros. Co. requests pursuant to FRAP 32.1 and 36-3, that this Court take notice of the following unpublished cases to be considered in support of Appellee's Responsive Brief, filed on September 15, 2023, as Dk. No. 15.

**UNPUBLISHED CASES**

1. Faith v. Miller (In re Miller),

   2015 Bankr.LEXIS 1929, at *6 (Bankr. C.D. Cal. June 12, 2015).

2. JP Morgan Chase Bank, N.A. v. Ellison (In re Ellison),

   2016 Bankr.LEXIS 3475, at *24 (Bankr. C.D. Cal. Sept. 23, 2016).

3. In re Nevett,

   2021 Bankr.LEXIS 1781, at *17 (B.A.P. 9th Cir. July 1, 2021).

4. Ravasia v. U.S. Tr. (In re Ravasia),

   2021 Bankr.LEXIS 1033, at *18 (B.A.P. 9th Cir. Apr. 16, 2021).

5. In re Retz,

   606 F.3d at 1200;

6. Schoenmann v. Chen (In re Chen),

   2009 Bankr.LEXIS 3636, at *14 (Bankr. N.D. Cal. Nov. 9, 2009).

7. Spaich v. Smith (In re Spaich),

   2005 Bankr. LEXIS 3431, at *3 (B.A.P. 9th Cir. 2005).

DATED: September 16, 2023

MARSHACK HAYS WOOD LLP

By: *|s| D. Edward Hays*
D. EDWARD HAYS
LAILA MASUD
BRADFORD N. BARNHARDT
Attorneys for Appellee,
HOUSER BROS. CO. dba RANCHO DEL REY MOBILE HOME ESTATES

# Exhibit "1"

 Neutral
As of: September 16, 2023 4:07 PM Z

# Faith v. Miller (In re Miller)

United States Bankruptcy Court for the Central District of California, Northern Division

June 12, 2015, Decided; June 12, 2015, Filed & Entered

Case. No. 9:13-bk-10313-PC, Adversary No. 9:13-ap-01133-PC, Chapter 7

**Reporter**
2015 Bankr. LEXIS 1929 *

In re: LOREN MILLER AND SARAH MILLER, Debtors.JEREMY W. FAITH, CHAPTER 7 TRUSTEE, Plaintiff, v. LOREN MILLER AND SARAH MILLER, Defendants.

**Notice:** NOT FOR PUBLICATION

**Subsequent History:** Related proceeding at *In re Miller, 2016 U.S. Dist. LEXIS 53084 (C.D. Cal., Apr. 20, 2016)*

Decision reached on appeal by *Miller v. Faith (In re Miller), 2017 U.S. App. LEXIS 15889 (9th Cir., Aug. 21, 2017)*

Decision reached on appeal by *Miller v. Geller (In re Miller), 2017 U.S. App. LEXIS 15888 (9th Cir. Cal., Aug. 21, 2017)*

Decision reached on appeal by *Miller v. Faith (In re Miller), 2017 U.S. App. LEXIS 15883 (9th Cir. Cal., Aug. 21, 2017)*

## Core Terms

turnover order, genuine, concealed, summary judgment, hinder, summary judgment motion, material fact, defraud, badges, funds, transferred

## Case Summary

### Overview

HOLDINGS: [1]-Debtor's discharge was denied under *11 U.S.C.S. § 727(a)(2)(A)* and *(B)*, as he transferred or concealed property within one year prior to and one year after the petition date; he failed to disclose assets and transactions; he concealed corporate accounts and disposed of funds in those accounts for personal use; and he acted with the subjective intent to hinder or delay, if not defraud, trustee and creditors; [2]-Discharge was denied under *§ 727(a)(4)(A)*, as debtor's false statements and omissions were so intertwined with his business and financial affairs and trustee's ongoing efforts to investigate and recover property of the estate that the court inferred that his failure to make full and accurate disclosure was intentional and for the purposes of deceiving creditors and the trustee; [3]-Discharge was denied under *§ 727(a)(6)(A)*, as debtor disobeyed a turnover order.

### Outcome

The court granted the Chapter 7 trustee's motion for summary judgment and denied debtor husband's discharge.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Legal Entitlement

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

*HN1*[] **Entitlement as Matter of Law, Genuine Disputes**

*Fed. R. Civ. P. 56(a)* authorizes a party to move for summary judgment, identifying each claim or defense -- or the part of each claim or defense -- on which summary judgment is sought. Summary judgment must be granted if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

**HN2[] Entitlement as Matter of Law, Appropriateness**

In determining whether a genuine factual issue exists, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability. The judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. However, the court's function on a motion for summary judgment is issue-finding, not issue-resolution.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Need for Trial

**HN3[] Entitlement as Matter of Law, Appropriateness**

*Fed. R. Civ. P. 56* does not permit trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are fact finder functions.

Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

**HN4[] Summary Judgment, Supporting Materials**

*Fed. R. Civ. P. 56(c)* identifies the procedures the court and parties must follow in conjunction with motions for summary judgment.

Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

**HN5[] Summary Judgment, Supporting Materials**

See *Fed. R. Civ. P 56(c)*.

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

**HN6[] Summary Judgment, Opposing Materials**

A court may grant summary judgment if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by *Fed. R. Civ. P. 56(c)*. *Rule 56(e)(3)*.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

**HN7[] Entitlement as Matter of Law, Genuine Disputes**

A court may, after notice and a reasonable opportunity to respond, grant summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute. *Fed. R. Civ. P. 56(f)(3)*

Bankruptcy Law > ... > Liquidations > Denial of Discharge > General Overview

**HN8[] Liquidations, Denial of Discharge**

Objections to discharge are to be literally and strictly construed against the objector and liberally construed in favor of the debtor. Courts should deny discharge only for very specific and serious infractions.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

Evidence > Burdens of Proof > Preponderance of Evidence

**HN9[] Denial of Discharge, Concealment & Fraudulent Transfers**

To deny discharge under *11 U.S.C.S. § 727(a)(2)(A)*, a plaintiff must establish by a preponderance of the evidence (1) a disposition of property (i.e., transfer or concealment); (2) with subjective intent to hinder, delay or defraud a creditor; and (3) it must occur within one year prior to filing bankruptcy. Because the statute is written in the disjunctive, an intent to hinder or delay is sufficient to deny discharge under *§ 727(a)(2)*. Proof of fraud is not necessary nor is injury to creditors relevant for purposes of *§ 727(a)(2)*.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

**HN10[] Denial of Discharge, Concealment & Fraudulent Transfers**

The standard for denial of discharge under *11 U.S.C.S. § 727(a)(2)(B)* is the same as *§ 727(a)(2)(A)*, but the disposition must be of estate property occurring after the petition date.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

Evidence > Types of Evidence > Circumstantial Evidence

Evidence > Inferences & Presumptions > Inferences

**HN11[] Denial of Discharge, Concealment & Fraudulent Transfers**

For purposes of a denial of discharge under *11 U.S.C.S. § 727(a)(2)*, intent may be established by circumstantial evidence, or by inferences drawn from a course of conduct.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

Evidence > Types of Evidence > Circumstantial Evidence

Evidence > Inferences & Presumptions > Inferences

**HN12[] Denial of Discharge, Concealment & Fraudulent Transfers**

Whether a debtor harbors intent to hinder, or delay, or defraud a creditor for purposes of denial of discharge under *11 U.S.C.S. § 727(a)(2)* is a question of fact reviewed for clear error. Intent may be inferred from surrounding circumstances. The surrounding circumstances include the various "badges of fraud" that constitute circumstantial evidence of intent. Certain badges of fraud strongly suggest that a transaction's purpose is to defraud creditors unless some other convincing explanation appears. These factors, not all of which need be present, include (1) a close relationship between the transferor and the transferee; (2) that the transfer was in anticipation of a pending suit; (3) that the transferor debtor was insolvent or in poor financial condition at the time; (4) that all or substantially all of the debtor's property was transferred; (5) that the transfer so completely depleted the debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and (6) that the debtor received inadequate consideration for the transfer.

Civil Procedure > Judgments > Enforcement & Execution > Fraudulent Transfers

**HN13[] Enforcement & Execution, Fraudulent Transfers**

A non-exclusive list of "badges of fraud" has been codified by California's Uniform Fraudulent Transfer Act

(UFTA). The UFTA factors are intended to provide guidance to a trial court, not compel a finding one way or another. They include: (1) whether the transfer or obligation was to an insider; (2) whether the debtor retained possession or control of the property transferred after the transfer; (3) whether the transfer or obligation was disclosed or concealed; (4) whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) whether the transfer was of substantially all the debtor's assets; (6) whether the debtor absconded; (7) whether the debtor removed or concealed assets; (8) whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) whether the transfer occurred shortly before or shortly after a substantial debt was incurred; (11) whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor. *Cal. Civ. Code § 3439.04(b)*.

Civil Procedure > Judgments > Enforcement & Execution > Fraudulent Transfers

***HN14***[] **Enforcement & Execution, Fraudulent Transfers**

The California Uniform Fraudulent Transfer Act (UFTA) list of "badges of fraud" in *Cal. Civ. Code § 3439.04(b)* provides neither a counting rule, nor a mathematical formula. No minimum number of factors tips the scales toward actual intent. A trier of fact is entitled to find actual intent based on the evidence in the case, even if no badges of fraud are present. Conversely, specific evidence may negate an inference of fraud notwithstanding the presence of a number of badges of fraud.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

Evidence > Types of Evidence > Circumstantial Evidence

Evidence > Inferences & Presumptions > Inferences

***HN15***[] **Denial of Discharge, False Accounts & Oaths**

Under *11 U.S.C.S. § 727(a)(4)(A)*, a debtor's discharge will be denied if it is proven that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. The debtor's knowledge and fraudulent intent may be shown by circumstantial evidence and inferred from the debtor's course of conduct.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > General Overview

***HN16***[] **Liquidations, Denial of Discharge**

*11 U.S.C.S. § 727(a)(6)* states that a court shall grant a debtor a discharge, unless the debtor has refused to obey and lawful order of the court, other than an order to respond to a material question or to testify. *§ 727(a)(6)(A)*.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > General Overview

***HN17***[] **Liquidations, Denial of Discharge**

The term used in *11 U.S.C.S. § 727(a)(6)(A)* is "refused," not "failed."

Bankruptcy Law > ... > Liquidations > Denial of Discharge > General Overview

***HN18***[] **Liquidations, Denial of Discharge**

A party objecting to discharge under *11 U.S.C.S. § 727(a)(6)(A)* satisfies its burden by demonstrating that a debtor received the order in question and failed to comply with its terms. Such a showing then imposes upon the debtor an obligation to explain his non-compliance.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > General Overview

***HN19***[] **Liquidations, Denial of Discharge**

It is totally within the discretion of a bankruptcy court to find a particular violation of the court's order so serious as to require denial of discharge under *11 U.S.C.S. § 727(a)(6)(A)*.

**Counsel: [*1]** For OneWest Bank, FSB, Creditor (9:13bk10313): Mark D Estle, The Estle Law Firm, San Diego CA.

For Loren Miller, Debtor (9:13bk10313): Vaughn C Taus, San Luis Obispo CA; Meghann A Triplett, Margulies Faith LLP, Encino CA.

For Sarah Miller, Joint Debtor (9:13bk10313): Reed H Olmstead, Hurlbett & Olmstead, Santa Barbara CA; Vaughn C Taus, San Luis Obispo CA; Meghann A Triplett, Margulies Faith LLP, Encino CA.

For Courtesy NEF, Interested Party (9:13bk10313): Meghann A Triplett, Margulies Faith LLP, Encino CA; Gilbert B Weisman, II, Becket & Lee LLP, Malvern PA.

For Andrew and Eileen Geller, Interested Party (9:13bk10313): Howard Camhi, Beverly Hills CA.

For Jeremy W. Faith (TR), Trustee (9:13bk10313): Craig G Margulies, Meghann A Triplett, Margulies Faith LLP, Encino CA.

For Jeremy W. Faith, Chapter 7 Trustee, Plaintiff (9:13-ap-01133-PC): Noreen A Madoyan, Encino, CA; Craig G Margulies, LEAD ATTORNEY, Meghann A Triplett, Margulies Faith LLP, Encino, CA.

Loren Miller, Defendant (9:13-ap-01133-PC), Pro se, Seabrook, TX.

For Jeremy W. Faith (TR), Trustee (9:13-ap-01133-PC): Meghann A Triplett, Margulies Faith LLP, Encino, CA.

**Judges:** Peter H. Caroll, United States Bankruptcy Judge.

**Opinion by:** Peter H. Caroll

## Opinion

**MEMORANDUM [*2] REGARDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT LOREN MILLER UNDER *11 U.S.C. § 727(a)(2)(A)*, *(a)(2)(B)*, *(a)(4)(A)*, AND *(a)(6)(A)***

At the above captioned date and time, the court considered the Plaintiff's Motion for Summary Judgment Against Defendant Loren Miller Under *11 U.S.C. § 727(a)(2)(A)*, *(a)(2)(B)*, *(a)(4)(A)*, and *(a)(6)(A)* ("Motion"). Appearances were stated on the record. Having considered Plaintiff's Motion, the response of Defendant, Loren Miller ("Miller") in opposition thereto, the summary judgment evidence and argument of counsel, the court will grant Plaintiff's Motion and deny Miller's discharge pursuant to *11 U.S.C. § 727(a)(2)(A)*, *(a)(2)(B)*, *(a)(4)(A)*, and *(a)(6)(A)* based on the following findings pursuant to *F.R.Civ.P. 56*,[1] as incorporated into *FRBP 7056* and applied to contested matters by *FRBP 9014(c)*.

A. Standard for Summary Judgment.

1. ***HN1***[] *Rule 56(a)* authorizes **[*3]** a party to "move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought." *F.R.Civ.P. 56(a)*. Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id.

2. ***HN2***[] In determining whether a genuine factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability . . . ." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial . . . . If the evidence is merely colorable, or is not significantly probative, . . . summary judgment may be granted. *Id. at 249-250*. However, the court's function on a motion for summary judgment is "issue-finding, not issue-resolution." *United States v. One Tintoretto Painting Entitled "The Holy Catholic Family With Saint Catherine and Honored Donor", 691 F.2d 603, 606 (2d Cir. 1982)*.

3. ***HN3***[] *Rule 56* does not permit "trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts

[1] Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, *11 U.S.C. §§ 101-1330* after its amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, ***Pub. L. 109-8, 119 Stat. 23 (2005)***. "Rule" references are to the Federal Rules of Bankruptcy Procedure ("FRBP"), which make applicable certain Federal Rules of Civil Procedure ("F.R.Civ.P."). "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("LBR").

are [fact finder] functions . . . ." *Anderson, 477 U.S. at 255*.

4. ***HN4***[] *Rule 56(c)*, which identifies the procedures the court and parties must follow **[*4]** in conjunction with motions for summary judgment, states:

> ***HN5***[] (1) **Supporting Factual Positions**. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> (2) **Objection That a Fact Is Not Supported by Admissible Evidence**. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> (3) **Materials Not Cited**. The court need consider only the cited materials, but it may consider other materials in the record.
>
> (4) **Affidavits or Declarations**. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant **[*5]** is competent to testify on the matters stated.

*F.R.Civ.P. 56(c)*. ***HN6***[] The court may grant summary judgment "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by *Rule 56(c)*." See *F.R.Civ.P. 56(e)(3)*.

5. ***HN7***[] The court may, after notice and a reasonable opportunity to respond, grant summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute. *F.R.Civ.P. 56(f)(3)*.

B. Undisputed Facts.

The court adopts and incorporates herein by reference Uncontroverted Fact Nos. 1 through 95 set forth in Plaintiff's Statement of Uncontroverted Facts and Conclusions of Law in Support of Motion for Summary Judgment Against Defendant Loren Miller Denying Debtor's Discharge Under *11 U.S.C. § 727(a)(2)(A)*, *(a)(2)(B)*, *(a)(4)(A)*, and *(a)(6)(A)* filed on March 11, 2015,[2] as though fully set forth herein.

C. Conclusions of Law:

1. This court has jurisdiction over this adversary proceeding pursuant to *28 U.S.C. §§ 157(b)* and *1334(b)*. This matter is a core proceeding under *28 U.S.C. § 157(b)(2)(A)*, *(J)* and *(O)*. Venue is appropriate in this court. *28 U.S.C. § 1409(a)*.

2. ***HN8***[] Objections to discharge **[*6]** are to be literally and strictly construed against the objector and liberally construed in favor of the debtor. *Lansdowne v. Cox (In re Cox), 41 F.3d 1294, 1297 (9th Cir. 1986)*. "Courts should deny discharge only for very specific and serious infractions." *Martin Marietta Materials Southwest, Inc. v. Lee (In re Lee), 309 B.R. 468, 476 (Bankr. W.D. Tex. 2004)*.

3. ***HN9***[] To deny discharge under *§ 727(a)(2)(A)*, the plaintiff must establish by a preponderance of the evidence (1) a disposition of property (i.e., transfer or concealment); (2) with subjective intent to hinder, delay or defraud a creditor; and (3) it must occur within one year prior to filing bankruptcy. See *Fogal Legware of Switzerland, Inc. v. Wills (In re Wills), 243 B.R. 58, 65 (9th Cir. BAP 1999)*. Because the statute is written in the disjunctive, an intent to hinder or delay is sufficient to deny discharge under *§ 727(a)(2)*. See *Bernard v. Sheaffer (In re Bernard), 96 F.3d 1279, 1281 (9th Cir. 1996)*. Proof of fraud is not necessary nor is injury to creditors relevant for purposes of *§ 727(a)(2)*. See *Id. at 1281-82*.

Miller's Discharge Will Be Denied Pursuant to *11 U.S.C. §§ 727(a)(2)(A)* & *(B)*

4. ***HN10***[] The standard for denial of discharge under *§ 727(a)(2)(B)* is the same as *§ 727(a)(2)(A)*, but the disposition must be of estate property occurring after the

[2] Notice of Lodgment of Order or Judgment in Adversary Proceeding Re: Motion for Summary Judgment Against Defendant Loren Miller Denying Debtor's Discharge Under *11 U.S.C. § 727(a)(2)(A)*, *(a)(2)(B)*, *(a)(4)(A)*, and *(a)(6)(A)* [Dkt. # 48], Exhibit A.

petition date. See 11 U.S.C. § 727(a)(2)(B).

5. HN11[] Intent "may be established by circumstantial evidence, or by inferences drawn from a course of conduct." First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1343 (9th Cir. 1986) (citation omitted).

6. "HN12[] Whether a debtor harbors intent to hinder, or delay, or defraud a creditor is a question of fact reviewed for clear error. Intent may be inferred from surrounding **[*7]** circumstances. The surrounding circumstances include the various 'badges of fraud' that constitute circumstantial evidence of intent." Wolkowitz v. Beverly (In re Beverly), 374 B.R. 221, 243 (9th Cir. BAP 2007) (citations omitted).

7. "Certain 'badges of fraud' strongly suggest that a transaction's purpose is to defraud creditors unless some other convincing explanation appears. These factors, not all of which need be present, include 1) a close relationship between the transferor and the transferee; 2) that the transfer was in anticipation of a pending suit; 3) that the transferor Debtor was insolvent or in poor financial condition at the time; 4) that all or substantially all of the Debtor's property was transferred; 5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and 6) that the Debtor received inadequate consideration for the transfer." Emmett Valley Assocs v. Woodfield (In re Woodfield), 978 F.2d 516, 518 (9th Cir. 1992).

8. HN13[] A non-exclusive list of "badges of fraud" has been codified by California's Uniform Fraudulent Transfer Act ("UFTA").[3] The UFTA factors are intended "to provide guidance to the trial court, not compel a finding one way or another." Filip v. Bucurenciu, 129 Cal.App.4th 825, 834, 28 Cal. Rptr. 3d 884 (2005).

9. HN14[] "The UFTA list of 'badges of fraud' provides neither a counting rule, nor a mathematical formula. No minimum number of factors tips the scales toward actual intent. A trier of fact is entitled to find actual intent based on the evidence in the **[*9]** case, even if no "badges of fraud" are present. Conversely, specific evidence may negate an inference of fraud notwithstanding the presence of a number of 'badges of fraud.'" Beverly, 374 B.R. at 236.

10. Miller transferred or concealed property within one year prior to the petition date, and transferred or concealed property of the estate within one year after the petition date.

11. Miller disposed of $27,173.38 through the Kitco Purchases of silver coins and gold bars in the months preceding the bankruptcy filing, and Defendant's Schedule B and SOFA failed to disclose these assets/transactions.

12. Miller also concealed his interest in the 2012 State Refund and 2012 Federal Refund.

13. Miller's Accounting admits to spending $68,000.00 of the Cash in the month prior to bankruptcy and during the three months following the petition date. Evidence recovered by Plaintiff shows that Miller was holding approximately $76,000.00 in additional undisclosed cash as of the petition date.

14. Miller concealed the Corporate Accounts and disposed of funds in the undisclosed Corporate Accounts for personal use both before and after the petition date.

15. Miller also concealed the post-petition rents generated by the Nevada Property **[*10]** and $100,000.00 worth of miscellaneous furniture.

16. Miller's transfer or concealment of property prior to the petition date was made with the subjective intent to hinder or delay, if not defraud, a creditor.

17. Miller's transfer or concealment of property of the estate after the petition date was made with the subjective intent to hinder or delay, if not defraud, the trustee and creditors of the estate.

---

[3] (1) Whether the transfer or obligation was to an insider; (2) whether the debtor retained **[*8]** possession or control of the property transferred after the transfer; (3) whether the transfer or obligation was disclosed or concealed; (4) whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) whether the transfer was of substantially all the debtor's assets; (6) whether the debtor absconded; (7) whether the debtor removed or concealed assets; (8) whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) whether the transfer occurred shortly before or shortly after a substantial debt was incurred; (11) whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor. Cal. Civ. Code § 3439.04(b).

18. Miller admits in his Accounting to spending $68,000 of the Cash on personal expenses in the three months following the petition date, with full knowledge of Trustee's efforts to recover said funds.

19. Miller disposed of funds in the Corporate Accounts for personal use, knowing that Trustee was examining said accounts after questioning Miller about them at a *§ 341(a)* meeting.

20. Miller's failure to disclose transfers and assets, as well as the dissipation of estate funds with knowledge of Trustee's efforts to recover said funds, are "badges of fraud" indicative of an intent to hinder or delay, if not defraud, creditors.

21. Miller's subjective intent to hinder or delay, if not defraud, the Trustee and creditors of the estate is further evidenced by Miller's overall course of conduct, which **[*11]** includes multiple instances of concealment of assets, frustrating Trustee's recovery efforts and ignoring the court's turnover orders.

22. There being no genuine issue of material fact with respect to Plaintiff's claims against Miller under *11 U.S.C. § 727(a)(2)(A)* or *(B)*, the court will enter an order granting Plaintiff's Motion against Miller on such claims.

Miller's Discharge Will Be Denied Pursuant to *11 U.S.C. §§ 727(a)(4)(A)*

23. ***HN15***[] "Under *section 727(a)(4)(A)*, the defendant's discharge will be denied if it is proven that: (1) the defendant made a statement under oath; (2) the statement was false; (3) the defendant knew the statement was false; (4) the defendant made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *Stanley v. Hoblitzell (In re Hoblitzell), 223 B.R. 211, 215 (Bankr. E.D. Cal. 1998)*.

24. "The debtor's knowledge and fraudulent intent may be shown by circumstantial evidence and inferred from the debtor's course of conduct." Id.

25. Miller made false statements under oath by failing to disclose in the schedules and statements property owned on the petition date, including (a) the Kitco Purchases; (b) the Cash; (c) the 2012 State Refund; (d) the 2012 Federal Refund; and (e) the Corporate Accounts.

26. Defendant also made false statements under oath at the July 15, 2013 *§ 341(a)* meeting **[*12]** when he confirmed that: (a) he had scheduled all of his interests in entities and/or assets; (b) he had not sold, transferred or given away anything of value in the last four years; and (c) the Nevada Property was not generating any rental income.

27. In each instance, Miller's false statement under oath related to a material fact because it bore a relationship to Miller's business transactions or the estate, or concerned the discovery of assets, business dealings, or the existence or disposition of property of the debtor or the estate.

28. Miller's false statements and omissions were so intertwined with his business and financial affairs and the Trustee's ongoing efforts to investigate and recover property of the estate that the court infers his failure to make full and accurate disclosure in his statements under oath was intentional and for the purpose of deceiving creditors and the Trustee.

29. There being no genuine issue of material fact with respect to Plaintiff's claim against Miller under *11 U.S.C. § 727(a)(4)(A)*, the court will enter an order granting Plaintiff's Motion against Miller on such claim.

Miller's Discharge Will Be Denied Pursuant to *11 U.S.C. §§ 727(a)(6)(A)*.

30. ***HN16***[] *Section 727(a)(6)* states that the court shall grant the debtor a discharge, **[*13]** unless the debtor has refused to obey and lawful order of the court, other than an order to respond to a material question or to testify. *11 U.S.C. § 727(a)(6)(A)*.

31. ***HN17***[] "The term used in *§ 727(a)(6)(A)* is 'refused,' not 'failed.'" *Smith v. Jordan (In re Jordan), 521 F.3d 430, 433 (4th Cir. 2008)*.

32. ***HN18***[] "The party objecting to discharge [under *§ 727(a)(6)(A)*] satisfies [its] burden by demonstrating that the debtor received the order in question and failed to comply with its terms. Such a showing then imposes upon the debtor an obligation to explain his non-compliance." Id. (citations omitted). See *Hicks v. Decker (In re Hicks), 2006 Bankr. LEXIS 4897, 2006 WL 6810987, *8 (9th Cir. BAP 2006)* ("Once Trustee has produced sufficient evidence to support the claim, the burden of going forward then shifts to the Debtor to satisfactorily explain his behavior.").

33. *HN19*[] "[I]t is totally within the discretion of the bankruptcy court to find a particular violation of the court's order so serious as to require denial of discharge under *§ 727(a)(6)(A)*." *Devers v. Bank of Sheridan (In re Devers), 759 F.2d 751, 755 (9th Cir. 1985)*.

34. On June 18, 2013, the court entered an Order Granting Chapter 7 Trustee's Motion for Turnover of Property of the Estate and Order Directing Debtors to Appear at Continued *11 U.S.C. § 341(a)* Meetings of Creditors [Dkt. # 54] ("First Turnover Order") which provided, in pertinent part: "[Loren Miller and Sarah Miller] are directed to immediately, but no later than five (5) days after entry of this **[*14]** Order, turn over to the Trustee, by and through his counsel Margulies Faith LLP ("MF"), $182,000, the amount listed in the Debtor's Schedule B filed on February 21, 2013 (Dkt. No. 11) by way of a Cashier's Check made payable to 'Jeremy W. Faith, Chapter 7 Trustee.'"

35. The First Turnover Order was served on Miller and his spouse, Sarah Miller, by United States mail, first class mail, postage prepaid, at 702 Whitecap Drive, Seabrook, TX 77586, on June 13, 2013.

36. The First Turnover Order was served electronically on Debtors' attorney of record, Vaughn C. Taus on June 13, 2013.

37. Miller had knowledge of the First Turnover Order either directly or through counsel.

38. Miller did turnover to the Trustee the sum of $182,000 by June 23, 2013, as required by the First Turnover Order.

39. On July 12, 2013, Miller ultimately turned over to the Trustee the sum of $101,731 and a one-page accounting prepared by Miller describing how $68,000 of the funds were spent prior to and approximately 3 months after the petition date.

40. Miller has neither turned over nor accounted for the balance of the funds -- $12,269, despite the First Turnover Order and repeated demands by the Trustee.

41. Miller attended **[*15]** a creditors' meeting on July 15, 2013, but did not appear for any continued creditors' meetings after July 15, 2015, despite the First Turnover Order and repeated demands by the Trustee.

42. On March 19, 2014, the court entered an Order Granting Chapter 7 Trustee's Motion for Turnover of Property of Estate [Dkt. # 124] ("Second Turnover Order") which provided, in pertinent part: [Loren Miller] is directed to immediately, but no later than ten (10) days after entry of this order, turn over to the Trustee, by and through his counsel Margulies Faith LLP, (i) $6,716 received post-petition from the 2012 State Refund; and (ii) the Kitco Purchases (as detailed in Exhibit A to the Motion), or their cash value of $27,173.38"

43. The Second Turnover Order was served on the Miller by United States mail, first class mail, postage prepaid, at 600 E. Medical Center Blvd., # 1509, Webster, TX 77598, on March 21, 2014.

44. The First Turnover Order was served electronically on Debtors' attorney of record, Vaughn C. Taus on March 21, 2014.

45. Miller had knowledge of the Second Turnover Order either directly or through counsel.

46. Despite the Second Turnover Order and repeated demands by the Trustee, Miller **[*16]** has not turned over to the Trustee either the 2012 State Refund or the Kitco Purchases.

47. Miller has not responded to explain his behavior nor produce significantly probative evidence to establish a genuine issue of material fact regarding his ability or inability to comply with either the First Turnover Order or the Second Turnover Order.

48. There being no genuine issue of material fact with respect to Plaintiff's claim against Miller under *11 U.S.C. § 727(a)(6)(A)*, the court will enter an order granting Plaintiff's Motion against Miller on such claim.

CONCLUSION

For the reasons stated, the court will enter an order granting Plaintiff's Motion against Miller on Plaintiff's claims against Miller under *11 U.S.C. § 727(a)(2)(A)*, *(a)(2)(B)*, *(a)(4)(A)* and *(a)(6)(A)*.

A separate order will be entered consistent with this memorandum.

Date: June 12, 2015

/s/ Peter H. Caroll

Peter H. Caroll

United States Bankruptcy Judge

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT LOREN MILLER UNDER *11 U.S.C. § 727(a)(2)(A)*, *(a)(2)(B)*, *(a)(4)(A)*, AND *(a)(6)(A)***

Based on the memorandum of even date herewith, it is

ORDERED that Plaintiff's Motion for Summary Judgment Against Defendant Loren Miller Under *11 U.S.C. § 727(a)(2)(A)*, *(a)(2)(B)*, *(a)(4)(A)*, and *(a)(6)(A)* is granted.

Date: June 12, 2015

/s/ Peter H. Carroll

Peter H. Carroll

United States Bankruptcy Judge

---

End of Document

# Exhibit "2"

 Positive
As of: September 16, 2023 4:06 PM Z

# JP Morgan Chase Bank, N.A. v. Ellison (In re Ellison)

United States Bankruptcy Court for the Central District of California, Los Angeles Division

September 23, 2016, Decided; September 23, 2016, FILED & ENTERED

Case No. 2:14-bk-24463-RK, Chapter 7, Adv. No. 2:15-ap-01001-RK

**Reporter**
2016 Bankr. LEXIS 3475 *

In re: JOSEPH ELLISON, Debtor.JP MORGAN CHASE BANK, N.A., JP MORGAN SECURITIES, LLC, Plaintiffs, vs. JOSEPH ELLISON, Defendant.

**Subsequent History:** Affirmed by *Ellison v. JPMorgan Chase Bank, N.A. (In re Ellison), 2017 Bankr. LEXIS 2561 (B.A.P. 9th Cir., Sept. 8, 2017)*

**Prior History:** *JPMorgan Chase Bank, N.A. v. Ellison (In re Ellison), 2015 Bankr. LEXIS 2571 (Bankr. C.D. Cal., Aug. 3, 2015)*

## Core Terms

transfers, funds, intent to hinder, exempt, hinder, non-exempt, prepetition, defraud a creditor, defraud, judgment creditor, actual intent, bankruptcy court, bankruptcy case, purposes, home loan, non-preferred, determines, fraudulent, prepayments, trial testimony, mere fact, preferential, refinancing, prepay, circumstances, fraudulent transfer, transactions, planning, insider, lenders

## Case Summary

**Overview**

HOLDINGS: [1]-Pursuant to *11 U.S.C.S. § 727(a)(2)(A)*, debtor was not entitled to a discharge because, under the totality of the circumstances, debtor's prepetition transfers, including transfers to his wife and pre-payment of mortgage payments, resulted in dilution of at least $247,350 in non-exempt assets and thereby "crossed the line" of permissible behavior, evidencing that debtor had acted with an intent to hinder, delay or defraud creditors; [2]-Debtor's express admissions supported a finding that debtor undertook the prepetition transfers in an effort to become judgment proof as to his non-preferred creditors, and thwart their collection efforts against him.

**Outcome**
Debtor's discharge denied.

## LexisNexis® Headnotes

Family Law > ... > Property Distribution > Characterization > Community Property

Family Law > ... > Property Distribution > Characterization > Separate Property

*HN1*[] **Characterization, Community Property**

The mere commingling of separate property and community property funds does not alter the status of the respective property interests, provided that the components of the commingled mass can be adequately traced to their separate property and community property sources. But if the separate property and community property interests have been commingled in such a manner that the respective contributions cannot be traced and identified, the entire commingled fund will be deemed community property pursuant to the general community property presumption of *Cal. Fam. Code § 760*.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

*HN2*[] **Denial of Discharge, Concealment & Fraudulent Transfers**

Under *11 U.S.C.S. § 727*, the court shall grant the debtor a discharge, unless the debtor, with intent to

Exhibit "2"
Page 13

hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed, (A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition. *11 U.S.C.S. § 727(a)(2)*.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

*HN3*[] **Denial of Discharge, Concealment & Fraudulent Transfers**

A party seeking denial of discharge under *11 U.S.C.S. § 727(a)(2)* must prove two things: (1) a disposition of property, such as transfer or concealment, and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act of disposing of the property. Under *11 U.S.C.S. § 101(54)*, the term "transfer" means each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property. Those objecting to discharge bear the burden of proving by a preponderance of the evidence that the debtor's discharge should be denied.

Bankruptcy Law > ... > Discharge & Dischargeability > Liquidations > Denial of Discharge

*HN4*[] **Liquidations, Denial of Discharge**

In keeping with the "fresh start" purposes behind the Bankruptcy Code, courts should construe *11 U.S.C.S. § 727* liberally in favor of debtors and strictly against parties objecting to discharge. While this does not alter the burden on the objector, it rather means that actual, rather than constructive intent is required on the part of debtor.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

*HN5*[] **Denial of Discharge, Concealment & Fraudulent Transfers**

For purposes of *11 U.S.C.S. § 727(a)(2)*, "transferred" means transferred and remained transferred. i.e., a debtor who fraudulently transfers property out of the bankruptcy estate during the one-year pre-petition period but then returns the property to the estate before filing the petition may still receive a discharge.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

*HN6*[] **Denial of Discharge, Concealment & Fraudulent Transfers**

For purposes of *11 U.S.C.S. § 727(a)(2)*, regarding the second Lawson element, the intent element, a debtor's intent does not need to be fraudulent to meet the requirements of *11 U.S.C.S. § 727(a)(2)*. Because the language of the statute is in the disjunctive, it is sufficient if the debtor's intent is to hinder or delay a creditor.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

*HN7*[] **Denial of Discharge, Concealment & Fraudulent Transfers**

The intent to hinder or delay for purposes of *11 U.S.C.S. § 727(a)(2)(A)* is a question of fact that requires the trier of fact to delve into the mind of the debtor and may be inferred from surrounding circumstances. Furthermore, intent for purposes of *11 U.S.C.S. § 727(a)(2)* may be inferred from the surrounding circumstances, including certain "badges of fraud" that constitute circumstantial evidence of intent: These factors, not all of which need be present, include 1) a close relationship between the transferor and the transferee; 2) that the transfer was in anticipation of a pending suit; 3) that the transferor Debtor was insolvent or in poor financial condition at the time; 4) that all or substantially all of the Debtor's property was transferred; 5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and 6) that the Debtor received inadequate consideration for the transfer. A course of conduct may also be probative of the question of intent.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Intent

HN8[] **Fraudulent Transfers, Intent**

The statutory text of 11 U.S.C.S. § 548(a)(1)(A) focuses on the debtor's intent. The debtor must possess an intent to hinder, an intent to delay or an intent to defraud. The requirement is disjunctive; any one of the three intents is sufficient for liability.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

HN9[] **Denial of Discharge, Concealment & Fraudulent Transfers**

The words "hinder," "delay" and "defraud" used to describe the intent required under 11 U.S.C.S. § 727(a)(2) are not defined terms under the Bankruptcy Code. The meaning of these terms comes from the common law and is codified in the Uniform Fraudulent Conveyance Act, now the Uniform Voidable Transactions Act. The terms of hinder, delay and defraud connote intentional actions by a debtor to frustrate or thwart collection by creditors and describe a continuum of intents that may differ temporally or in substance and effect, but each of which is impermissible for purposes of 11 U.S.C.S. § 727(a)(2).

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

HN10[] **Denial of Discharge, Concealment & Fraudulent Transfers**

The intent to prefer creditors is not equivalent to the intent to hinder, delay or defraud creditors. A transfer preferring one creditor over another does not amount to an act to "hinder, delay, or defraud" an unpreferred creditor. Nonetheless, even if the intent to prefer creditors is not equivalent to the intent to hinder, delay or defraud creditors, the intent to prefer creditors may still coincide with the intent to hinder, delay or defraud creditors if there is other evidence of intent.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

HN11[] **Denial of Discharge, Concealment & Fraudulent Transfers**

The Ninth Circuit's statement in Hultman that the mere fact of a preferential transfer does not justify discharge denial means that such a transfer by itself is not grounds to deny a discharge, but it says nothing about a preferential transfer being considered as evidence of intent in the context of other facts that may evidence intent.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

HN12[] **Denial of Discharge, Concealment & Fraudulent Transfers**

The court may consider preferential payments to creditors for purposes of determining an intent to hinder, delay or defraud under 11 U.S.C.S. § 727(a)(2)(A).

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

HN13[] **Denial of Discharge, Concealment & Fraudulent Transfers**

When a debtor admits that he acted with the intent penalized by 11 U.S.C.S. § 727(a)(2)(A), there is no need for the court to rely on circumstantial evidence or inferences in determining whether the debtor had the requisite intent. Additionally, entry of a discharge order should be denied if a debtor had the intent penalized by the statute notwithstanding any other motivation he may have had for the transfer.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

Civil Procedure > Judgments > Enforcement & Execution > Fraudulent Transfers

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Constructively Fraudulent Transfers

HN14[] **Denial of Discharge, Concealment & Fraudulent Transfers**

Under the Uniform Fraudulent Transfer Act (now the Uniform Voidable Transactions Act), a transfer is constructively fraudulent if the debtor made the transfer without receiving a reasonably equivalent value for the

transfer in exchange for the transfer and the debtor was insolvent at the time of the transfer or became insolvent as result of the transfer. *Cal. Civ. Code § 3439.05(a)*. Although the finding of lack of reasonably equivalent value is not directly relevant for a claim under *11 U.S.C.S. § 727(a)(2)*, such a finding would itself be a badge of fraud indicating actual intent to hinder, delay or defraud current creditors under the Uniform Fraudulent Transfer Act (now Uniform Voidable Transactions Act) and under the Ninth Circuit's listing of badges of fraud.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

***HN15***[] **Denial of Discharge, Concealment & Fraudulent Transfers**

"Insider" as defined in *11 U.S.C.S. § 101(31)* specifically includes the spouse of the debtor.

**Counsel: [*1]** For Joseph Ellison, Debtor (2:14-bk-24463-RK): David S Hagen, Encino, CA.

For Trustee (2:14-bk-24463-RK): Brad D Krasnoff (TR), Los Angeles, CA.

For JPMORGAN CHASE BANK, N.A., J.P. Morgan Securities LLC, Plaintiffs (2:15-ap-01001-RK): Bryant S Delgadillo, Jeffrey N Williams, Wargo French LLP, Los Angeles, CA.

For Joseph Ellison, Defendant (2:15-ap-01001-RK): David S Hagen, Encino, CA.

For Trustee (2:15-ap-01001-RK): Brad D Krasnoff (TR), Los Angeles, CA.

**Judges:** Robert Kwan, United States Bankruptcy Judge.

**Opinion by:** Robert Kwan

## Opinion

MEMORANDUM DECISION ON PLAINTIFFS' ADVERSARY COMPLAINT OBJECTING TO ENTRY OF DISCHARGE PURSUANT TO *11 U.S.C. §§ 727(a)(2)(A)* AND *(a)(2)(B)*

The above-captioned adversary proceeding on the complaint of plaintiffs JP Morgan Chase Bank, N.A. and JP Morgan Securities, LLC ("Plaintiffs" or collectively, "JPMorgan"), asserting claims objecting to discharge of defendant Joseph Ellison ("Defendant"), Debtor, under *11 U.S.C. §§ 727(a)(2)(A)* and *(a)(2)(B)* came on for trial before the undersigned United States Bankruptcy Judge on November 19, 2015. Bryant S. Delgadillo, of the law firm of Wargo & French LLP, appeared for Plaintiffs. David S. Hagen, of the Law Offices of David S. Hagen, appeared for Defendant.

After trial, on January 15, 2016, Plaintiffs lodged their **[*2]** Proposed Findings of Fact and Conclusions of Law, and on February 1, 2016, Defendant lodged his Proposed Findings of Fact and Conclusions of Law. ECF 26 and 27. On February 4, 2016, Defendant filed objections to Plaintiffs' Proposed Findings of Fact and Conclusions of Law. ECF 28. Afterwards, the court then took the matter under submission.

Having considered the witness testimony and exhibits received at trial, and the other matters in evidence, the court hereby makes the following findings of fact and conclusions of law pursuant to *Rule 7052 of the Federal Rules of Bankruptcy Procedure* and *Rule 52 of the Federal Rules of Civil Procedure*.[1]

### FINDINGS OF FACT

Findings of Fact 1 through 39 are undisputed facts that were established through the Pre-Trial Stipulation for Claims for Relief, ECF 22, which the parties jointly filed and was approved by the court in its Order Approving Joint Pretrial Stipulation and Setting Trial Date, ECF 24.

1. Defendant was employed by JPMorgan as a financial advisor until approximately April 2012.

2. During the course of his employment, Defendant **[*3]** developed an animus towards JPMorgan.

3. In or about June 2012, Defendant initiated an arbitration action against JPMorgan before a Financial Regulatory Authority panel, FINRA case number 12-02244 ("FINRA Action"), by asserting various claims related to his employment.

4. JPMorgan filed a counterclaim in the FINRA Action for breach of contract related to a loan, in the approximate amount of $750,000, that Defendant obtained from JPMorgan as part of his employment, but

[1] Any findings of fact that should be properly characterized as conclusions of law will be considered as such, and any conclusions of law that should be properly characterized as findings of fact will be considered as such.

failed to repay.

5. During the FINRA Action, Defendant was represented by counsel. His original counsel, Shustak & Partners LLP ("Shustak"), was replaced during the proceeding as the result of a fee dispute.

6. Defendant's replacement counsel, Jeffrey Sigler, represented Defendant on a contingency basis.

7. The FINRA panel conducted an evidentiary hearing from April 28, 2014 to May 6, 2014.

8. On or about June 3, 2014, the FINRA panel found against Defendant on his claims and in favor of JPMorgan on its counterclaim, entering an award in favor of JPMorgan in the amount of $789,624.06 ("FINRA Award").

9. On July 17, 2014, JPMorgan initiated a proceeding with the United States District Court for the Central District of California, **[*4]** case number CV14-05567, for judicial confirmation of the FINRA Award ("FINRA Award Confirmation Action").

10. Less than two weeks later, on July 29, 2014, Defendant filed a voluntary petition for relief under chapter 7 of Title 11 of the United States Code ("Petition Date"), thereby initiating bankruptcy case number 2:14-bk-24463-RK, in the U.S. Bankruptcy Court for the Central District of California, Los Angeles Division ("Bankruptcy Case").

11. The FINRA Award Confirmation Action was stayed as a result of Defendant filing the Bankruptcy Case. *See* *11 U.S.C. § 362(a)*.

12. In the Schedule F filed concurrently with the petition in the Bankruptcy Case, Defendant reported unsecured debts totaling $926,506.00, including: (1) $789,000 owed to JPMorgan on account of the FINRA Award (not listed as disputed, contingent, or unliquidated); and (2) $45,000 owed to Shustak related to the attorney fee dispute (listed as disputed).

13. JPMorgan and Shustak are Defendant's two largest unsecured creditors and the debts owed to them account for approximately 90 percent of all of the Defendant's unsecured debt.

14. Eleven Sixteen LLLP is a limited liability company was [sic] created in January 2014. [LLLP refers to limited **[*5]** liability limited partnership. *See* Plaintiff's Exhibit 9, Proof of Claim No. 2, filed by Wood, Erickson & Whittaker on April 27, 2015, referring to billing statement for "Drafting and formation of limited liability limited partnership: Eleven Sixteen LLLP [Flat fee] Amount - $7,500.00".]

15. Defendant admits that he retained a firm to form a trust and limited liability partnership, but denies that he formed or created Eleven Sixteen LLLP.

16. Defendant and his wife, Ellen Ellison, are the owners of the residential real property located at 555 S. Norton Avenue, Los Angeles, California 90020 ("Property").

17. In addition to the Property, Defendant holds interests in various bank accounts including: (1) Joseph Ellison ITF Ellen Ellison, City National Bank, account ending 1756 ("Defendant's CNB Account"); and (2) Joseph Ellison and Ellen Ellison Joint WROS, Mutual Securities, Inc., account ending 9350 ("Joint Account").

18. While the FINRA Action was pending, on or about February 14, 2014, Defendant and his wife obtained a loan, in the principal amount of $1,496,500 from Greenbox Loans, Inc. ("First DOT"). Dovenmuehle Mortgage, Inc. is the current servicer of the First DOT. [The court understands **[*6]** that "DOT" refers to a Deed of Trust securing a loan on Defendant's residence. *See* Plaintiff's Exhibit 8, Voluntary Petition for Relief and Schedules filed on July 29, 2014, referring to Schedule D listing "1st trust deed on residence" held by Dovenmuehle Mortgage Inc.; Defendant's Exhibit A, Closing Statement, referring to loan by Greenbox Loans, Inc., to Joseph Ellison and Ellen Ellison.].

19. The funds from the First DOT were disbursed as follows: (1) payoff of a deed of trust in favor of Ocwen Loan Servicing in the approximate amount of $605,728.11; (2) payoff of deed of trust in favor of Morgan Stanley Home Loans in the approximate amount of $742,802.77; and (3) disbursement in the approximate amount of $69,441.17 to Defendant's CNB Account.

20. Additionally, while the FINRA Action was pending, on or about February 28, 2014, Defendant and his wife obtained a loan, in the principal amount of $200,000 from Brian Dror and Rafael Ryzman ("Second DOT"). Logan Investments is the current servicer of the Second DOT.

21. The funds from the Second DOT, in the approximate amount of $178,509.68, were disbursed to Defendant's CNB Account.

22. The First DOT and Second DOT fully encumbered the Property **[*7]** (reflecting value of the property of $1,500,000 and encumbered with debts totaling $1,716,551.00).

23. On or about March 1, 2014, the funds disbursed to Defendant from the First DOT and the Second DOT, totaling $247,950.85, were in Defendant's CNB account.

24. Later that same month, Defendant transferred a total of $38,000 to two of his friends, Ed Jeffers and Charles Springer. Defendant testified that he was repaying one personal and one business project loan to these individuals, although the purported business loan was to pay for Defendant's living expenses.

25. While the FINRA Action was pending and shortly after the evidentiary hearing in the matter concluded, on or about May 12, 2014, Defendant transferred $18,000 from Defendant's CNB Account to an account held by the Law Offices of Ellen Ellison, at City National Bank, account ending 5499 ("Wife's CNB Account").

26. Approximately one week after the issuance of the FINRA Award, on or about June 10 and June 11, 2014, Defendant transferred, through two transactions, a total of $51,000 from Defendant's CNB Account to his Wife's CNB account.

27. Less than two weeks after the entry of the FINRA Award, on or about June 16, 2014, Defendant **[*8]** transferred $121,000 from Defendant's CNB Account to the corporate account of Clownputsch, Inc., a corporation wholly owned by Defendant, at City National Bank, account ending in 7881 ("Clownputsch Account").

28. Defendant testified during the 2004 examination that he transferred the funds, in part, because he was afraid people were going to take all his money away and leave his family destitute.

29. Defendant retained bankruptcy counsel on or about June 15, 2014.

30. On or about June 21, 2014, Defendant transferred $119,000 from Clownputsch Account to Defendant's CNB Account.

31. On or about July 9, 2014, six days after receiving notice of the FINRA Award against him and three weeks before filing his petition, Defendant transferred $41,415.30 from Defendant's CNB Account to Dovenmuehle Mortgage, thereby prepaying the First DOT for six months[2].

32. Also on or about July 9, 2014, Defendant transferred $11,062 from Defendant's CNB Account to Logan Investments, thereby prepaying the Second DOT for six months.[3]

33. Defendant testified at his 2004 Examination as follows:

> A. Well, at the time that the payments were made — let's see. . . . July was the prepayment[,] by then the case had been decided, and I didn't know what I was going to do. Really, we were trying to make up our mind what we were going to do, and then I just wanted to make sure that those -- that whatever happened -- I mean, I got a threatening letter. I got threatening letters from the beginnings of what might have been attempts to collect money or whatever, and I just wanted to make sure that we wouldn't be thrown out in the street.
> Q. And who did those letters come from?
>
> A. Well, I got -- well, the award in and of itself was pretty breathtaking. When I got the notice of the award, that was F.I.N.R.A., and the F.I.N.R.A. fees. I didn't know if I would lose my license. I didn't. J.P. Morgan, obviously, they had sent me by July -- yeah. They had sent me a letter by then saying they wanted their money. **[*10]** And who else was there? I was having a fee disputes. That's another thing. I was having a fee dispute. I found out that I was grossly overcharged by the attorneys I used first, and I got several attorneys' opinions, and so I was possibly fighting with them. Whatever else was going to go on, I wanted to make sure my family was at least ensconced in our home until the end of the year.
> [. . . ]
> Its a priority of survival. I wanted to make sure we had a home to live in and a place to live in while all this was going on.
> Q. So if you had kept the funds in your city national

---

[2] Although the parties stipulated that Defendant prepaid both the First and Second DOT by six months, as clarified by Defendant's testimony at trial, it appears that the six month figure included the then currently due monthly payment, and thus, the court finds that Defendant prepaid the First and Second DOT by five months, not six months. *Trial Testimony **[*9]** of Joseph Ellison*, November 19, 2015 at 9:22-9:23 a.m.

[3] *Supra* note 2.

bank account, why wouldn't they have been there for you to be able to pay your mortgage?
A. Well, I didn't know if, for example, Shustak had gotten a judgment, which he didn't. They threw him out of court, but he kept trying to do things. I didn't know where -- I felt under siege. I guess you can understand that. So I had to prioritize where this money went, and other than food and other -- certain other things that had to be accounted -- you know, taken care of. This was a pretty important piece of that puzzle.
Q. Okay. So were [you] concerned that Shustak might get the judgment and then take the money?

A. That was a possibility. **[*11]** I thought I had -- I mean, I had a few disputes. I reported . . . .
Q. Were you concerned that the money would have gone to J.P. Morgan?
A. I don't remember my thinking about that. But I remember thinking, "if I don't keep a roof over our heads right now, we're going to be in a lot of trouble."

34. Defendant further testified that he "had to prioritize where this money went" and that repayment of the First DOT and Second DOT "was a pretty important piece of that puzzle."

35. The funds transferred to Dovenmuehle Mortgage and Logan Investments, totaling $52,477.30 are not available for distribution to Defendant's unsecured creditors.

36. Defendant transferred, through four separate transactions, a total of $31,600 from the non-exempt Joint Account to various destinations. This included a transfer of $17,000.00 to his wife on the Petition Date.

37. The four transactions posted to the Joint Account after the Petition Date.

38. As a result of the four transfers, the balance of the Joint Account decreased from $33,494.92 to $1,895.02.

39. Defendant disclosed a balance for the Joint Account of $1,895.02 in the Schedule B.

40. The parties in their Pre-Trial Stipulation for Claims for Relief, ECF 22, **[*12]** designated the following as Disputed Fact 1 for determination at trial:

[Disputed Fact] "1. Defendant's bankruptcy schedules and statement of financial affairs did not disclose any interest in a limited liability limited partnership, or a bank account in the name of a company owned by the Defendant, Clownputsch, Inc."

The court finds that this disputed fact is not supported by a preponderance of the evidence because Defendant's Schedule B-Personal Property, Petition, Exhibit 8 at 16, disclosed the existence of Clownputsch, Inc.

41. The parties in their Pre-Trial Stipulation for Claims for Relief, ECF 22, designated the following as Disputed Fact 2 for determination at trial:

[Disputed Fact] "2. Defendant held no interest in his Wife's CNB Account."

The court finds that this disputed fact is not supported by a preponderance of the evidence. Based on California Family Code § 760 and In re Marriage of Braud, 45 Cal.App.4th 797, 822-823, 53 Cal. Rptr. 2d 179 (1996), the court finds that the evidence shows that Defendant had a community property interest in the funds in his Wife's CNB Account. At trial, Defendant testified that he was not involved in opening his Wife's CNB Account, which belonged to his wife's law practice, that he was not a signatory on that account, that he had no control over the **[*13]** account, that he had nothing to do with the account and that he was not a member of his wife's law practice. *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:17-9:18 a.m. Although Defendant's testimony on these points is credible and although Defendant listed the account as his wife's personal checking account on his bankruptcy schedules, the court gives more weight to other admitted evidence. First, the court observes that Defendant listed his Wife's CNB Account as community property on Defendant's Schedule B, Exhibit 8 at 14, and claimed a $24,925.00 exemption in that account, whose value on the Petition Date was scheduled at $25,793.00 pursuant to Defendant's Schedule C, Exhibit 8 at 20. Further, even if Defendant's Wife's CNB Account was his wife's separate property, because community property was commingled with separate property in Wife's CNB Account, and because no evidence was presented tracing the source of any separate funds, the court determines that based upon the admitted evidence, Defendant has a community property interest in the funds in his Wife's CNB Account. That is, given that less than three months before the Petition Date, shortly after Defendant refinanced **[*14]** the Property, Defendant transferred at least $69,000.00 to his Wife's CNB Account from the refinancing of the Property, which Defendant listed as community property on Defendant's Schedule A, Exhibit 8 at 13, and given

that no evidence was presented tracing the funds in his Wife's CNB Account to a separate property source and no other evidence was admitted regarding the characterization of the Property, the court determines that Defendant had a community interest in his Wife's CNB Account. *In re Marriage of Braud, 45 Cal.App.4th at 822-823* (citations omitted) (*HN1*[] "[T]he mere commingling of separate property and community property funds does not alter the status of the respective property interests, provided that the components of the commingled mass can be adequately traced to their separate property and community property sources. But if the separate property and community property interests have been commingled in such a manner that the respective contributions cannot be traced and identified, the entire commingled fund will be deemed community property pursuant to the general community property presumption of *section 760*.").

42. The parties in their Pre-Trial Stipulation for Claims for Relief, ECF 22, designated the following as Disputed Fact 3 for **[*15]** determination at trial:

> [Disputed Fact] 3. Defendant prepaid the First DOT and Second DOT because he had received a collection letter related to the FINRA Award and had a fee dispute pending with Shustak, and wanted to ensure that his family could remain in the Property and that the funds used for the prepayment would not go to pay any judgment obtained by Shustak.

As discussed in detail below, the court finds this disputed fact to be supported by a preponderance of the evidence.

43. There are no liens on Defendant's CNB Account or the Joint Account.

Finding of Fact 43 was established through the Order on Plaintiffs JPMorgan Chase, N.A. and J.P. Morgan Securities, LLC's Motion for Summary Judgment, ECF 19, which treated certain facts as established pursuant to *Federal Rule of Civil Procedure 56(g)*, but was left out of the parties Pre-Trial Stipulation for Claims for Relief, ECF 22. *See* ECF 11, Exhibit 10, Proposed Uncontroverted Fact No. 18.

In addition to the findings of fact set forth above, the court makes the following findings of fact based on the testimony at trial.

44. As indicated by Defendant's testimony that less than one month after the FINRA award, he thought of prepaying the loans secured by DOTs on his residence **[*16]** by five months because "I had the money at that time and I wanted to make sure my family was protected and that I had paid my primary obligation to them for that period of time," *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:22-9:23 a.m., and that a primary motivation behind his home loan prepayments was that he was concerned about his prior lawyer, who he was having a fee dispute with, and who has a disputed claim in Defendant's bankruptcy case, "from coming in and attaching his assets," *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:24-9:25 a.m., such loan prepayments by Defendant indicate an intent on his part to hinder or delay payment of his non-preferred creditors, including Shustak, his prior lawyer, and JPMorgan, the FINRA awardee, in taking his nonexempt home equity to prepay the preferred home loan lenders holding DOTs on the home where he and his family resided.

45. As indicated by Defendant's testimony that he prepaid Dovenmuehle Mortgage, the servicer for the First DOT on the Property, roughly $40,000.00 (i.e., $41,415.30), and Logan Investments, the servicer for the Second DOT on the Property, roughly $11,000.00 (i.e., $11,062.00), "to assure that **[*17]** my wife and my daughter and myself had a home to live in through the end of the year . . . I did prepay [the home loans in the past] but not to that degree, not six months, or four months, five months, whatever it was in advance, normally." *Trial Testimony of Joseph Ellison*, November 19, 2015 at 10:43 a.m., the number of advance mortgage payments were admittedly out of the ordinary and further indicate an intent to hinder or delay payment of his non-preferred creditors.

46. As indicated by Defendant's testimony that prior to filing his bankruptcy petition, he met with an asset protection firm, and one of his goals in doing so, was to potentially protect his assets from potential creditors, *Trial Testimony of Joseph Ellison*, November 19, 2015 at 10:58-10:59 a.m., and while he changed his mind about using the asset protection firm, the evidence of his consideration, meeting and paying the asset protection firm supports a finding that Defendant intended to hinder or delay his non-preferred creditors.

47. From his refinancing of the Property, Defendant took out cash of almost $250,000.00 (i.e., $247,950.85) from the equity in the Property. *Trial Testimony of Joseph Ellison*, November 19, **[*18]** 2015 at 9:15 a.m.; *see also*, Finding of Fact No. 23, *supra*.

48. As stated on his bankruptcy schedules, as of the

Petition Date, Defendant had $600.00 in his CNB Account, for which he did not claim an exemption. Exhibit 8 at 14 and 20. Furthermore, as stated on his bankruptcy schedules, as of the Petition Date, Defendant had $1,894.00 in the Joint Account, for which he did not claim an exemption. *Id.*

**CONCLUSIONS OF LAW**

**HN2**[] Under 11 U.S.C. § 727,

> [t]he court shall grant the debtor a discharge, unless . . . the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed[,] (A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2).

**HN3**[] A party seeking denial of discharge under § 727(a)(2) must prove two things: "(1) a disposition of property, such as transfer or concealment, and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act [of] disposing of the property." **[*19]** Hughes v. Lawson (In re Lawson), 122 F.3d 1237, 1240 (9th Cir. 1997); *accord*, In re Retz, 606 F.3d 1189, 1200 (9th Cir. 2010); Cooke v. Renshaw (In re Cooke), 2016 Bankr. LEXIS 2703, *12, 2016 WL 4039699, at *5 (9th Cir. BAP 2016), *appeal pending*, No. 16-60068 (9th Cir., notice of appeal filed on August 5, 2016). Under 11 U.S.C. § 101(54), "The term 'transfer' means . . . (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with— (i) property; or (ii) an interest in property." "Those objecting to discharge 'bear [ ] the burden of proving by a preponderance of the evidence that [the debtor's] discharge should be denied." In re Retz, 606 F.3d at 1196, *quoting*, Khalil v. Developers Surety & Indemnity Co. (In re Khalil), 379 B.R. 163, 172 (9th Cir. BAP 2007), *affirmed*, 578 F.3d 1167, 1168 (9th Cir. 2009); *see also*, Beverly v. Beverly (In re Beverly), 374 B.R. 221, 243 (9th Cir. BAP 2007) ("The burden of proof on an objection to discharge under § 727(a)(2) is preponderance of the evidence."), *affirmed in part and appeal dismissed in part*, 551 F.3d 1092 (9th Cir. 2008), *citing inter alia*, Grogan v. Garner, 498 U.S. 279, 289, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991).

**HN4**[] "In keeping with the 'fresh start' purposes behind the Bankruptcy Code, courts should construe § 727 liberally in favor of debtors and strictly against parties objecting to discharge." In re Retz, 606 F.3d at 1196, *quoting*, Bernard v. Sheaffer (In re Bernard), 96 F. 3d 1279, 1281 (9th Cir. 1996). While "[t]his does not alter the burden on the objector, [it] rather means that 'actual, rather than constructive intent is required' on the part of debtor." In re Retz, 606 F.3d at 1196, *quoting*, In re Khalil, 379 B.R. at 172.

**I. Prepetition Transfers Under 11 U.S.C. § 727(a)(2)(A)**

The court first addresses the relevant prepetition transfers at issue in this case under 11 U.S.C. § 727(a)(2)(A). As explained in more detail below, based on evidence of Defendant's prepetition **[*20]** transfers and of his intent to hinder, delay or defraud creditors JPMorgan and Shustak, his prior lawyer, the court determines that Defendant's discharge should be denied pursuant to 11 U.S.C. § 727(a)(2)(A).

Within one year prior to filing his bankruptcy petition, Defendant refinanced the Property by taking out a loan in the principal amount of $1,496,500.00 secured by the First DOT in favor of Greenbox Loans, Inc., used the $1,496,500.00 to pay off the previous first deed of trust to Ocwen Loan Servicing and the previous second deed of trust to Morgan Stanley Home Loans in the amounts of $605,728.11 and $742,802.77 respectively, deposited the remaining $69,441.17 in Defendant's CNB account, took out another loan in the amount of $200,000.00 secured by the Second DOT in favor of Brian Dror and Rafael Ryzman, and then deposited $178,509.68 of the $200,000.00 in Defendant's CNB account. Subsequently, from the refinancing proceeds deposited into Defendant's CNB account, Defendant transferred $38,000.00 to two friends, Ed Jeffers and Charles Springer, allegedly in satisfaction of two debts owed to them, separately transferred $18,000.00 and $51,000.00 from Defendant's CNB Account to his Wife's CNB Account, and **[*21]** transferred $41,415.30 to Dovenmuehle Mortgage and $11,062.00 to Logan Investments, thereby prepaying the loans secured by the First and Second DOTs on the Property by five months. At or just before the petition date, Defendant also transferred $31,600.00 from Defendant's non-exempt Joint Account to various destinations, including a $17,000.00 transfer to his wife on the Petition Date. Because all of the above-described acts involved the disposition of or parting with of property within the

statutory time period, the court determines that each of the above-described acts constitute transfers under the first *Lawson* element.

Additionally, Defendant transferred $121,000.00 from Defendant's CNB Account into the Clownsputsch Account, then transferred $119,000.00 from the Clownsputsch Account back to Defendant's CNB Account. The court determines that the net of $2,000.00 that remained in the Clownsputsch Account constitutes a transfer under *Lawson* because the $2,000.00 was disposed of or parted with, but the $119,000.00 that was transferred back to Defendant's CNB Account does not constitute a transfer under *Lawson* because that money did not remain in the Clownsputsch Account. 4 March, Ahart **[*22]** and Shapiro, *California Practice Guide: Bankruptcy*, ¶ 22:856 at 22-118 (2015) (***HN5***[] "For purposes of *§ 727(a)(2)*, 'transferred' means 'transferred and *remained transferred*." I.e., a debtor who fraudulently transfers property out of the bankruptcy estate during the one-year prepetition period but then *returns the property to the estate* before filing the petition may still receive a discharge.") (emphasis in original), *citing, In re Adeeb, 787 F.2d at 1339, 1344-1345 (9th Cir. 1986)*.

**A. Both Intent to Hinder and Intent to Delay are Individually Sufficient to Deny a Debtor's Discharge Under *11 U.S.C. § 727(a)(2)***

***HN6***[] Regarding the second *Lawson* element, the intent element, "[a] debtor's intent does not need to be fraudulent to meet the requirements of *11 U.S.C. § 727(a)(2)*. *In re Retz, 606 F.3d at 1200*. "Because the language of the statute is in the disjunctive, it is sufficient if the debtor's intent is to hinder or delay a creditor." *Id., citing, In re Bernard, 96 F.3d at 1281*; *accord, In re Cooke, 2016 Bankr. LEXIS 2703 at *14, 2016 WL 4039699, at *5*; *see also*, 6 Resnick and Sommer, *Collier on Bankruptcy*, ¶ 727.02[3][a] at 727-17 (16th ed. 2016) ("The language of *section 727(a)(2)*, drawn from the Uniform Fraudulent Conveyance Act, implies that the debtor must have intent to defraud a creditor or officer of the estate. However, some courts have found that, under a literal reading of the language, an intent to hinder or delay creditors, even **[*23]** if not fraudulent, may be sufficient to warrant denial of discharge.") (footnotes and citations omitted), *citing inter alia, In re Retz, supra*; *First Beverly Bank v. Adeeb, 787 F.2d 1339, 1343 (9th Cir. 1986)* (concluding that trial court's finding that the debtor "acted with actual intent to hinder or delay a creditor" was not clearly erroneous based on the debtor's admission that "he transferred the property intending to put it out of the reach of one of his creditors"); *but see, In re Cooke, 2016 Bankr. LEXIS 2703 at *27, 2016 WL 4039699, at *9* (Taylor, J., dissenting) (noting the bankruptcy court and the majority opinion affirming the bankruptcy court "fail to cite a single reported Ninth Circuit or Panel decision where a court denied discharge based on efforts to hinder or delay that did not involve deceit or other objectively or subjectively improper conduct"); *cf., Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 804-812 (9th Cir. 1994)* (reviewing for clear error and affirming trial court's holding and sustaining reorganized debtor's fraudulent transfer claims under *11 U.S.C. §§ 544(b)* and *548(a)(1)* against debtor's insider as transferee of corporate funds based on factual findings that the insider caused debtor to transfer the funds with intent to hinder or delay debtor's creditors); *Pioneer Liquidating Corp. v. San Diego Trust & Savings Bank, 211 B.R. 704, 717 (S.D. Cal. 1997)* (stating that "the purpose of fraudulent transfer recovery is to prevent a debtor from putting assets otherwise available to its creditors **[*24]** out of their reach"), *citing and quoting*, Jack F. Williams, *Revisiting the Proper Limits of Fraudulent Transfer Law*, *8 Bankr. Dev. J. 55, 128 (1991)* ("In our quest to understand fraudulent transfer liability, we often overlook first principles. At its core, fraudulent transfer law is a debt-collection device and not a revenue generating tool; its mission is to prevent the unjust diminution of the debtor's estate.").

***HN7***[] "The intent to hinder or delay [for purposes of *11 U.S.C. § 727(a)(2)(A)*] 'is a question of fact that requires the trier of fact to delve into the mind of the debtor and may be inferred from surrounding circumstances.'" *In re Cooke, 2016 Bankr. LEXIS 2703 at *15-16, 2016 WL 4039699, at *6*, *citing*, *Searles v. Riley (In re Searles), 317 B.R. 368, 379 (9th Cir. BAP 2004)*, *affirmed in an unpublished decision*, *212 Fed. Appx. 589 (9th Cir. 2006)*, *citing*, *Emmett Valley Associates v. Woodfield (In re Woodfield), 978 F.2d 516, 518 (9th Cir. 1992)*. Furthermore, intent for purposes of *11 U.S.C. § 727(a)(2)* may be inferred from the surrounding circumstances, including certain "badges of fraud" that constitute circumstantial evidence of intent:

> These factors, not all of which need be present, include 1) a close relationship between the transferor and the transferee; 2) that the transfer was in anticipation of a pending suit; 3) that the transferor Debtor was insolvent or in poor financial condition at the time; 4) that all or substantially all of

the Debtor's property was transferred; 5) that the transfer so completely **[*25]** depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and 6) that the Debtor received inadequate consideration for the transfer.

In re Woodfield, 978 F.2d at 518, *citing inter alia*, Evans v. Trude, 193 Or. 648, 240 P.2d 940, 944 (1952) (citing state court cases listing "badges of "fraud" to infer actual intent to prove fraudulent transfer) and Matter of Ayala, 107 B.R. 271, 274-275 (Bankr. E.D. Cal. 1989) (citing federal court cases listing similar but not identical indicia of fraud to prove intent under 11 U.S.C. § 727(a)(2)). "A course of conduct may also be probative of the question of intent." In re Beverly, 374 B.R. at 243, *citing*, In re Adeeb, 787 F.2d at 1343.

As previously noted, *Collier on Bankruptcy* commented that the language of 11 U.S.C. § 727(a)(2) was drawn from the Uniform Fraudulent Conveyance Act and "implies that the debtor must have intent to defraud a creditor or officer of the estate", but that citing the Ninth Circuit in *In re Retz*, "some courts have found that, under a literal reading of the language, an intent to hinder or delay creditors, even if not fraudulent, may be sufficient to warrant denial of discharge." 6 Resnick and Sommer, *Collier on Bankruptcy*, ¶ 727.02[3][a] at 727-17 (footnotes and citations omitted). In this court's view, *Collier*'s comment is somewhat overstated because the Uniform Fraudulent Conveyance Act, later the Uniform **[*26]** Fraudulent Transfer Act, and now the Uniform Voidable Transactions Act, does not draw any distinction in proving actual intent to prove a "fraudulent", now voidable, transfer, whether to hinder, to delay, or to defraud, because to prove any of these forms of intent stated in the disjunctive may be proven by a common set of factors, or indicia, as indicated by the current California version of the Uniform Fraudulent Conveyance Act, now the Uniform Voidable Transactions Act, California Civil Code § 3439.04(a), which provides as follows:

(a) A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:
(1) With actual intent to hinder, delay, or defraud any creditor of the debtor.
(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:

(A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

(B) Intended to incur, or believed or reasonably should **[*27]** have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(b) In determining actual intent under paragraph (1) of subdivision (a), consideration may be given, among other factors, to any or all of the following:
(1) Whether the transfer or obligation was to an insider.
(2) Whether the debtor retained possession or control of the property transferred after the transfer.
(3) Whether the transfer or obligation was disclosed or concealed.
(4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
(5) Whether the transfer was of substantially all the debtor's assets.
(6) Whether the debtor absconded.
(7) Whether the debtor removed or concealed assets.
(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

(11) Whether the debtor transferred the essential assets of the business to a lienor **[*28]** that transferred the assets to an insider of the debtor.

(c) A creditor making a claim for relief under subdivision (a) has the burden of proving the elements of the claim for relief by a preponderance of the evidence.

*See also*, 8 Witkin, *California Procedure*, Enforcement of Judgment, § 495 at 534-536 (2008 and 2016 Supp.); *cf.*, 5 Resnick and Sommer, *Collier on Bankruptcy*, ¶ 548.04[1][a] at 548-56 and n. 5 (**HN8**[]) "The statutory text [of 11 U.S.C. § 548(a)(1)(A)] focuses on the debtor's intent. The debtor must possess an intent to hinder, an intent to delay or an intent to defraud. The

requirement is disjunctive; any one of the three intents is sufficient for liability." *citing inter alia, Lippe v. Bairnco Corp., 249 F. Supp. 2d 357, 374 (S.D.N.Y. 2003)* ("As the use of the disjunctive 'or' makes clear, '[o]nly an actual intent to hinder and delay need be established, not an actual intent to defraud.'") (citation omitted).

***HN9***[] The words "hinder," "delay" and "defraud" used to describe the intent required under *11 U.S.C. § 727(a)(2)* are not defined terms under the Bankruptcy Code. *See 11 U.S.C. § 101*. The meaning of these terms comes from the common law and is codified in the Uniform Fraudulent Conveyance Act, now the Uniform Voidable Transactions Act. *See In re Woodfield, 978 F.2d at 518*, *citing inter alia, Evans v. Trude, supra*, and *Matter of Ayala, supra.* The terms of hinder, delay and defraud connote intentional actions **[*29]** by a debtor to frustrate or thwart collection by creditors and describe a continuum of intents that may differ temporally or in substance and effect, but each of which is impermissible for purposes of *11 U.S.C. § 727(a)(2)*. The dictionary definitions of these words reinforce these observations. The word "hinder" has been defined as a transitive verb: "1. To be or get in the way of. 2. To obstruct or delay the progress of." *The American Heritage Dictionary of the English Language* at 830 (4th ed. 2006). The word "delay" has been defined as a transitive verb: "1. To postpone until a later time; defer. 2. To cause to be later or slower than expected or desired." *Id.* at 480. The word "defraud" has been defined as a transitive verb: "To take something by fraud; swindle." *Id.* at 477. The word "fraud", in turn, has been defined as a noun: "1. A deception deliberately practiced in order to secure unfair or unlawful gain. 2. A piece of trickery; a trick . . . ." *Id.* at 699.

### B. An Examination of *In re Cooke* and *Hultman v. Tevis*: the Court May Consider Prepetition Preferential Payments to Creditors for Purposes of Determining Whether There is Intent to Hinder, Delay or Defraud Under *11 U.S.C. § 727(a)(2)(A)*

Before the court addresses whether, under *Lawson*, Defendant's **[*30]** pre-bankruptcy acts of using non-exempt assets to pay, and thus prefer, some creditors, including the home loan lenders holding the First and Second DOTs on the Property, and his friends as well as an insider, his wife, involved the requisite actual intent to hinder, delay or defraud a creditor, the court must also carefully consider the overlay between the intent to prefer creditors and the intent to hinder, delay or defraud creditors. ***HN10***[] "The intent to prefer creditors is not equivalent to the intent to hinder, delay or defraud creditors." 6 Resnick and Sommer, *Collier on Bankruptcy*, ¶ 727.02[3][c] at 727-19, *citing inter alia, Equitable Bank v. Miller (In re Miller), 39 F.3d 301 (11th Cir. 1994)* and *In re Richter, 57 F.2d 159 (2d Cir. 1932)*; *see also, In re Chu, 511 B.R. 681, 685 (Bankr. D. Hawaii 2014)* ("An intent to prefer one creditor over others is not necessarily the same as an intent to hinder, delay, or defraud creditors."). A transfer preferring one creditor over another does not amount to an act to "hinder, delay, or defraud" an unpreferred creditor. 8 Witkin, *California Procedure*, Enforcement of Judgment, § 495 at 534, *citing inter alia*, *California Civil Code § 3432* and *Wyzard v. Goller, 23 Cal.App.4th 1183, 28 Cal. Rptr. 2d 608 (1994)*; *see also*, *Hultman v. Tevis, 82 F.2d 940, 941 (9th Cir. 1936)* (mere fact of a preferential transfer does not establish an act to "hinder, delay or defraud" creditor to deny discharge). Nonetheless, in this court's view, as discussed below, even **[*31]** if the intent to prefer creditors is not equivalent to the intent to hinder, delay or defraud creditors, the intent to prefer creditors may still coincide with the intent to hinder, delay or defraud creditors if there is other evidence of intent as was recently held by a divided Bankruptcy Appellate Panel of the Ninth Circuit ("BAP") in an unpublished memorandum decision in *In re Cooke, 2016 Bankr. LEXIS 2703, 2016 WL 4039699, at *1-8* (majority opinion) and at *2016 Bankr. LEXIS 2703, [WL] *8-17* (Taylor, J., dissenting), affirming a decision of another judge of this court (the Honorable Peter H. Carroll); *cf.*, 5 Resnick and Sommer, *Collier on Bankruptcy*, ¶ 548.04[1][a] at 548-57 and n. 6 ("The requisite actual intent [to hinder, delay or defraud to prove fraudulent transfer under *11 U.S.C. § 548(a)(1)(A)*], however, must be something more than just an intent to prefer one creditor over another." *citing inter alia*, *Stone v. Abraham (In re Prestige Spring Corp.), 628 F.2d 840, 842-843 (4th Cir. 1980)*. For purposes of determining whether the court may consider prepetition preferential payments to creditors when determining whether there is intent to hinder, delay or defraud under *11 U.S.C. § 727(a)(2)(A)*, the court now examines the BAP's decision in *Cooke* and the Ninth Circuit's decision in *Hultman*.

In *Cooke*, the debtor and the judgment creditor were involved in a multi-vehicle accident in which the creditor, **[*32]** a former fireman, was seriously and permanently injured. *2016 Bankr. LEXIS 2703 at *1, [WL] at *1*. The judgment creditor sued the debtor in state court for negligence and the debtor who was insured was defended by the counsel retained by the insurance company. *Id.* The state court entered a

judgment in favor of the judgment creditor against the debtor of $1.6 million, and in October 2012, the insurance company paid the judgment creditor directly the amount of the policy limits of $250,000. *Id.* The debtor's insurance policy also provided for certain supplemental payments to be made on behalf of the debtor as the insured, including postjudgment interest, which was $45,147.62 as of the date the insurance company paid the judgment creditor on the judgment. *Id.* On November 13, 2012, the insurer mailed a check for the postjudgment interest to the debtor, who deposited the check in his checking account on November 19, 2012. *2016 Bankr. LEXIS 2703 at *3-4, [WL] at *1-2*. On November 30, 2012, the debtor filed a Chapter 7 bankruptcy case in this court; however, shortly before filing his Chapter 7 bankruptcy case, he spent approximately $30,000 from the insurance payment not to the judgment creditor on the judgment, but for other purposes, including: (1) $1,040 in cash paid for **[*33]** miscellaneous items, $1,040; (2) $5,600 for on-campus housing at the university he was attending for the upcoming quarter; (3) $4,670 for tuition and fees to the university for the upcoming quarter; (4) $11,000 for taxes on the insurance payment he received, which was paid to the IRS; (5) $4,306 for bankruptcy attorney and filing fees; (6) $2,800 for taxes on the insurance payment he received, which was paid to the state taxing authority; and (7) $2,500 for the purchase of a personal computer for his use. *2016 Bankr. LEXIS 2703, [WL] at *2*. The debtor claimed the remaining amount of $14,250 as exempt on his bankruptcy schedules. *Id.* The judgment creditor filed an adversary proceeding under *11 U.S.C. § 727(a)(2)* against the debtor to deny his discharge. *2016 Bankr. LEXIS 2703, [WL] at *3*. During his meeting of creditors under *11 U.S.C. § 341(a)*, during an examination under *Federal Rule of Bankruptcy Procedure 2004* by the judgment creditor and during the trial in the adversary proceeding, the debtor gave inconsistent testimony about whether he received and read the letter from the insurance company transmitting the supplemental payment check which told him what the check was for before depositing the check into his account, and he admitted in his testimony that he knew the insurance payment he received represented the interest accrued **[*34]** from the judgment creditor's judgment, that based on his attorney's advice (never disclosed due to the continued assertion of the attorney-client privilege), the debtor concluded that the money from the insurance payment belonged to him and not the judgment creditor, that the judgment creditor might try to collect the money and that he could have given the money to the judgment creditor, but elected to use the money for other purposes, and that he contemplated filing for bankruptcy before depositing the check. *2016 Bankr. LEXIS 2703, [WL] and n. 5*.

Among other things, the bankruptcy court in *Cooke* found that the debtor intended to hinder or delay the judgment creditor in his ability to collect on the judgment by transferring the funds. *Id.* Based on the totality of the circumstances, the bankruptcy court believed that the debtor's transfers went beyond legitimate prebankruptcy planning and were done with the intent to keep the funds from the judgment creditor, his most significant creditor, and to maximize the benefit of the funds for himself. *2016 Bankr. LEXIS 2703, [WL] at *8*. The bankruptcy court entered judgment in favor of the judgment creditor, denying the debtor his discharge under *11 U.S.C. § 727(a)(2)*, and the Bankruptcy Appellate Panel in a divided vote **[*35]** affirmed.

In affirming the bankruptcy court's judgment denying the discharge, the majority in *Cooke* held that the bankruptcy court applied the correct law articulating the elements for a claim under *11 U.S.C. § 727(a)(2)* and made the necessary findings of fact to determine the debtor's actual intent to hinder or delay the creditor, including inferences and course of conduct that may be considered as circumstantial evidence of intent. *2016 Bankr. LEXIS 2703, [WL] at *8*. "The party objecting to discharge under *§ 727(a)(2)(A)* must prove two things: (1) the disposition of property, whether by transfer, removal, destruction, mutilation or concealment (within the statutory time period); and (2) the debtor's subjective intent to hinder, delay or defraud a creditor through the act of disposition of the property." *2016 Bankr. LEXIS 2703, [WL] at *5*, *citing*, *In re Retz, 606 F.3d at 1200*, *citing*, *In re Lawson, 122 F.3d at 1240*. As to the second *Lawson* element, the majority held that the bankruptcy court's factual findings of intent were not clearly erroneous because the court could properly have found actual intent to hinder or delay based on the facts and debtor's course of conduct that he made the transfers with the knowledge that he was liable to the judgment creditor in excess of the policy limits, that the supplemental insurance payment was for accrued **[*36]** interest on the judgment owed to the judgment creditor, that the judgment creditor might try to collect the payment from him, that he did not want the judgment creditor to get the payment, and that the debt owed to the judgment creditor was the reason he filed for bankruptcy as he had no other material debt as of the petition date. *2016 Bankr. LEXIS 2703, [WL] at *6*. The majority finally observed that "[a]lthough two views of the evidence may exist, the court's choice between

them in determining that [the debtor] actually intended to hinder or delay, cannot be clearly erroneous." *2016 Bankr. LEXIS 2703, [WL] at *8*.

The dissent in *Cooke* observed that the critical inquiry in the case came down to the question of "what did [the debtor] do with the Funds that would justify the loss of discharge?", and the dissent's answer was that "he did nothing that was an appropriate basis for discharge denial under *§ 727(a)(2)(A)*." *2016 Bankr. LEXIS 2703, [WL] at *9*. Among the eleven reasons that the dissent gave for reversal and possible remand of the bankruptcy court's judgment denying discharge was that reversal is warranted as a matter of law because the bankruptcy court's factual finding of intent was based on transfers which it could not consider for purposes of *§ 727(a)(2)(A)*. *2016 Bankr. LEXIS 2703, [WL] at *9-17*.

The debtor in *Cooke* has appealed the judgment of the **[*37]** Bankruptcy Appellate Panel affirming the bankruptcy court to the Ninth Circuit, which will decide the appeal in due course. This court specifically addresses some of the concerns raised in *Cooke* which are germane to the discussion of the issues in this case, particularly whether reversal is warranted as a matter of law because the bankruptcy court's factual finding of intent was based on transfers which it could not consider for purposes of *11 U.S.C. § 727(a)(2)(A)*, and in support of that ground for reversal, the dissent in *Cooke* cited the Ninth Circuit's decision in *Hultman v. Tevis, supra*, which was decided under the Bankruptcy Act of 1898 rather than the modern Bankruptcy Code.

The facts in *Hultman v. Tevis* were as follows. *82 F.2d at 940-941*. The debtor filed a petition for relief under the Bankruptcy Act and was adjudged a voluntary bankrupt. *Id. at 940*. The trustee in bankruptcy opposed the petition and sought denial of the debtor's discharge on two grounds, including the transfer of large sums of money within one year of the petition date to his son with the intent to hinder, delay or defraud his creditors. *Id. at 940-941*, *citing*, Bankruptcy Act of 1898, § 14b, as amended by § 6 of the Act of May 27, 1926, c. 406, 44 Stat. 663, former 11 U.S.C § 32(b). The debtor owed a debt to his son, which had not **[*38]** been fully paid. *Id. at 941*. Debtor began receiving money from a spendthrift trust set up by his sister, and he transferred some of that money to his son within one year of the petition date. *Id.* The debtor had been advised by his attorney, to whom all the facts were fully disclosed, that the money received from the spendthrift trust could not be subjected to the claims of his creditors, even after it reached his hands. *Id.* The debtor in good faith believed and relied upon the attorney's advice and acted on it in making the transfer to his son. *Id.* The amount of money that the debtor transferred to his son was less than the amount owed. *Id.* The special master in bankruptcy made the above findings of fact, which were not excepted to at trial, and further found that the money which the debtor transferred to his son was not transferred with the intent to hinder, delay or defraud his creditors and that the debtor was entitled to a discharge of his debts. *Id.* The trustee in bankruptcy interposed exceptions to the special master's findings of fact and conclusions of law, but the district court accepted the special master's findings and conclusions granting the debtor a discharge. *Id.* The Ninth Circuit **[*39]** in *Hultman* affirmed the district court's judgment upholding the debtor's discharge. In so holding, the Ninth Circuit made two specific observations germane here. *Id.* First, the Ninth Circuit stated: "Whether [the lawyer's] advice was correct or not is a question which the District Court did not, nor do we, deem it necessary to decide." *Id.* Second, the Ninth Circuit stated: "The mere fact that a bankrupt has made a preferential payment or transfer to one of his creditors is no ground for denying a discharge." *Id.* (citations omitted).

The dissent in *Cooke* concluded that "[t]he bankruptcy court here did not acknowledge the rule in *Hultman* and erroneously relied on [the debtor]'s use of the Funds to pay other creditors." *In re Cooke, 2016 Bankr. LEXIS 2703 at *34, 2016 WL 4039699, at *11* (Taylor, J., dissenting). The dissent in *Cooke* asserted that the majority opinion only addressed one of the two relevant rulings of the Ninth Circuit in *Hultman* for not denying the debtor's discharge based on reliance of counsel and simply disregarded the other relevant ruling relating to preferential payments. *Id.* Relying on the Ninth Circuit's statement in *Hultman* that "[t]hat the mere fact that a bankruptcy has made a preferential payment or transfer to one of his creditors is **[*40]** no grounds for denying a discharge," the dissent in *Cooke* stated: "*Hultman* clearly states that payment of legitimate creditor claims, even to insiders, is not a basis for discharge denial. Both the bankruptcy court and the majority ignore this authority; I cannot and do not do so." *Id.* In other words, as the dissent stated, "as the Ninth Circuit made clear in *Hultman*, some transfers do not support discharge denial as a matter of law." *2016 Bankr. LEXIS 2703, [WL] at *12 n. 4*.

In asserting that reversal in *Cooke* was warranted as a matter of law because the bankruptcy court's factual finding was based on transfers which it could not consider for purposes of *11 U.S.C. § 727(a)(2)(A)*, the

dissent in *Cooke* also criticized the majority's analysis based on another Ninth Circuit decision in *In re Adeeb, supra*. *2016 Bankr. LEXIS 2703, [WL] at *14*. The dissent stated:

> In summary, I would reverse because the bankruptcy court erred as a matter of law when it based its decision almost entirely on [the debtor]'s payment of other debt. *Hultman*, as recognized by this Panel, does not permit this reliance. I also conclude that the laptop computer acquisition in isolation did not justify *§ 727(a)(2)(A)* denial of discharge.
>
> I emphasize that my analysis is independent of the bankruptcy court's finding of intent. As **[*41]** already noted, all commencements of bankruptcy cases involve, to some extent, an express intent to hinder and delay a creditor. Further, almost all bankruptcy cases involve some measure of transfer in anticipation of the creditor-hindering-or-creditor-delaying bankruptcy; bankruptcy lawyers are paid, creditors are preferred, and in some reasonable regards non-exempt assets become exempt or goods or services essential to day-to-day existence are obtained. These types of transfers do not justify a denial of discharge, so one never need consider a debtor's intent when causing them. And *Hultman* provides a firm foundation for a determination that not all transfers are appropriately considered in a *§ 727(a)(2)(A)* context. *Adeeb* is another such case.
>
> In *Adeeb*, the debtor admitted to making pre-petition transfers with improper intent. *787 F.2d at 1341-42*. But, he repented and attempted to retrieve the assets. *Id.* The Ninth Circuit, thus, reversed the district court and remanded to the bankruptcy court for a determination as to whether recovery had been complete. *Id. at 1346*. The Ninth Circuit read transferred in *§ 727(a)(2)(A)* as meaning 'transferred and remained transferred.' *Id. at 1345*. And it noted that Congress intended to deny discharge where debtors took **[*42]** actions **to keep assets from their creditors** by hiding assets or destroying them. *Id.* The facts here evidence no such improper conduct. Instead, in *Hultman*, the transfers did not support *§727(a)(2)(A)* discharge denial.

*2016 Bankr. LEXIS 2703, [WL] at *14* (emphasis in original).

With respect to the debtor's use of the insurance payment funds to purchase a laptop computer, the dissent in *Cooke* commented:

> Moreover, the Ninth Circuit allows debtors to engage in some forms of pre-bankruptcy planning and to protect assets by converting them from non-exempt to exempt. *See, e.g., Gill v. Stern (In re Stern), 345 F.3d 1036, 1043 (9th Cir. 2003)* ("[T]he purposeful conversion of nonexempt assets to exempt assets on the eve of bankruptcy is not fraudulent per se." (quoting *Wudrick v. Clements, 451 F.2d 988, 989 (9th Cir. 1971))*. The bankruptcy court acknowledged this fact, stating that this was a close case, but finding that combined expenditures from the Funds tipped the balance towards a denial of discharge. In a close case, the bankruptcy court could not find that the purchase of a much-needed tool of [the debtor]'s trade as a student, one that involved use of less than ten percent of the Funds, justified discharge denial.

*Id.* (footnote omitted).

In response to the dissent's analysis, the majority in *Cooke* stated that "[i]n the requisite analysis for this appeal, we need **[*43]** to determine if the bankruptcy court's finding of actual intent was clear error." *2016 Bankr. LEXIS 2703, [WL] at *7 n. 7*. In addressing the dissent's analysis, citing *Hultman*, the majority stated:

> The dissent's analysis doesn't consider intent, but rather questions whether any transfers contemplated by *§ 727(a)(2)* occurred if the transfers constitute preferment of other creditors. *See Hultman v. Tevis, 82 F.2d 940, 941 (9th Cir. 1936)*. As noted in *First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1343 (9th Cir. 1986)*, the real issue in *Hultman* involved whether the debtor acted with the requisite intent when he "in good faith, believed and relied upon his attorney's advice and acted on it in making the transfer to his son." *Id.* The Hultman court concludes no other indicia of intent existed, warranting a discharge. The facts in this present appeal distinguish this appeal from *Hultman*. Although [the debtor] vaguely raised an advice of counsel defense, he inconsistently testified as to whether he talked to his counsel. Further he declined to waive his attorney-client privilege so [the attorney] could testify or submit a declaration as to his advice to [the debtor]. However, in raising such a defense, [the debtor] could not invoke an attorney-client privilege. *Chevron Corp. v. Pennzoil Co., 974 F.2d 1156,*

1163 (9th Cir. 1992).

2016 Bankr. LEXIS 2703, [WL] at *5 n. 5.

With respect to the bankruptcy court's factual findings on intent, the majority in *Cooke* noted **[*44]** that "[b]eyond the credibility determination, the bankruptcy court also identified several elements as support for the inference that [the debtor] acted with the requisite intent under § 727(a)(2)(A)," citing what the bankruptcy court considered as reflected in the trial transcript:

> The bankruptcy court considered: "(1) the timing of the transfer; (2) the amount of the transfer in relation to the remaining property of the debtor; (3) whether the transfer occurred after the entry of a large judgment against the debtor; (4) whether the transfer rendered the debtor insolvent; (5) the debtor's motivation to make the transfers; and (6) the credibility of the debtor's explanation regarding the transfers."

2016 Bankr. LEXIS 2703, [WL] at *7 and n. 6, *citing*, Trial Tr. (Jan.12, 2015) 10:23-11:5.

This court has quoted the dissent and majority opinions in *Cooke* at length because the issues raised are germane to this case, that is, whether, as the dissent in *Cooke* concluded, based on the Ninth Circuit's decision in *Hultman* that some transfers by a bankruptcy debtor, including preferential payments to other creditors, do not support discharge denial as a matter of law. In considering the merits of the analyses of the majority and dissent in *Cooke*, this **[*45]** court concludes that while the dissent makes cogent points, the majority has the better side of the argument. The majority in *Cooke* is correct in emphasizing that "[i]n the requisite analysis for this appeal, we need to determine if the bankruptcy court's finding of actual intent was clear error." The bankruptcy court's analysis based on its findings considering "(1) the timing of the transfer; (2) the amount of the transfer in relation to the remaining property of the debtor; (3) whether the transfer occurred after the entry of a large judgment against the debtor; (4) whether the transfer rendered the debtor insolvent; (5) the debtor's motivation to make the transfers; and (6) the credibility of the debtor's explanation regarding the transfers" was not clear error, though a reasonable finder of fact could decide differently. *Id.*

In this court's view, *Hultman* does not dictate a different result in *Cooke* or in this case. The Ninth Circuit's statement in *Hultman* that "[t]hat the mere fact that a bankruptcy has made a preferential payment or transfer to one of his creditors is no grounds for denying a discharge" does not support the broad reliance of the dissent in *Cooke* for its proposition that **[*46]** preferential transfers do not support discharge denial as a matter of law and cannot be considered for determining intent for purposes of 11 U.S.C. § 727(a)(2)(A). That is not what the Ninth Circuit said in *Hultman*. As worded, **HN11**[] the Ninth Circuit's statement in *Hultman* that the mere fact of a preferential transfer does not justify discharge denial means that such a transfer by itself is not grounds to deny a discharge, but says nothing about a preferential transfer being considered as evidence of intent in the context of other facts that may evidence intent. The analysis in *Hultman* indicated that the appropriate inquiry was to determine the existence of an intent on behalf of the debtor to hinder, delay or defraud creditors, which is a fact-based inquiry, and the findings of fact and conclusions of law proposed by the special master adopted by the district court that the debtor lacked such intent was reviewed for clear error, which was affirmed by the Ninth Circuit. The *Cooke* majority's analysis of *Hultman* was correct that the district court's finding of lack of intent based on the debtor's reliance on counsel's advice without other evidence of intent was not clearly erroneous and was appropriately affirmed. **[*47]** *See also*, In re Perrine, 2008 Bankr. LEXIS 4719, 2008 WL 8448835, at *5-6 (9th Cir. BAP 2008) (unpublished BAP memorandum decision discussing *Hultman* and acknowledging the Ninth Circuit's determination in that case that the fact that a preferential payment did not necessitate a finding that it was made with an intent to hinder or delay creditors, upholding the district court's finding of lack of intent without additional evidence of intent, but distinguishing *Hultman* on its facts to uphold discharge denial involving a preferential or fraudulent transfer with additional evidence of intent).

The court acknowledges what the Ninth Circuit stated in *Hultman* about the *mere* fact that a preferential transfer is not a ground to deny a discharge under 11 U.S.C. § 727(a)(2)(A), but the circumstantial evidence in this case supports a finding that Defendant made transfers to prefer creditors, including the home loan lenders holding the First and Second DOTs on the Property and his wife, with the intent to hinder, delay or defraud creditors beyond the mere fact that he made certain preferential transfers to other creditors and, as discussed in more detail below, beyond the mere fact that he converted nonexempt assets into exempt assets.

**C. Based on *In re Beverly*, Defendant "Crossed the Line"**

Beyond the **[*48]** previous determination that ***HN12***[] the court may consider preferential payments to creditors for purposes of determining an intent to hinder, delay or defraud under *11 U.S.C. § 727(a)(2)(A)*, the court is persuaded by the decision and analysis of the Bankruptcy Appellate Panel for the Ninth Circuit ("BAP") in *In re Beverly*, which dealt with another issue that is relevant to this case: whether the pre-bankruptcy conversion of non-exempt assets into exempt assets, which is nonfraudulent by itself as a matter of law under the Ninth Circuit's decision in *Gill v. Stern (In re Stern), 345 F.3d 1036, 1044 (9th Cir. 2003)*, warrants denial of a bankruptcy debtor's discharge if there was also a subjective intent to hinder, delay or defraud a creditor. *In re Beverly, 374 B.R. at 242-246*. The court believes the BAP's framework in that case is instructive here because in addition to Defendant's use of non-exempt assets to prefer certain creditors prepetition, this case also involves the transfer of non-exempt assets to Defendant's Wife's CNB Account which Defendant claimed an exemption in. As discussed in more detail below, the totality of circumstantial evidence in this case shows an intent to hinder, delay or defraud creditors to warrant denial of discharge as shown by Defendant's prepayments of the First and Second DOTs **[*49]** with five advance monthly payments, and transfers to his Wife's CNB Account which Defendant claimed an exemption in, all of which, like in *Beverly*, are forms of improper pre-bankruptcy planning that furthered Defendant's intent to keep certain assets for his personal benefit and out of reach of his creditors who might have received the value of these assets through a bankruptcy distribution.

In *Beverly*, the BAP reversed the bankruptcy court's holding that the debtor's pre-bankruptcy conversion of non-exempt assets to exempt assets during the debtor's divorce was non-fraudulent as a matter of law for purposes of denying the debtor's discharge under *11 U.S.C. § 727(a)(2)*. *Id. at 246*. In *Beverly*, the facts were as follows. The debtor, anticipating a large judgment on a community debt, executed a marital settlement agreement with his wife prepetition whereby he transferred a $1 million interest of non-exempt property to his non-filing wife in exchange for his wife's interest in his $1.1 million exempt retirement fund. *Id. at 226-227*. By doing so, the debtor would shoulder the impending judgment debt, but having first stripped himself of the non-exempt liquid assets with which to pay that debt. *Id. at 227*. After the debtor filed for bankruptcy, **[*50]** the trustee and the judgment creditor objected to the debtor's discharge under various *11 U.S.C. § 727(a)* theories. *Id. at 229*. The bankruptcy court ruled for the debtor, reasoning that the toleration of bankruptcy exemption planning meant that the discharge cannot be denied because there could not have been an intent to hinder, delay or defraud creditors. *Id. at 244*.

On the creditor's appeal of its *11 U.S.C. § 727(a)(2)(A)* claim, the BAP in *Beverly* specifically addressed the relationship between the conversion of non-exempt assets to exempt assets, which is not by itself fraudulent, and an intent to defraud creditors, stating:

> [I]t is difficult to draw the line between legitimate bankruptcy planning and intent to defraud creditors. Only two things are certain about the line.
>
> First, as already explained, denial of discharge involving exemption planning requires that there be evidence other than the mere timing of the transformation of property from nonexempt to exempt status.
>
> Second, there is a principle of "too much." In classical terms, it is the Sword of Damocles. In the agrarian terms used by the Fifth Circuit affirming the denial of a discharge, "when a pig becomes a hog it is slaughtered."
>
> The reality is that cases finding discharge-disqualifying **[*51]** intent to hinder, delay, or defraud creditors typically involve some combination of large claims of exemption and overtones of overreaching.

*Id. at 245* (citations omitted). Based upon the fact of the debtor's conversion of at least $424,450 in non-exempt assets to exempt assets and a record replete with evidence that the debtor was fixated on moving assets away from the reach of the judgment creditor, the BAP in *Beverly* held that the bankruptcy court's factual finding that the debtor did not have the requisite intent to hinder or delay the judgment creditor was clearly erroneous. *Id. at 245*. In so holding, the court stated,

> [t]here is a remarkably large volume of evidence of [the debtor]'s intent to hinder or delay that is extrinsic from the fact that he transferred nonexempt property for exempt property in the MSA. As a result, it is beyond cavil that [the debtor]'s intent was to become judgment proof and not just to protect his assets.

*Id. at 246*.

Based on the BAP's analytical framework in *Beverly* regarding the relationship between a debtor's intent and the conversion of assets from nonexempt to exempt status, and based on additional evidence of intent beyond the mere conversion of assets from nonexempt to exempt, the court **[*52]** considers, as discussed below, whether Defendant "crossed the line" based on additional evidence of intent beyond the mere fact that some of the transfers appear to be preferential only when Defendant used his non-exempt assets to make prepetition transfers to preferred payees when he made five months of prepayments to his home lenders totaling $51,000.00 and transferred $38,000.00 to two of his friends on debts allegedly owed to each of them, as well as when Defendant converted non-exempt assets to exempt assets by transferring $86,000.00 to his Wife's CNB Account which Defendant claimed an exemption in.

**i. Defendant's Prepayments of First and Second DOTs on the Property**

Regarding the additional evidence of intent beyond the mere preferential payments and conversion of nonexempt assets to exempt assets, and specifically, Defendant's act of prepaying the First and Second DOTs on his home, the court first notes that aside from the timing of Defendant's prepetition transfers of nonexempt assets and the amounts of those transfers, he made multiple admissions in his trial testimony that evidence his intent to hinder or delay his non-preferred creditors. ***HN13***[] "When a debtor admits that he acted **[*53]** with the intent penalized by *section 727(a)(2)(A)*, there is no need for the court to rely on circumstantial evidence or inferences in determining whether the debtor had the requisite intent." *In re Adeeb, 787 F.2d at 1343* ("Adeeb admitted that he transferred the property intending to put it out of the reach of one of his creditors."). Additionally, entry of a discharge order should be denied if a debtor "had the intent penalized by the statute notwithstanding any other motivation he may have had for the transfer." *Id. at 1343*; *accord, In re Beverly, 374 B.R. at 246*; *cf. Matter of Trinity Baptist Church, 25 B.R. 529, 532-533 (Bankr. M.D. Fla. 1982)* (analyzing fraudulent transfer claim under Florida law) ("Intent to defraud within the meaning of the statute is the debtor's intention to prevent his creditors from satisfying their debts . . . An evil motive is not required in order to set aside a transfer.") (citations omitted).

Specifically, at his *Rule 2004* examination, Defendant testified to the following:

> Well, at the time that the payments were made — let's see. . . . July was the prepayment[,] by then the case had been decided, and I didn't know what I was going to do. Really, we were trying to make up our mind what we were going to do, and then I just wanted to make sure that those -- that whatever happened -- I mean, I got a threatening letter. I got threatening **[*54]** letters from the beginnings of what might have been attempts to collect money or whatever, and I just wanted to make sure that we wouldn't be thrown out in the street.
> Well, I got -- well, the award in and of itself was pretty breathtaking. When I got the notice of the award, that was F.I.N.R.A., and the F.I.N.R.A. fees. I didn't know if I would lose my license. I didn't. J.P. Morgan, obviously, they had sent me by July -- yeah. They had sent me a letter by then saying they wanted their money. And who else was there? I was having a fee disputes. That's another thing. I was having a fee dispute. I found out that I was grossly overcharged by the attorneys I used first, and I got several attorneys' opinions, and so I was possibly fighting with them. Whatever else was going to go on, I wanted to make sure my family was at least ensconced in our home until the end of the year.
> [. . . ]
> Its a priority of survival. I wanted to make sure we had a home to live in and a place to live in while all this was going on.
>
> Well, I didn't know if, for example, Shustak had gotten a judgment, which he didn't. They threw him out of court, but he kept trying to do things. I didn't know where -- I felt under **[*55]** siege. I guess you can understand that. So I had to prioritize where this money went, and other than food and other -- certain other things that had to be accounted -- you know, taken care of. This was a pretty important piece of that puzzle.

Furthermore, at trial, Defendant testified that he thought of prepaying his home loans by five months because "I had the money at that time and I wanted to make sure my family was protected and that I had paid my primary obligation to them for that period of time", *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:22 a.m., and that a primary motivation behind his prepayments was that he was concerned about his prior lawyer, Shustak, who he was having a fee dispute with, and who has a disputed claim in Defendant's bankruptcy

case, "from coming in and attaching his assets", *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:24-9:25 a.m. *In re Adeeb, 787 F.2d at 1343* ("Adeeb admitted that he transferred the property intending to put it out of the reach of one of his creditors."). Although Defendant had a benign motive of protecting his family, the evidence otherwise indicates that he still had the intent to hinder or delay his creditors. *Matter of Trinity Baptist Church, 25 B.R. at 532-533* (mixed motive of a debtor **[*56]** does not defeat a finding of intent, stating: "Clearly, the Debtor intended to hold those dissatisfied creditors at bay, and prevent levy and sale of the property, in hopes of rehabilitation and the satisfaction of all creditors. While admirable, the end result of this scheme was nonetheless hindrance and delay of creditors.").

Moreover, Defendant testified that he prepaid the home loans secured by the First and Second DOTs "to assure that my wife and my daughter and myself had a home to live in through the end of the year . . . I did prepay [the mortgage in the past] but not to that degree, not six months, or four months, five months, whatever it was in advance, normally." *Trial Testimony of Joseph Ellison*, November 19, 2015 at 10:43 a.m. This out of the ordinary course transaction and Defendant's admissions are additional evidence of his intent to hinder or delay his creditors by putting these funds out of their reach for his personal benefit. *Silagy v. Morris (In re Morris), 2013 Bankr. LEXIS 4369, 2013 WL 5705630, at *17 (Bankr. N.D. Ohio 2013)* (transfers of debtor's property in exchange for waiver of future child support was a badge of fraud due to detriment of debtor's current creditors indicating intent to hinder, delay or defraud creditors as fraudulent transfer under *11 U.S.C. § 548(a)(1)(A)*), *objections* ***[*57]*** *to bankruptcy court's proposed findings of fact and conclusions of law overruled in pertinent part and sustained in part on other grounds*, *2015 U.S. Dist. LEXIS 23565, 2015 WL 853499 (N.D. Ohio 2015)*. In holding that the debtor's transfers of her equity in the marital residence to her spouse in a martial dissolution for a waiver of her future child support obligations was a badge of fraud with respect to her current creditors, the bankruptcy court stated in *In re Morris*:

> Debtor's actions amount to accelerating an unmatured, future obligation and allowed her to prepay it. Assets that were immediately available, equity in the real estate, were traded for a future obligation that has not yet come due. This is little different than allowing a debtor to prepay ten years of rent or any other future expense saving tactic at the expense of current creditors holding liquidated, matured debts. While this action has not been previously listed as a badge of fraud, under the particular facts of this case, the court finds that the transaction increases the overall likelihood of actual fraudulent intent.

*2013 Bankr. LEXIS 4369, 2013 WL 5705630, at *17*. The court in *In re Morris* also held that the transfer was also constructively fraudulent because prepayment of a future obligation was not reasonably equivalent **[*58]** value and the transfer harmed creditors:

> . . . Debtor should not be able to reduce the amount she will pay to her current creditors by either obtaining a waiver of a future obligation or withholding money to satisfy a future debt. For example, a debtor should not be allowed to set aside money for her next five years of rent under the guise that the money will be used to pay her future creditor (the landlord) at the expense of her current creditors. In *In re Strasser*, a debtor moved $62,000 out of reach of her current creditors by transferring the money to her father, who then gave the money back to the debtor for the payment of her living expenses. *303 B.R. 841, 847-48 (Bankr. D. Ariz. 2004)*. The court held that the debtor should not be able to harm her current creditors by withholding money under the guise that the property would be used to pay her future expenses, and therefore her future creditors. *Id.* Such an action is putting money out of the reach of current creditors, and then claiming 'no harm no foul, I used it on my future creditors.' *Id.* (internal quotation marks omitted). While the facts are different in the current case, the theory is the same: Debtor is not allowed to give significant value to her future creditors **[*59]** in order to harm her current creditors. For the above reason, the court will not consider the waiver of the child support in calculating reasonable equivalence.

*2013 Bankr. LEXIS 4369, 2013 WL 5705630, at *11*.

**HN14**[] Under the Uniform Fraudulent Transfer Act (now the Uniform Voidable Transactions Act), a transfer is constructively fraudulent if the debtor made the transfer without receiving a reasonably equivalent value for the transfer in exchange for the transfer and the debtor was insolvent at the time of the transfer or became insolvent as result of the transfer. *California Civil Code § 3439.05(a)*. Although the finding of lack of reasonably equivalent value was made in support of the holding of constructive fraudulent transfer in *In re Morris*, though not directly relevant for a claim under *11*

U.S.C. § 727(a)(2), such a finding would itself be a badge of fraud indicating actual intent to hinder, delay or defraud current creditors under the Uniform Fraudulent Transfer Act (now Uniform Voidable Transactions Act) and under the Ninth Circuit's listing of badges of fraud in *In re Woodfield, supra. California Civil Code § 3439.04(b)(8)* ("(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred."); *In re Woodfield, 978 F.2d at 518* ("6) that the Debtor received inadequate consideration **[*60]** for the transfer.") (citations omitted).

Although Defendant might have argued that the prepayments of the home loans are not indicative of an intent to hinder, delay or defraud creditors because these payments to the home lenders were to fully secured creditors, the court would not be persuaded by such. *See Pioneer Liquidating Corp. v. San Diego Trust & Savings Bank, 211 B.R. at 717 (S.D. Cal. 1997)* (holding that payment to a fully secured creditor does not hinder, delay or defraud creditors because it does not put assets otherwise available in a bankruptcy distribution out of the reach of other creditors), *cited in, Henry v. Lehman Commercial Paper, Inc. (In re First Alliance Mortgage Co.), 471 F.3d 977, 1008 (9th Cir. 2006)*. This argument fails under the circumstances of this case because Defendant had refinanced his existing home loans by taking out new home loans to repay the old ones and to extract and monetize the existing equity in his home that was otherwise available to pay his current creditors. Defendant took out the surplus refinancing proceeds, which were converted home equity, and transferred such proceeds for his personal purposes rather than to pay debt to current creditors. Defendant made transfers to his wife, and he made prepayments on his new home loans five months in advance as he admitted so he and his family had a place to live. Although the new home lenders **[*61]** are secured creditors, the liens they hold are based on trust deeds on the home as real property, and not on the surplus refinancing proceeds. Findings of Fact Nos. 18-22. Defendant's transfers in his home loan prepayments from the refinancing proceeds were thus not payments of the home lenders as fully secured creditors from their collateral, the home itself, which is different from the circumstances in *Pioneer Liquidating Corp. v. San Diego Trust & Savings Bank, supra*, where the fully secured lender was paid from its collateral on which it had a security interest, which was held not to be a transfer involving an intent to hinder, delay or defraud creditors since there was no diminution of the bankruptcy estate as the transferred assets were fully encumbered by the secured creditor's lien. This is not the situation here because the funds used to make Defendant's home loan prepayments were from the surplus refinancing proceeds from his converted home equity, which were prepetition assets not encumbered by the home lenders' security interests, and thus, these funds had been prepetition assets otherwise available to his current creditors which he put out of their reach resulting in a diminution of the bankruptcy estate. Why this is overreaching and **[*62]** improper is that Defendant converted the prepetition asset of nonexempt home equity available to pay prepetition debts for which he was legally obligated to pay at the time into a postpetition asset by prepaying his future obligations which were not yet legally due, thus, diminishing the pool of prepetition assets available to pay current creditors otherwise barred from further collection due to the bankruptcy discharge and relieving him of having to use his postpetition assets to pay debts for which he had to pay in the future, but he did not yet have to pay at the time, and conferring a financial benefit to him at the expense of his current creditors. Accordingly, the court finds on this record that Defendant's transfers of $41,415.30 and $11,062.00 to prepay his home loans for five months are badges of fraud indicating an intent to hinder, delay or defraud his current creditors, including JP Morgan Chase, by putting these otherwise available assets out of the reach of these creditors and by not receiving reasonably equivalent value in doing so.

Additionally, Defendant testified that prior to filing his bankruptcy petition, he met with an asset protection firm, and one of his goals **[*63]** in doing so was to potentially protect his assets from potential creditors. *Trial Testimony of Joseph Ellison*, November 19, 2015 at 10:58-10:59 a.m. These admitted facts of Defendant's knowledge and planning are additional evidence of his intent to hinder or delay his creditors. Accordingly, based on the Ninth Circuit's decisions in *Adeeb* and *Retz*, the court determines that Defendant's admissions that he prepaid the home loans secured by the First and Second DOTs to prevent other creditors from gaining access to equity in the Property and collecting on those assets, constitutes additional and sufficient evidence of an actual intent to hinder, delay or defraud creditors beyond the mere fact of making preferential transfers, and thus, establishes a claim to deny Defendant's discharge under *11 U.S.C. § 727(a)(2)(A)*. Furthermore, based on the analytical framework set forth in *Beverly*, the court also determines that such admissions constitute evidence of defendant's actual intent to

hinder, delay or defraud his creditors beyond the mere fact of the timing of using non-exempt funds to prepay the home loans secured by the First and Second DOTs immediately before he filed for bankruptcy.

Defendant's admissions notwithstanding, **[*64]** the sequence of events preceding the filing of his bankruptcy petition provides circumstantial evidence of his actual intent to hinder or defraud his creditors. *See In re Beverly, 374 B.R. at 243* (for the purposes of *11 U.S.C. § 727(a)(2)(A)*, intent to hinder, delay, or defraud may be established by circumstantial evidence or by inferences drawn from a course of conduct); *In re Adeeb, 787 F.2d at 1343*, *citing, In re Devers, 759 F.2d 751, 755 (9th Cir. 1985)*. The Ninth Circuit in *Woodfield* identified certain "badges of fraud" indicative of circumstantial evidence of an intent to hinder or defraud, which can be found here, including factors (1) a close relationship between the transferor (Debtor) and the transferee (his wife and friends); (2) that the transfers were in anticipation of a pending suit (Plaintiffs' counterclaims in the FINRA Action and suit to confirm their award); (3) that the transferor Debtor was insolvent or in poor financial condition at the time (Defendant's filing of his bankruptcy case with his schedules showing insufficient nonexempt assets to pay his outstanding debts); (4) that all or substantially all of the Debtor's property was transferred (prepetition payment of preferred parties, his wife, his friends and his home lenders, and Debtor's conversion of nonexempt assets into exempt assets); **[*65]** (5) that the transfers so completely depleted the Debtor's assets that the creditors have been hindered or delayed in recovering any part of the judgment (reduction of most, if not all, value in nonexempt assets as of the petition date). *In re Woodfield, 978 F.2d at 518*.

Defendant took out the equity from the Property and used the proceeds to pay his wife, friends, and the First DOT and the Second DOT on the Property so that his family could continue to retain the benefits of the funds and live in the Property. As a result of Defendant depleting the equity in the Property through the refinancing and prepetition transfers, there is little or no equity in the Property available to pay nonpreferred creditors through Defendant's bankruptcy case. Though the refinancing transactions, Defendant pulled out net equity of almost $250,000 from his residence, solving his practical problem of shielding the nonexempt equity from his creditors based on the limited $100,000 homestead exemption for Defendant and his spouse as a "family unit" under *California Code of Civil Procedure § 704.730(a)(2)*. Likewise, as a result of the transfers, the disbursed funds, which would have otherwise remained in Defendant's [unencumbered] CNB Account, are also **[*66]** unavailable for distribution to Defendant's unsecured creditors. Defendant's nonpreferred unsecured creditors, JPMorgan and Shustak, representing 90 percent of the value of Defendant's general unsecured claims, are thus likely to recover little or nothing from Defendant's bankruptcy estate in light of Defendant's prepetition transfers, while he continues to benefit from these transfers diverting his assets which would have otherwise been intended and available for distribution to these creditors in this bankruptcy case.

According to Defendant's bankruptcy schedules, his real property asset, the home, is fully encumbered, and of his personal property assets with a total value of $303,587.00, most of the value of these assets is claimed as exempt in the amount of $254,673.00, leaving a net of $48,914.00 as non-exempt property. Schedule A-Real Property, Schedule B-Personal Property, Schedule C-Property Claimed as Exempt, Petition, Exhibit 8 at 13-21. Most of the value of Defendant's nonexempt assets comes from an account receivable valued at $35,914.00, which he says is owed from his former employer, Morgan Stanley, in company stock from a performance award, and is thus not traceable to **[*67]** the subject transfers from Defendant's converted home equity. Schedule B-Personal Property, Petition, Exhibit 8 at 17. In comparison, on March 1, 2014, Defendant received the funds of $247,950.85 disbursed to him from the refinancing of his home not claimed as exempt on his bankruptcy schedules representing the home equity that he took out and converted for his use, and not available to pay claims of current creditors, including the transfers discussed herein. These circumstances indicate perfect prebankruptcy planning from Defendant's perspective because through the transfers, he was able to extract the net equity of almost $250,000 from his home and provide for himself and his family and his preferred creditors, leaving almost nothing for his nonpreferred creditors, despite the limited $100,000 homestead exemption, and are the result of Defendant's design and actual intent to hinder or delay his creditors.

Furthermore, the court also observes that the timing, quantity, and circumstances surrounding Defendant's transfers—which occurred while the FINRA Action was pending, while an evidentiary hearing was ongoing, while the issuance of an adverse FINRA award was imminent, and shortly **[*68]** after the issuance of the FINRA award, highlight that Defendant made the transfers intending to hinder creditors' ability to recover

from his assets. Moreover, within the five months preceding the Petition Date and while the FINRA Action was pending, Defendant sought the assistance of an asset protection law firm to create an asset protection trust and establish a Limited Liability Limited Partnership (LLLP) to shield his assets from creditors, and while Defendant said that he changed his mind about forming the asset protection trust and tried to instruct the asset protection law firm not to go ahead with the trust formation, such consultation reflects Defendant's state of mind with an awareness and intent not to pay his nonpreferred creditors. During this same time period, Defendant then refinanced the loans on the Property and, in the process, took out cash of nearly $250,000.00 from the equity in the Property, and then transferred much of this cash to pay preferred parties, his wife and his home lenders, notably, so he would be able to stay in his residence through advance loan payments.

**ii. Defendant's Prepetition Transfers to His Friends**

Nonetheless, regarding Defendant's $38,000 **[*69]** of prepetition payments to his friends, the court does not find that such payments by themselves indicate an intent to hinder, delay or defraud his other creditors because the evidence indicates that Defendant was repaying loan obligations to them, which makes these transfers only preferential payments to these creditors, which transfers by themselves do not indicate an intent to hinder, delay or defraud under applicable law. *California Civil Code § 3432*; *Hultman v. Tevis, supra.* According to Defendant, Mr. Springer had advanced Defendant $30,000 in advance capital for a joint business venture that they were going to have, and that he did not have a contractual or written obligation to repay him, and Mr. Jeffers had loaned him $8,000.00 to help him pay personal expenses, and that he did not have a written agreement to repay the loan. *Trial Testimony of Joseph Ellison*, November 19, 2015 at 10:46-10:48 a.m. The court determines that Defendant's payment of $30,000.00 to Mr. Springer was to repay money held by Defendant for their joint business venture, but the money belonged to Mr. Jeffers, and not Defendant, as the evidence does not indicate that a gift to Defendant was intended. The court further determines that Defendant's payment of **[*70]** $8,000.00 to Mr. Jeffers was to repay a loan made by Mr. Jeffers to Defendant. These transfers, while preferential, do not indicate an intent to hinder, delay or defraud other creditors.

**iii. Defendant's Prepetition Transfers to His Wife's CNB Account**

Regarding Defendant's prepetition transfers to his Wife's CNB Account, by transferring a total of $86,000.00 to his wife prepetition, Defendant hindered, delayed and defrauded his creditors' ability to collect on their claims by putting these funds out of his name and into his wife's name and control, which transactions do not exemplify the actions of an "honest but unfortunate debtor." *See* *Grogan v. Garner, 498 U.S. at 286-287*. Specifically, six days after the conclusion of a week-long evidentiary hearing in the FINRA Action, Defendant transferred $18,000.00 to his wife's CNB Account. One week after the FINRA Award issued, Defendant, through two transactions, transferred an additional $51,000.00 to his wife's CNB Account because he was worried about what would happen, he wanted to retain the funds to benefit him and his family, and he did not want anyone to gain access to these funds. Defendant's wife is an insider for purposes of the Bankruptcy Code pursuant to *11 U.S.C. § 101(31)(A)(i)* as a relative **[*71]** of an individual debtor. *See* *Hahn v. Leong (In re Llamas), 2011 Bankr. LEXIS 4779, 2011 WL 7637254, at *7 (Bankr. C.D. Cal. 2011)* (dicta in unpublished opinion holding former spouse is not an insider) (***HN15***[] "'Insider,' as defined in *§ 101(31)*, specifically includes the spouse of the debtor . . . ."), *citing*, *Miller v. Schuman, 81 B.R. 583, 585 (9th Cir. BAP 1987)* ("A spouse of the debtor is a relative . . . because the definition includes individuals 'related by affinity.'") (dicta as holding related to former spouse). Defendant's pattern of asset diversions to his wife continued all the way to the Petition Date, when Defendant transferred an additional $17,000.00 to his wife. Given that within three months of the Petition Date, Defendant transferred at least $86,000.00 from the CNB account in his name to his Wife's CNB Account in which, as previously stated, Defendant had a community property interest, and given that the account belonged to his wife's law practice and that Defendant was not a signatory on the account, the court determines that through such transfers, Defendant intended to hinder, delay and defraud creditors by making it difficult for them to collect on their claims because they would have had to establish that his interest in property no longer in his name was still his, having transferred funds in his name to another. **[*72]** *See* *In re Woodfield, 978 F.2d at 518* (intent may be inferred from certain "badges of fraud" that constitute circumstantial evidence of intent, including a close relationship between the transferor and the transferee); *California Civil Code § 3439.04(b)(1)* and *(2)* ("(1) Whether the transfer or obligation was to an insider" and

"(2) Whether the debtor retained possession or control of the property transferred after the transfer"); 6 Resnick and Sommer, *Collier on Bankruptcy*, ¶ 727.02[3][b] at 727-18 and n. 37 ("The fact that a transfer is to a relative or close associate can also be indicative of fraud, as can the debtor's retaining possession, benefits or use of the property that was transferred."), *citing, Pavy v. Chastant (In re Chastant), 873 F.2d 89 (5th Cir. 1989)*.

Defendant argues that the transfers to his wife of $86,000 in the three months before his bankruptcy case was filed were to "pay customary bills," but there is no evidence to corroborate Defendant's testimony that this was the purpose of the transfers and for the court to determine that such "customary" bills were reasonable living expenses. *See Defendant's Post-Trial Proposed Findings of Fact and Conclusions of Law*, ECF 27 at 6-7, *citing inter alia, Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:16 a.m. and 9:51-9:52 a.m. The court cannot **[*73]** accept at face value Defendant's assertion that his wife used the funds transferred by him to her bank account to pay "customary bills", implicitly suggesting that her use of the transferred funds was reasonable or justifiable, since he admitted in his testimony that her bank account was her own account, that he had nothing to do with it, that he was not a signatory on her bank account, and had no control over the account, thus indicating that he may not have personal knowledge of what she did with the funds transferred to her bank account . *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:16 a.m. and 9:16-9:18 a.m.; *Federal Rule of Evidence 602* (A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. . . ."). The only person with personal knowledge of what Defendant's wife did with the funds transferred to her bank account over which she had sole control was the wife, and she did not testify at trial. It appears that he would only have known what she did with the transferred funds based on what she told him. Thus, the court determines that Defendant's testimony as to what his wife did with the transferred **[*74]** funds is not credible because he has not provided a foundation for the court to make a finding that he has personal knowledge of that matter, and that the court otherwise has no reliable evidence as to what Defendant's wife did with the funds that Defendant transferred to her account, that is, there is no way of ascertaining from this record whether she used the funds to make preferential transfers to existing creditors, which may indicate a lack of intent to hinder, delay or defraud, or she went on a shopping spree before Defendant filed his bankruptcy case, which may indicate such intent. Given the timing of the transfers by Defendant to his wife's bank account and the amounts transferred within three months of his filing this bankruptcy case totaling $86,000, of which only $25,793 was listed in her bank account on his bankruptcy schedules, the court infers that the unaccounted for amount of about $61,000 was dissipated for the benefit of Defendant and his wife to avoid paying his nonpreferred creditors, which is similar to the situation in *In re Cooke, supra*, i.e., expenditures for the personal benefit of the debtor rather than payment of current creditors.

According to Defendant, the $18,000 transferred **[*75]** to his wife right before the petition date is accounted for on his bankruptcy schedules as his community property interest in his wife's bank account which is a listed asset on Schedule B-Personal Property (i.e., part of the $25,793 listed on Schedule B for her account). *Id.* at 7. This interest is claimed as exempt on Schedule C-Property Claimed as Exempt and is apparently intended to pay for "customary bills" in the future (i.e., postpetition). Exhibit 8 at 21; *see In re Beverly, 374 B.R. at 245* ("Even if the exemption is not defeated, the existence of intent to hinder, delay, or defraud creditors nevertheless may warrant denial of discharge under *§ 727(a)(2)*."), *citing inter alia, Norwest Bank Neb., N.A. v. Tveten, 848 F.2d 871, 874-876 (8th Cir. 1988)* ("debtor did not want a mere *fresh* start, he wanted a *head* start") (emphasis in original; internal quotation marks omitted). Thus, the circumstances of Defendant's transfers to his wife go beyond the mere fact that Defendant converted his nonexempt home equity to exempt property to be outside the holding of *Gill v. Stern, supra. See also, In re Beverly, 374 B.R. at 240-241* (discussing *Gill v. Stern, supra*, in that it involved a transfer from one form of exempt asset to another form of exempt asset, and was "not a simple instance of eve-of-bankruptcy exemption planning").

**iv. Defendant's Other Prepetition Transfers Right Before [*76] Filing for Bankruptcy**

At or just before the petition date, Defendant also transferred $31,600.00 from Defendant's non-exempt Joint Account to various destinations. Aside from the $17,000.00 transfer to his wife on the Petition Date, which was discussed above regarding his transfers to his wife, Defendant made two transfers to benefit himself and his wife by making a contribution of $6,500.00 to a Roth Individual Retirement Account (IRA)

in his name and a contribution of $6,500.00 to a Roth IRA in his wife's name. Apparently, these were new accounts because Defendant's bankruptcy schedules only show the amounts of these contributions in the accounts. *See Defendant's Post-Trial Proposed Findings of Fact and Conclusions of Law*, ECF 27 at 6-7. Both of these assets are claimed by Defendant as exempt. *Id.; see also, In re Beverly, 374 B.R. at 245* ("Even if the exemption is not defeated, the existence of intent to hinder, delay, or defraud creditors may warrant denial of discharge under *§ 727(a)(2)*.") (citations omitted). These transfers are additional evidence of Defendant's actual intent to hinder or delay his creditors in light of the other circumstances of his transfers in this case as discussed herein.

**v. The Totality of Circumstances [*77] Showing Defendant's Actual Intent to Hinder, Delay or Defraud Creditors**

The court considers Defendant's admitted animus towards JPMorgan and his fear of former counsel, Shustak, obtaining a judgment and levying Defendant's CNB Account, as further evidence of his actual intent to hinder, delay or defraud creditors through his prepetition asset transfers. Defendant has been open about his hostility towards both creditors, who and which are the largest unsecured creditors in his bankruptcy case, and the transfer of Defendant's property prevented the distribution of the value of such property to these creditors. Indeed, if Defendant had not transferred the funds, the funds would be in Defendant's CNB Account and available for distribution as part of the bankruptcy estate. For instance, had Defendant not made the transfers to Dovenmuehle Mortgage and Logan Investments, $52,477.30 would have been in Defendant's CNB Account on the Petition Date, would have become part of the bankruptcy estate by operation of law, and thus, would have been available for distribution to Defendant's unsecured creditors. The same is true for all of Defendant's prepetition transfers. Indeed, Defendant recognized **[*78]** that, absent the transfers, the funds would be available to benefit his creditors, including JPMorgan and Shustak. In order to avoid that outcome however, Defendant admitted at trial that he "had to prioritize where this money went" and the court determines that he made the various transfers at issue to his wife and preferred creditors in the weeks preceding the Petition Date to ensure the funds were distributed, as he, and not the Bankruptcy Code, deemed appropriate.

The court concludes that under these circumstances, as in *Beverly*, Defendant's prepetition transfers were "too much" because they involved a large dilution of non-exempt assets. *In re Beverly, 374 B.R. at 245*. On or about March 1, 2014, before Defendant prepaid the loans secured by the First and Second DOTs on the Property, Defendant had at least $247,950.85 in his CNB Account, and considering that Defendant did not claim an exemption in his CNB account, Defendant would have had non-exempt assets of at least $247,950.85 that could have been used to pay Defendant's unsecured creditors. After the various transfers described above, Defendant had only $600.00 in his CNB Account on the Petition Date, and almost no assets with which to pay his non-preferred **[*79]** creditors like Plaintiffs and Shustak. Furthermore, as detailed above, the record is replete with evidence that Defendant focused on preventing his non-preferred creditors from reaching the value in his assets, including the nonexempt equity in the Property. Accordingly, based on the dilution of at least $247,350.85 in non-exempt assets, leaving little to pay the claims of nonpreferred creditors shortly before filing for bankruptcy, who would be otherwise barred from collecting due to the bankruptcy discharge, and the dilution of the pool of prepetition assets included Defendant's transfers of $52,000.00 in non-ordinary course prepayment of his home loans (i.e., paying future creditors as opposed to current nonpreferred creditors), and his insider transfers of $86,000.00 to his wife, and based on evidence of Defendant's prior animus towards, and intent not to pay, his nonpreferred creditors, such as JPMorgan, including express admissions, the court determines that Defendant undertook the prepetition transfers involving large claims of exemption and overtones of overreaching, like the debtor in *Beverly*, in an effort to become judgment proof as to his non-preferred creditors, including **[*80]** JPMorgan and Shustak, and thwart their collection efforts against him, and the evidence surrounding the circumstances of these transfers demonstrate his intent to hinder, delay, or defraud his creditors to warrant denial of his bankruptcy discharge under *11 U.S.C. § 727(a)(2)(A)*.

In making such a determination in this case, the court does not intend to "draw a line" that demarcates the line between permissible and impermissible prebankruptcy planning, but rather, the court determines that based on the additional and sufficient evidence of intent presented in this case beyond the mere fact that Defendant made some preferential transfers to other creditors immediately preceding his bankruptcy filing, and beyond the mere fact that Defendant converted nonexempt

assets to exempt assets, Defendant "crossed over the line" of what is permissible behavior. *See* *In re Beverly, 374 B.R. at 244-246* (discussing the difficulty in drawing the line between legitimate bankruptcy planning and intent to hinder, delay or defraud creditors). Accordingly, the court determines that under the totality of the circumstances here, the preponderance of the evidence shows that Defendant transferred property prepetition with the intent to hinder, delay or defraud creditors, **[*81]** and therefore, the court should deny the entry of a discharge order in Defendant's bankruptcy case under *11 U.S.C. § 727(a)(2)(A)*.

**II. Postpetition Transfers Under *11 U.S.C. § 727(a)(2)(B)***

Through their complaint, Plaintiffs argue that Defendant's discharge should be denied pursuant to *11 U.S.C. § 727(a)(2)(B)*. Nonetheless, the court observes that Plaintiffs abandoned this claim by failing to introduce evidence supporting the existence of any postpetition transfers and by failing to argue such at trial. Accordingly, the court denies Plaintiffs' claim under *11 U.S.C. § 727(a)(2)(B)* for lack of proof.

**III. Conclusion**

For the foregoing reasons, the court determines that there is adequate and sufficient evidence to establish by a preponderance that Defendant made prepetition transfers to preferred parties with actual intent to hinder or delay non-preferred creditors, including JPMorgan and Shustak, and therefore, Defendant's discharge should be denied pursuant to *11 U.S.C. § 727(a)(2)(A)*.

This memorandum decision constitutes the court's findings of fact and conclusions of law pursuant to *Rule 7052 of the Federal Rules of Bankruptcy Procedure* and *Rule 52 of the Federal Rules of Civil Procedure*. A separate judgment is being entered concurrently.

IT IS SO ORDERED.

Date: September 23, 2016

/s/ Robert Kwan

Robert Kwan

United States Bankruptcy Judge

JUDGMENT

The court having issued its memorandum decision in this adversary **[*82]** proceeding on the complaint objecting to entry of discharge pursuant to *11 U.S.C. § 727(a)(2)(A)* and *(a)(2)(B)*, which decision sets forth its findings of fact and conclusions of law after trial, pursuant to *Rule 7052 of the Federal Rules of Bankruptcy Procedure* and *Rule 52 of the Federal Rules of Civil Procedure*,

Judgment is hereby entered in favor of Plaintiffs JP Morgan Chase Bank, N.A., and JP Morgan Securities, LLC, and against Defendant Joseph Ellison that the discharge of Defendant Joseph Ellison, the debtor in this bankruptcy case, is denied pursuant to *11 U.S.C. § 727(a)(2)(A)*.

IT IS SO ORDERED.

Date: September 23, 2016

/s/ Robert Kwan

Robert Kwan

United States Bankruptcy Judge

---

End of Document

# Exhibit “3”

 Neutral
As of: September 16, 2023 4:08 PM Z

# In re Nevett

United States Bankruptcy Appellate Panel for the Ninth Circuit

July 1, 2021, Filed

BAP No. SC-20-1154-SGB, Bk. No. 15-07986-CL7

**Reporter**

2021 Bankr. LEXIS 1781 *; 70 Bankr. Ct. Dec. 108; 2021 WL 2769799

In re: SEAN PAUL NEVETT and SHANNON LEE NEVETT, Debtors.SEAN PAUL NEVETT, Appellant, v. UNITED STATES TRUSTEE, Appellee.

**Notice:** THIS DISPOSITION IS NOT APPROPRIATE FOR PUBLICATION. ALTHOUGH IT MAY BE CITED FOR WHATEVER PERSUASIVE VALUE IT MAY HAVE (SEE *FED. R. APP. P. 32.1*), IT HAS NO PRECEDENTIAL VALUE. SEE 9TH CIR. BAP RULE 8013-1.

**Prior History:** **[*1]** Appeal from the United States Bankruptcy Court for the Southern District of California. Adv. No. 18-90038-CL. Christopher B. Latham, Bankruptcy Judge, Presiding.

## Core Terms

records, loan proceeds, loans, documentation, bankruptcy court, summary judgment, transactions, adequate record, circumstances, invest, financial condition, bankruptcy filing, loan transaction, registers, summary judgment motion, standard of review, mixed question, business transaction, clearly erroneous, purposes, genuine, exam, prima facie case, trial testimony, no record, de novo, sophistication, adequacy, entities, lookback

## Case Summary

**Overview**

HOLDINGS: [1]-The bankruptcy court did not err in denying debtor's discharge under *11 U.S.C.S. § 727(a)(3)* for failing to keep records of his use of loan proceeds of $ 381,000 he received from two individuals, dating as far back as six years before he filed bankruptcy. The court considered the amount and nature of the transactions, the nature of debtor's overall business dealings, the millions of dollars in loans and investment funds he managed during the course of his career, the types of records he typically kept, and his overall level of sophistication, education, and experience.

**Outcome**

Judgment affirmed.

## LexisNexis® Headnotes

Bankruptcy Law > ... > Judicial Review > Standards of Review > Clear Error Review

Bankruptcy Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

Bankruptcy Law > ... > Discharge & Dischargeability > Liquidations > Denial of Discharge

*HN1*[] **Standards of Review, Clear Error Review**

As stated in in cases concerning denial of discharge under 11 U.S.C.S. § 727, the U.S. Bankruptcy Appellate Panel for the Ninth Circuit typically applies the following standards of review: (1) the bankruptcy court's determinations of the historical facts are reviewed for clear error; (2) the selection of the applicable legal rules under § 727 is reviewed de novo; and (3) the application of the facts to those rules requiring the exercise of judgments about values animating the rules is reviewed de novo.

Bankruptcy Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Judgments

**HN2[] Standards of Review, De Novo Standard of Review**

The U.S. Bankruptcy Appellate Panel for the Ninth Circuit relies on the court's initial grant of summary judgment as to the adequacy and necessity determinations and reviews those issues de novo.

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Causes of Action

Civil Procedure > Pleading & Practice > Pleadings > Impleader

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Judgments

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Counterclaims & Crossclaims

Civil Procedure > Trials > Separate Trials

**HN3[] Adversary Proceedings, Causes of Action**

Fed. R. Civ. P. 42(b) (made applicable in adversary proceedings by Fed. R. Bankr. P. 7042) authorizes trial courts to order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims. In addition, Fed. R. Civ. P. 56(g) (made applicable in adversary proceedings by Fed. R. Bankr. P. 7056) enables courts to grant partial relief on a summary judgment motion by identifying specific material facts as not genuinely disputed and thereafter treating those facts as established.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

Civil Procedure > Appeals > Standards of Review > De Novo Review

**HN4[] Standards of Review, Clearly Erroneous Review**

There are two distinct categories of mixed questions: those where legal issues predominate and those where factual issues predominate. When the mixed question principally requires the court to expound on the law, particularly by amplifying or elaborating on a broad legal standard, the mixed question is considered predominantly legal and is subject to de novo review. But when the mixed question primarily requires the court to make a case-specific inquiry based on a group of facts already established — or to make an additional factual inference from those facts — the resolution of the question is inherently factual in nature, and the appellate court needs to apply the more-deferential clearly erroneous standard of review. Mixed questions are typically reviewed de novo, but, depending on the nature of the inquiry involved, may be reviewed under a more deferential clearly erroneous standard.

Bankruptcy Law > ... > Judicial Review > Standards of Review > Clear Error Review

Bankruptcy Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

**HN5[] Standards of Review, Clear Error Review**

When the bankruptcy appellate panel reviews a matter de novo, it considers it anew as if it were not previously ruled on by the bankruptcy court. In contrast, a factual finding is not clearly erroneous unless it is illogical, implausible, or without support in the record.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Failure to Preserve Records

**HN6[] Denial of Discharge, Failure to Preserve Records**

The bankruptcy court must deny the debtor a discharge if he or she fails to keep or preserve written records from which his or her financial condition and material business transactions can be ascertained. 11 U.S.C.S. § 727(a)(3). Thus, in order to qualify for a discharge, § 727(a)(3) requires the debtor to maintain sufficient financial records to enable his or her creditors reasonably to ascertain his present financial condition and to follow his business transactions for a reasonable period in the past.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Failure to Preserve Records

**HN7[] Denial of Discharge, Failure to Preserve**

**Records**

To rule on a 11 U.S.C.S. § 727(a)(3) claim, the bankruptcy court typically must engage in a two-step process. First, the court must consider whether the party challenging the discharge has made a prima facie case by demonstrating that: (1) the debtor failed to maintain and preserve adequate records; and (2) this failure rendered it impossible to ascertain the debtor's financial condition and material business transactions. And second, if the plaintiff meets its prima facie case, the burden shifts to the debtor to justify the inadequacy or nonexistence of records.

Bankruptcy Law > ... > Preferential Transfers > Elements > Benefit of Creditor

*HN8*[] **Elements, Benefit of Creditor**

When a debtor transfers a substantial amount of money to a third party, the failure to keep any documentation evidencing the terms of the transfer or the fact that the payment actually took place establishes a prima facie violation of 11 U.S.C.S. § 727(a)(3).

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Failure to Preserve Records

*HN9*[] **Denial of Discharge, Failure to Preserve Records**

The justification issue under 11 U.S.C.S. § 727(a)(3) requires the court to consider all of the relevant circumstances of the case. If the extent and nature of the debtor's transactions were such that others in like circumstances would ordinarily keep financial records, she must show more than that she did not comprehend the need for them. In such cases, the justification must indicate that because of unusual circumstances, the debtor was absolved from the duty to maintain records herself.

Bankruptcy Law > Conversion & Dismissal > Individuals With Regular Income

*HN10*[] **Conversion & Dismissal, Individuals With Regular Income**

The following non-exclusive factors can help inform the bankruptcy court's consideration of the justification issue under 11 U.S.C.S. § 727(a)(3): debtor's education, the sophistication of the debtor's business experience, the size and complexity of debtor's business, debtor's personal financial structure, and any special circumstances.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Failure to Preserve Records

*HN11*[] **Denial of Discharge, Failure to Preserve Records**

Debtors are required to keep records for a reasonable period of time for 11 U.S.C.S. § 727(a)(3) purposes, and a court's determination of reasonableness' depends on the particular facts and circumstances of each case.

Bankruptcy Law > ... > Plan Confirmation > Confirmation Criteria > Consensual Confirmations

*HN12*[] **Confirmation Criteria, Consensual Confirmations**

Fraudulent or bad-faith intent is not required to support a claim under 11 U.S.C.S. § 727(a)(3).

**Counsel:** For SEAN PAUL NEVETT, Appellant: Jon R. Williams, Esquire, Williams Iagmin LLP, San Diego, CA; Vincent Renda, Esquire, Pinnacle Legal P.C., San Diego, CA.

For UST- UNITED STATES TRUSTEE, SAN DIEGO, Appellee: Russell Clementson, California, Los Angeles, CA.

**Judges:** Before: SPRAKER, GAN, and BRAND, Bankruptcy Judges.

## Opinion

**MEMORANDUM***

---

* This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* ***Fed. R. App. P. 32.1***, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

**INTRODUCTION**

Sean Paul Nevett appeals from the bankruptcy court's denial of his discharge under § 727(a)(3)[1] for failing to keep records of his use of loan proceeds he received from Mitch Pullman and Heath Bell, dating as far back as six years before he filed bankruptcy. Mr. Nevett contends that the court clearly erred when it imposed a six-year "lookback" on his duty to keep records of his material transactions. He contends that given the age of the two loans, his failure to keep adequate records was justified. He alternately asserts that even without records of his use of these loan proceeds, he produced ample documents to the United States Trustee ("UST"), which provided a clear and complete understanding of his current **[*2]** financial condition at the time he filed for bankruptcy.

The bankruptcy court determined otherwise, based largely on the nature of Mr. Nevett's business dealings, the amount of money lent to him in the years before he filed bankruptcy, the scarce funds in his possession at the time he filed bankruptcy, and Mr. Nevett's inconsistent testimony regarding how he had used the Pullman and Bell loan proceeds. Forced to speculate about what happened to the full amount of the Pullman and Bell loan proceeds, the court disagreed that Mr. Nevett had otherwise provided sufficient information to discern his current financial condition.

We find no reversible error in the bankruptcy court's determinations. Accordingly, we AFFIRM.

**FACTS**

**A. Mr. Nevett's background, the bankruptcy, and the UST's initial discovery**.

Mr. Nevett holds a bachelor's degree in real estate finance from the University of Southern California. For several years he held a stockbroker's license (series 7 and 24). Over the span of thirty years he initially was employed as a stockbroker and later formed his own consulting and investment services companies.

The Nevetts commenced their bankruptcy case by filing a joint chapter 7 petition in **[*3]** December 2015. They listed total assets of $1,720,002.49 and total liabilities of $7,320,467.61. Of their liabilities, nearly $6,000,000 was owed to their general unsecured creditors. The Nevetts listed the vast majority of their general unsecured debt as "business obligations." In fact, $5,178,842 of this debt originated from loans Mr. Nevett received from eleven individuals ranging from 2009 through 2015. This appeal arose from the UST's efforts to understand how Mr. Nevett used these loan proceeds. Though he borrowed over $5,000,000, at the time of their bankruptcy filing the Nevetts had less than $10,000 in cash and bank account balances.

The UST examined the Nevetts at the § 341(a) first meeting of creditors and subsequently requested a number of documents to better understand the Nevetts' financial condition. The UST reviewed documents produced by them in September 2016 and January 2017. The UST then sought documentation explaining the disposition of the loan proceeds from the individual lenders. In March 2017, the UST and Mr. Nevett stipulated to an examination and production of documents under Rule 2004. Again, the UST sought documentation explaining Mr. Nevett's receipt and disbursement of **[*4]** the loan proceeds. The Rule 2004 exam was conducted and continued from time to time beginning in April 2017 and ending in February 2018.

**B. The UST's objection-to-discharge complaint**.

Unsatisfied with the completeness and perceived reliability of Mr. Nevett's explanation, the UST filed a complaint in March 2018 objecting to Mr. Nevett's discharge under § 727(a)(3) and (5). The complaint detailed the Nevetts' assets and liabilities as stated in their schedules. It also referenced Mr. Nevett's disclosure of his prepetition income from operating his consulting services business through Checkpoint Marketing, Inc. But the complaint focused on the $5,178,842 in loans from the individual lenders. The UST alleged that Mr. Nevett had no documentation explaining the disposition of the $1,500,000 in loans he received from Deanne Gage ($25,000 loaned in 2010), Heath Bell ($500,000 loaned in 2011), Mitch Pullman ($475,000 loaned between 2009 and 2010),[2] and Steve

---

[1] Unless specified otherwise, chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, "Rule" references are to the Federal Rules of Bankruptcy Procedure, and "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2] Pullman lent Mr. Nevett a total of $900,000. However, as per the complaint, Mr. Nevett only failed to provide documentation accounting for $475,000 of the $900,000.

Zeldin ($500,000 loaned in 2009).

The complaint based this allegation on Mr. Nevett's *Rule 2004* examination, during which he testified that he had no records to support his use of the $1,500,000 in loan proceeds. The complaint also referenced the inconsistency between his **[*5]** *Rule 2004* examination testimony and his sworn schedules. The schedules identified the loans from individual lenders as "business obligations," but Mr. Nevett later testified that he used some of the loan proceeds to pay credit card bills, home mortgage installments, and utility bills.

**C. The UST's summary judgment motion and Mr. Nevett's response**.

The UST moved for summary judgment focusing on Mr. Nevett's admitted lack of documentation supporting his claimed disposition of the $1,500,000 in loan proceeds. The UST contended that Mr. Nevett failed to maintain adequate books and records pertaining to these proceeds. As a result of this failure, the UST posited that it could not meaningfully ascertain his financial condition and the nature of some of his material business transactions. This, the UST argued, justified denial of his discharge under *§ 727(a)(3)*. According to the UST, given Mr. Nevett's education in finance, his securities background, and his experience in providing consulting and investment services through his wholly-owned companies, he qualified as a highly-sophisticated debtor, who reasonably could be expected to maintain records regarding his use of the $1,500,000 in loan proceeds which were **[*6]** ostensibly procured as business obligations. And his unjustified failure to do so was sufficient to support its *§ 727(a)(3)* claim.

As for its *§ 727(a)(5)* claim, the UST argued that the same facts demonstrated the requisite failure to adequately explain the absence of the loan proceeds as part of Mr. Nevett's assets at the time of his bankruptcy filing.

Mr. Nevett opposed the summary judgment motion. He argued that he produced sufficient documentation to give the UST a "clear picture of [his] financial condition" during the four years immediately preceding his bankruptcy filing — from January 2012 to December 2015. As Mr. Nevett explained, he provided the UST with a plethora of documents from this period, including complete sets of personal and business bank account statements, credit card statements, and tax returns. He further pointed to the promissory notes and check registers he produced. He insisted that these documents provided the UST with "specific transactions and accountings for much of the loans received between years 2012 to 2015."

With respect to the $1,500,000 in loan proceeds, Mr. Nevett explained that these loan proceeds were paid to him (or on his behalf) during the time period between 2009 **[*7]** and 2011—a period for which his records admittedly were incomplete. However, Mr. Nevett insisted that for the subject loans, whenever his documentation was incomplete, he specified third parties from whom documentation might be obtained.

**D. Mr. Nevett's explanation for the subject loans in response to the summary judgment motion**.

**1. Bell loan transaction ($500,000 to invest in Location Based Technology for or on behalf of RFF Family Partnership)**.

As part of his summary judgment opposition, Mr. Nevett recounted his *Rule 2004* exam testimony wherein he explained to the UST that the $500,000 he received from Heath Bell was used to purchase and exercise an option for 1,000,000 shares of Location Based Technology at $0.50 per share. According to Mr. Nevett, he told the UST that Location Based Technology's transfer agent — Transhare — delivered the stock shares directly to one of his other lenders (the RFF Family Partnership), which liquidated the shares to pay off a debt Mr. Nevett owed to that lender.

According to Mr. Nevett, he offered to subpoena these records from Transhare, but the UST declined the offer.

**2. Zeldin loan transaction ($500,000 to pay off Wells Fargo Advisors' margin call)**.

With respect **[*8]** to the $500,000 loan from Steve Zeldin, Mr. Nevett initially testified at his *Rule 2004* examination that he did not have any records regarding its use because the entire amount was paid directly by Zeldin to Wells Fargo Advisors to pay off Mr. Nevett's margin call obligation. However, his summary judgment opposition included a bank statement reflecting a wire transfer from Zeldin to Well Fargo Advisers for $494,224.17. Mr. Nevett stated that this wire transfer record was the record of the disposition of the Zeldin loan proceeds.

**3. Gage loan transaction ($25,000 to invest in Hawaii Mona Protein Powder)**.

As for the $25,000 Gage loan, Mr. Nevett stated that it was used as part of his investment in a company known as Hawaii Mona Protein Powder, which ultimately failed. But he admitted that he did not have in his possession or control any documents reflecting that investment.

**4. Pullman loan transaction ($475,000 to invest in O'Quinn LLC and in Transpacific Aerospace)**.

Finally, as for the $475,000 Pullman loan, Mr. Nevett asserted that $400,000.00 was invested in a company known as O'Quinn LLC, from whom supporting records presumably could be subpoenaed — even though Mr. Nevett said O'Quinn was the **[*9]** subject of its own bankruptcy case. The remaining $75,000 portion of the Pullman loan was used to purchase stock in a company known as Transpacific Aerospace. Though Mr. Nevett was unable to provide any evidence of the $400,000 that he purportedly invested in O'Quinn, LLC, Mr. Nevett provided the UST with the stock certificate for Transpacific Aerospace to account for the $75,000 loaned by Pullman.

In short, Mr. Nevett argued that given the age of these loans — some of them dating back as many as six years before his bankruptcy filing — his explanation and production of supporting documents was reasonable and adequate under the circumstances.

**E. The bankruptcy court's interim order on the summary judgment motion**.

After considering the parties' summary judgment papers, the court accepted the documentation supporting Mr. Nevett's claimed disposition of the Zeldin loan ($500,000) and $75,000 of the Pullman loan proceeds. The court held that summary judgment was inappropriate as this documentation raised a genuine dispute whether Mr. Nevett had produced sufficient records as to those loans.

With respect to the Bell loan ($500,000), the larger Pullman loan ($400,000), and the Gage loan ($25,000), **[*10]** the court ruled that there was no factual dispute that Mr. Nevett had failed to maintain any records relating to these transactions. As the court determined, there also was no genuine dispute that the absence of such records prevented the UST from fully understanding Mr. Nevett's financial condition at the time of his bankruptcy filing and his material business transactions. The court explained that these facts — established for purposes of summary judgment — shifted the burden to Mr. Nevett to show that his failure to maintain such records was justified under the circumstances. According to the court, there was a genuine issue of material fact regarding whether the Bell, Pullman, and Gage loans were so temporally remote from Mr. Nevett's bankruptcy filing as to render it unreasonable to expect Mr. Nevett to have retained any records respecting his use of the loan proceeds from these transactions.

As a result, the court ordered the summary judgment proceeding held in abeyance and set this factual issue for trial.[3]

**F. Trial and the court's post-trial findings**.

The court held a one-day trial on May 14, 2019. The court initially admonished the parties that the trial was limited to the issue **[*11]** of justification and what constituted a reasonable lookback period for requiring Mr. Nevett to keep records regarding his use of the Gage, Pullman, and Bell loan proceeds. The court told the parties that they need not and should not present evidence at trial regarding the matters it deemed established after it heard the UST's summary judgment motion.

After holding the trial, the court rendered its "Factual Findings After Evidentiary Hearing." The court did not, however, limit its findings to the issues of justification and the reasonable lookback period for Mr. Nevett's use of the subject loan proceeds. Rather, it made findings concerning Mr. Nevett's use of the Pullman (larger), Bell, and Gage loan proceeds.

More specifically, Mr. Nevett's check registers and related trial testimony established that only $28,000 of the $400,000 Pullman loan proceeds were used for purposes other than investing in O'Quinn LLC. The court pointed out that this trial testimony conflicted with Mr. Nevett's *Rule 2004* examination testimony that he had used the entire $400,000 of the Pullman loan proceeds to invest in O'Quinn. Regardless of how Mr. Nevett actually used the Pullman loan proceeds, there

---

[3] The bankruptcy court never returned to the question of whether Mr. Nevett presented sufficient records of the Zeldin loan and smaller Pullman loan ($75,000).

remained no records **[*12]** for the disposition of $372,000 of these proceeds.

At trial, Mr. Nevett's account of how he used the Bell loan proceeds changed even more dramatically. While he had previously stated in opposition to the UST's motion for summary judgment that he used the entire $500,000 loan to purchase 1,000,000 shares of Location Based Technology stock and then delivered the shares to the RFF Family Partnership, Mr. Nevett used his check registers and related trial testimony to show that $491,000 of the $500,000 Bell loan proceeds were used for purposes other than investing in Location Based Technology. He testified that based on the check register he presented as his Trial Exhibit A, he actually used $491,000 of the Bell loan proceeds "to make payments on pending bills, debts and loan payments." While inconsistent with Mr. Nevett's prior explanations, the court credited the check registers as accurate and contemporaneous records of the disbursement of $491,000 of the Bell loan proceeds. But there remained no disbursement records for the $9,000 balance of the Bell loan.

As for the $25,000 Gage loan transaction, the court noted Mr. Nevett's proffered explanation that he invested in a company called **[*13]** Hawaii Mona Protein Powder was "inadequate on its face." Yet, the court also considered the size of the loan, its age, and the fact that Mr. Nevett testified at trial that he largely repaid this loan. The court accepted this trial testimony and concluded that the Gage loan transaction and Mr. Nevett's use of the proceeds was not a material transaction for which Mr. Nevett reasonably could have been expected to retain records.

In sum, the UST commenced the case because Mr. Nevett had failed to provide adequate records for $1,500,000 in loan proceeds he had received. Mr. Nevett was eventually able to produce adequate records for $575,000 of those loan proceeds in response to the UST's motion for summary judgment, and the bankruptcy court held on summary judgment that he had failed to produce adequate records for the remaining $925,000 in loan proceeds. This prompted the trial at which Mr. Nevett then presented adequate documentation accounting for another $544,000 of the remaining loan proceeds. On the other hand, after trial there were still no records explaining Mr. Nevett's use of $381,000.00 of the loan proceeds from the Pullman and Bell loans, and the court determined that Mr. Nevett's **[*14]** failure to keep such records was unreasonable for purposes of *§ 727(a)(3)*.

In addition, the bankruptcy court revisited and reaffirmed its earlier summary judgment determination that, under all the circumstances, records regarding these transactions were necessary in order to enable the UST to fully understand Mr. Nevett's financial condition and material transactions — especially in light of the conflicting trial evidence regarding his use of the Pullman and Bell loan proceeds.

With respect to the justification issue and what constitutes a reasonable lookback period, the bankruptcy court again examined all of the circumstances and found that the Pullman and Bell loan transactions fell within the time period for which Mr. Nevett reasonably should have retained records documenting his receipt and disbursement of the loan proceeds. In making this finding, the court primarily relied on Mr. Nevett's education, training, business experience, and sophistication, and on the size and nature of these two transactions.

**G. The bankruptcy court's final ruling and Mr. Nevett's appeals**.

Based on its findings after trial and on its prior interim order on the summary judgment motion, the court entered an "Order Granting **[*15]** Summary Judgment and Denying Discharge." The court recited that it had previously determined that the UST had met her prima facie burden as to the Gage, Pullman, and Bell loans totaling $925,000 in loan proceeds. However, it applied its findings after trial to reduce further the unexplained loan proceeds to only the $381,000 from the larger Pullman and Bell loans.[4] As previously found in its interim order, the court noted that the burden had shifted to Mr. Nevett to justify the failure to keep adequate records for the disposition of those funds. The court then found that Mr. Nevett had not justified the failure to keep adequate records for the $381,000 in funds received from the Pullman and Bell loans warranting denial of his discharge.

The court entered judgment pursuant to *§ 727(a)(3)*

[4] The court discussed the Gage loan in its Order Granting Summary Judgment and Denying Discharge and concluded that it was not unreasonable for Mr. Nevett to have failed to preserve adequate records for that loan given the size of the loan and the testimony that it had largely been repaid. We construe this as a finding that Mr. Nevett established an adequate justification for the lack of records as to the Gage loan.

denying Mr. Nevett his discharge on August 8, 2019. Mr. Nevett appealed on August 22, 2019. This initial appeal was dismissed as interlocutory, *see Nevett v. U.S. Trustee*, BAP No. SC-19-1203 (9th Cir. BAP Mar. 3, 2020), because the bankruptcy court's decision had not disposed of the UST's *§ 727(a)(5)* claim. In light of its denial of Mr. Nevett's discharge under *§ 727(a)(3)*, the bankruptcy court declined to dispose of the *§ 727(a)(5)* claim.

Subsequently, **[*16]** based on the parties' stipulation, the court entered final judgment on the *§ 727(a)(3)* claim in accordance with *Civil Rule 54(b)*, made applicable in adversary proceedings by *Rule 7054*. Mr. Nevett timely appealed the final judgment.

## JURISDICTION

The bankruptcy court had jurisdiction under *28 U.S.C. §§ 1334* and *157(b)(2)(J)*. We have jurisdiction under *28 U.S.C. § 158*.

## ISSUE

Did the bankruptcy court commit reversible error when it denied Mr. Nevett's discharge pursuant to *§ 727(a)(3)*?

## STANDARDS OF REVIEW

***HN1***[] As stated in *Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010)*, in cases concerning denial of discharge under *§ 727*, we typically apply the following standards of review:

> (1) the [bankruptcy] court's determinations of the historical facts are reviewed for clear error; (2) the selection of the applicable legal rules under *§ 727* is reviewed de novo; and (3) the application of the facts to those rules requiring the exercise of judgments about values animating the rules is reviewed de novo.

(quoting *Searles v. Riley (In re Searles), 317 B.R. 368, 373 (9th Cir. BAP 2004)*, *aff'd*, *212 Fed. App'x 589 (9th Cir. 2006)*).

***HN2***[] We rely on the court's initial grant of summary judgment as to the adequacy and necessity determinations and review those issues de novo.[5] *See Ingenco Holdings, LLC v. Ace Am. Ins. Co., 921 F.3d 803, 808 (9th Cir. 2019)*.

But there is another issue we must address complicating the applicable standards of review. Even though the bankruptcy court determined the justification issue after trial, this issue arguably **[*17]** could be viewed as a mixed question of fact and law requiring the

---

[5] The parties do not challenge the bankruptcy court's use of summary judgment by which it entered an "interim" order that it held in abeyance while it conducted an "evidentiary hearing," and then entered a final order granting summary judgment. As such, we express no opinion as to the propriety of the procedures used except to note that it has complicated our review on appeal. The court granted summary judgment after conducting an evidentiary hearing and making findings of fact. This appears internally inconsistent and raises concerns about the appropriate standard of review. ***HN3***[] However, *Civil Rule 42(b)* (made applicable in adversary proceedings by *Rule 7042*) authorizes trial courts to "order a separate **trial** of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." (Emphasis added.) In addition, *Civil Rule 56(g)* (made applicable in adversary proceedings by *Rule 7056*) enables courts to grant partial relief on a summary judgment motion by identifying specific material facts as not genuinely disputed and thereafter treating those facts as established. In substance, this is exactly what appears to have happened here. But any final ruling following partial resolution of the case by summary judgment and partial resolution of the remaining issues after trial would still be a judgment after trial. For this reason, we treat the court's denial of discharge as a decision after trial on separate issues limited by its prior grant of summary judgment. Even then, the court's findings after trial could be read as revisiting its initial order on summary judgment as it revised the court's prior summary judgment on the adequacy of the records produced. As the findings of fact after trial revised the scope of the summary judgment granted, they could call into question the propriety of applying de novo review to the two issues determined by the initial grant of summary judgment: the adequacy of the records produced and the necessity for such records. *See Hussain v. Malik (In re Hussain), 508 B.R. 417, 424-25 (9th Cir. BAP 2014)* (applying clearly erroneous standard of review to both elements of creditor's prima facie case under *§ 727(a)(3)*). But in this instance, the court's Order Granting Summary Judgment and Denying Discharge reaffirmed the initial grant of partial summary judgment as to the remaining unexplained balances of the Bell and Pullman loans, so we treat the summary judgment as controlling on the issues of adequacy and necessity. We also note that our result would not differ if we were to treat the court's determinations of adequacy and necessity as findings after trial, which would be subject to the more deferential clearly erroneous standard.

application of facts to the applicable legal rules. If so viewed, a reflexive recitation of *Retz*'s standards of review could mistakenly lead to a conclusion that all mixed questions of fact and law are subject to de novo review. But the determination of the applicable standard of review is more nuanced.

HN4[] There are two distinct categories of mixed questions: those where legal issues predominate and those where factual issues predominate. *See* U.S. Bank Nat'l Ass'n ex rel CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC, ___ U.S. ___, 138 S. Ct. 960, 967, 200 L. Ed. 2d 218 (2018). When the mixed question principally requires the court "to expound on the law, particularly by amplifying or elaborating on a broad legal standard," the mixed question is considered predominantly legal and is subject to de novo review. *Id.* But when the mixed question primarily requires the court to make a case-specific inquiry based on a group of facts already established — or to make an additional factual inference from those facts — the resolution of the question is inherently factual in nature, and the appellate court needs to apply the more-deferential clearly erroneous standard of review. *Id. at 967-68*; *see also* Aspen Skiing Co. v. Cherrett (In re Cherrett), 873 F.3d 1060 (9th Cir. 2017) ("Mixed questions are typically reviewed de novo, but, depending on the nature **[*18]** of the inquiry involved, may be reviewed under a more deferential clearly erroneous standard." (cleaned up)).

Assuming without deciding that the justification question presented herein qualifies as a mixed question of fact and law, it is precisely and unequivocally the latter type of mixed question—a predominantly factual one. To resolve this question, the bankruptcy court needed to look at the totality of circumstances presented and decide whether a reasonable person would have been justified under the circumstances in failing to keep adequate records. As the Ninth Circuit has stated, the justification question hinges on "whether others in like circumstances would ordinarily keep [records]." *Caneva v. Sun Cmtys. Operating Ltd. P'ship (In re Caneva), 550 F.3d 755, 763 (9th Cir. 2008)* (quoting Lansdowne v. Cox (In re Cox), 41 F.3d 1294, 1299 (9th Cir. 1994)).

Consequently, we will apply the de novo standard of review to the adequacy and necessity issues, and we will apply the clearly erroneous standard of review to the justification issue.

HN5[] When we review a matter de novo, we consider it anew as if it were not previously ruled on by the bankruptcy court. Francis v. Wallace (In re Francis), 505 B.R. 914, 917 (9th Cir. BAP 2014). In contrast, a factual finding is not clearly erroneous unless it is illogical, implausible, or without support in the record. In re Retz, 606 F.3d at 1196.

**DISCUSSION**

**A. General Legal standards governing § 727(a)(3).**

HN6[] The bankruptcy **[*19]** court must deny the debtor a discharge if he or she fails to keep or preserve written records from which his or her financial condition and material business transactions can be ascertained. § 727(a)(3); *In re Caneva, 550 F.3d at 761* (citing In re Cox, 41 F.3d at 1296). Thus, in order to qualify for a discharge, § 727(a)(3) requires the debtor to maintain sufficient financial records to enable his or her creditors "reasonably to ascertain his present financial condition and to follow his business transactions for a reasonable period in the past." *Id.* (quoting Rhoades v. Wikle, 453 F.2d 51, 53 (9th Cir. 1971)).

HN7[] To rule on a § 727(a)(3) claim, the bankruptcy court typically must engage in a two-step process. Brandenfels v. Ticor Title Ins. Co. (In re Brandenfels), BAP No. OR-14-1145-FJuKi, 2015 Bankr. LEXIS 3410, 2015 WL 5883317, at *6 (9th Cir. BAP Oct. 7, 2015), *aff'd*, 692 F. App'x 461 (9th Cir. 2017). First, the court must consider whether the party challenging the discharge has made a prima facie case by demonstrating that: "(1) the debtor failed to maintain and preserve adequate records; and (2) this failure rendered it impossible to ascertain the debtor's financial condition and material business transactions." In re Hussain, 508 B.R. at 424 (citing *In re Caneva, 550 F.3d at 761*). And second, if the plaintiff meets its prima facie case, "the burden shifts to the debtor to justify the inadequacy or nonexistence of records." *Id.*

**B. Mr. Nevett's arguments on appeal.**

Mr. Nevett's arguments on appeal are relatively sparse and limited in scope. Relying principally **[*20]** on the length of time that passed between the loans at issue and when he filed for bankruptcy, Mr. Nevett challenged the court's determination that adequate records were needed but not provided for these loans. Charitably construed, this argument implicates both elements of the UST's prima facie case, as well as the justification question. We address each of these questions below.