**1. Adequacy and necessity of records**.

In his opening appeal brief, Mr. Nevett did not directly challenge the bankruptcy court's determination that the debtor failed to create and preserve adequate records regarding his use of the $381,000 consisting of Pullman and Bell loan proceeds. Instead, he argued that he kept and produced copious records generally covering his transactions and financial condition during the four years immediately preceding his bankruptcy filing — from January 2012 to December 2015. Mr. Nevett contended that the 2012 through 2015 records were "adequate" in the general sense. He also argued that the UST did not need anything else to understand his financial condition at the time he filed bankruptcy or his material transactions.

In the alternative, Mr. Nevett argued that to the extent he **[*21]** did need to keep records specifically addressing his earlier use of the Pullman and Bell loan proceeds, and his failure to keep or produce such records was inadequate, the UST should have requested them from third parties instead of seeking to deny his discharge.

Strikingly, the debtor-appellant in *Caneva* made almost identical arguments. There, the debtor Caneva owned or controlled roughly fifteen businesses and admitted during his *Rule 2004* exam that he kept no records for these entities. Similarly, he had no documentation concerning a $500,000 payment he made to an individual named Bowden. Creditor Sun Communities Operating Limited Partnership objected to Caneva's discharge and sought summary judgment on its claim under *§ 727(a)(3)*. The bankruptcy court entered summary judgment in favor of Sun, and the district court affirmed the bankruptcy court's judgment.

On appeal to the Ninth Circuit, Caneva argued that Sun could have obtained any necessary records regarding the $500,000 transaction with Bowden from the public record generated in his criminal prosecution. He further asserted that the substantial quantity of documents he did keep and produce concerning other transactions he was involved in and other **[*22]** aspects of his financial condition were sufficient to create a genuine issue of material fact regarding both elements required to establish Sun's prima facie case — both the adequacy of records kept and the need for additional records to understand his finances and transactions.

The Ninth Circuit rejected Caneva's arguments and affirmed the summary judgment. It explained that *§*

*727(a)(3)* imposes an "affirmative duty" on debtors to create and preserve records. *In re Caneva, 550 F.3d at 762* (citing *Peterson v. Scott (In re Scott), 172 F.3d 959, 969 (7th Cir. 1999)*). The *Caneva* court further observed that the more sophisticated the debtor, the more demanding his or her duty to keep records — both in terms of quantity and quality. *Id.* Based on this reasoning, *Caneva* held:

> when a debtor owns and controls numerous business entities and engages in substantial financial transactions, the complete absence of recorded information related to those entities and transactions establishes a prima facie violation of *11 U.S.C. § 727(a)(3)*. **HN8**[↑] Likewise, we hold that when a debtor transfers a substantial amount of money to a third party, the failure to keep any documentation evidencing the terms of the transfer or the fact that the payment actually took place establishes a prima facie violation of *11 U.S.C. § 727(a)(3)*.

*Id.*

*Caneva* recognized that the debtor **[*23]** still could have avoided summary judgment if he had presented sufficient evidence to demonstrate a genuine issue of material fact "as to whether such failure [to keep records] was justified under the circumstances." *Id. at 763*. *Caneva* concluded that the debtor presented no such evidence, in the process noting that a "transfer of a half million dollars is the kind of transaction for which most business entities would preserve some record." *Id.*

Here, Mr. Nevett admitted during his *Rule 2004* examination that he kept no records to support his claimed disposition of the Bell, Pullman, and Gage loan proceeds, supposedly used to purchase interests in third party entities or, alternatively, to pay his business and personal debts. Nor did Mr. Nevett attempt to retract this admission in his summary judgment opposition. At the time of the bankruptcy court's summary judgment ruling, the amount of the Bell, Pullman, and Gage loan proceeds unaccounted for was $925,000. Given the substantial amount at issue, there was no genuine dispute that this amount required documentation. And Mr. Nevett conceded he had not kept any records for these three loans. The UST established for summary judgment purposes that a financially **[*24]** sophisticated, educated, and experienced businessman had failed to produce any records to establish the disposition of close to a million dollars where he had been able to do so for other similar

2021 Bankr. LEXIS 1781, *24

loans borrowed during that same time frame. Following *Caneva*, as we must, the absence of any records for the use of these significant loan proceeds established not only the inadequacy of the records kept but the need for such records in order to understand Mr. Nevett's finances and transactions.

Though the bankruptcy court here subsequently modified its ruling after trial by giving Mr. Nevett credit for the content of his check registers, which accounted for the disposition of $544,000 of the $925,000, the remaining $381,000 unaccounted for is still a substantial sum. Mr. Nevett has never argued that the $119,000 difference between the $500,000 unaccounted for in *Caneva* and the $381,000 ultimately unaccounted for herein distinguishes his appeal from *Caneva*. Nor are we aware of any reasoned basis for saying so.

In short, under *Caneva*, the bankruptcy court correctly granted summary judgment in favor of the UST on the adequacy and necessity elements required for its prima facie case under *§ 727(a)(3)*.

## 2. Justification [*25] .

Mr. Nevett primarily contends that the court erred by imposing a six-year lookback period for requiring records relating to his use of the loan proceeds from the Pullman and Bell loans. According to Mr. Nevett, on the record presented, the bankruptcy court clearly erred when it found that his failure to keep such records was unjustified. More specifically, he maintains that it was unreasonable to expect him to keep such records given that these two loan transactions occurred between four and six years prior to his bankruptcy filing.

Mr. Nevett additionally points to his testimony that the loan proceeds were used to invest in companies that since that time had failed and over which he had no control. Thus, he reasons that he should not be faulted for his inability to obtain the missing records from them. He further insists that the voluminous records he produced detailing his financial condition and business transactions within three years of his bankruptcy filing amply demonstrated the reasonableness of his record keeping practices.

*HN9*[⬆] The justification issue requires the court to consider all of the relevant circumstances of the case. *In re Cox, 41 F.3d at 1297*. "If the extent and nature of the debtor's transactions [*26] were such that others in like circumstances would ordinarily keep financial records, she must show more than that she did not comprehend

the need for them." *Id.* "In such cases, the justification must indicate that because of unusual circumstances, the debtor was absolved from the duty to maintain records herself." *Id.*

*HN10*[⬆] The following non-exclusive factors can help inform the bankruptcy court's consideration of the justification issue: "debtor's education, the sophistication of the debtor's business experience, the size and complexity of debtor's business, debtor's personal financial structure, and any special circumstances." *Tan v. Tranche 1 (SVP—AMC), Inc. (In re Tan), BAP No. NC—06-1372-RSD, 2007 Bankr. LEXIS 4858, 2007 WL 7541007, at *12 (9th Cir. BAP Sept. 28, 2007)*; see also *In re Cox, 41 F.3d at 1299* (referencing the same list of factors and citing in support *Singer Sewing Co. v. Harmon (In re Harmon), Adv. No. 91-00147, 1992 Bankr. LEXIS 96, 1992 WL 13624, at *5 (Bankr. W.D. Tenn. Jan. 10, 1992)*).

*HN11*[⬆] These same factors also inform the court's decision regarding how far back it is reasonable to expect a debtor to keep records regarding his financial transactions. See *Sfadia v. Dongkuk Int'l, Inc. (In re Sfadia), BAP No. CC-06-1176-MaBPa, 2007 Bankr. LEXIS 4933, 2007 WL 7540987, at *11 (9th Cir. BAP Sept. 5, 2007)* ("Debtors are required to keep records for a 'reasonable' period of time for *§ 727(a)(3)* purposes, and a court's determination of 'reasonableness' depends on the particular facts and circumstances of each case.").[6]

We disagree with Mr. Nevett that the bankruptcy court's finding that it was reasonable under the circumstances [*27] to have expected Mr. Nevett to maintain records regarding his use of the Pullman and Bell loan proceeds was clearly erroneous. In addition to the age of these two loan transactions, the court

---

[6] The court and the parties cited a number of cases addressing what constitutes a reasonable lookback period for purposes of *§ 727(a)(3)*. See, e.g., *Snyder v. Dykes (In re Dykes), 590 B.R. 904, 912-13 (8th Cir. BAP 2018)*; *DeWine v. Scott (In re Scott), 566 B.R. 471 (Bankr. N.D. Ohio 2017)*; *Menotte v. Hahn (In re Hahn), 362 B.R. 542, 548 (Bankr. S.D. Fla. 2007)*; *Structured Asset Servs. v. Self (In re Self), 325 B.R. 224, 241-42 (Bankr. N.D. Ill. 2005)*; *Losinski v. Losinski (In re Losinski), 80 B.R. 464, 474 (Bankr. D. Minn. 1987)*. Virtually all of these cases recognize that what constitutes a reasonable lookback period must be determined on a case-by-case basis. *But see In re Self, 325 B.R. at 241* (listing two cases limiting lookback to a period of two years before the bankruptcy filing absent evidence of avoidable transfers or dissipation of assets).

2021 Bankr. LEXIS 1781, *27

considered the amount and nature of the transactions, the nature of Mr. Nevett's overall business dealings, the millions of dollars in loans and investment funds Mr. Nevett managed during the course of his career, the types of records he typically kept, and his overall level of sophistication, education, and experience.

The court also considered Mr. Nevett's trial testimony and the contents of the check registers he produced, which contradicted his earlier *Rule 2004* exam testimony regarding his use of the loan proceeds. Mr. Nevett testified during his *Rule 2004* exam that he used $400,000.00 of the Pullman loan proceeds to invest in O'Quinn LLC. His check registers established, however, that Mr. Nevett used $28,000 of the Pullman loan proceeds for purposes that were not related to O'Quinn, LLC. Similarly, Mr. Nevett testified during his *Rule 2004* exam that he used the $500,000 from the Bell loan to invest in Location Based Technology, but the check registers established that Mr. Nevett used at least $491,000 of the Bell loan **[*28]** proceeds for personal expenses rather than investing in Location Based Technology.

Additionally, the bankruptcy court expressed concern that, in spite of his borrowing millions of dollars in the years leading up to his bankruptcy filing, Mr. Nevett and his spouse had less than $10,000.00 in cash and in bank accounts at the time they filed their petition.

Based on all of these circumstances, the bankruptcy court inferred that Mr. Nevett lacked sufficient justification for failing to maintain adequate records regarding his use of the Pullman and Bell loan proceeds. On this record, this inference was logical, plausible, and supported by the evidence.

It is clear that Mr. Nevett views the evidence differently and would instead infer from the evidence that his failure to keep adequate records was sufficiently justified. However, even if we assume that Mr. Nevett's posited inference is likewise logical, plausible, and supported by the evidence, the court's choice between two reasonable views of the evidence is not clearly erroneous. *Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985)*.

**3. Intent**.

Finally, Mr. Nevett argues that any failure on his part to keep adequate records was innocent and inadvertent, as opposed to intentional and culpable. **[*29]** Mr. Nevett

maintains that it was inappropriate for the court to "punish" him for failing to keep adequate records in the absence of bad faith or other wrongful intent. This argument lacks merit. **_HN12_**[⬆] As Mr. Nevett concedes, fraudulent or bad-faith intent is not required to support a claim under *§ 727(a)(3)*. *In re Cox, 41 F.3d at 1297*; *accord*, *Sterling Int'l, Inc. v. Thomas (In re Thomas), Adv. No. 01-06321, 2003 Bankr. LEXIS 2472, 2003 WL 21981707, at *9 (Bankr. D. Idaho July 17, 2003)*. Therefore, we reject Mr. Nevett's intent argument.

**CONCLUSION**

For the reasons set forth above, we AFFIRM the bankruptcy court's judgment denying Mr. Nevett his discharge under *§ 727(a)(3)*.

---

**End of Document**

Exhibit "4"

 Positive
As of: September 16, 2023 4:09 PM Z

## *Ravasia v. United States Tr. (In re Ravasia)*

United States Bankruptcy Appellate Panel for the Ninth Circuit

April 16, 2021, Filed

BAP No. EW-20-1212-BTL

**Reporter**
2021 Bankr. LEXIS 1033 *; 2021 WL 1511940

In re: SAJID A. RAVASIA and DEBRA J. RAVASIA, Debtors.SAJID A. RAVASIA; DEBRA J. RAVASIA, Appellants, v. UNITED STATES TRUSTEE, Appellee.

**Notice:** THIS DISPOSITION IS NOT APPROPRIATE FOR PUBLICATION. ALTHOUGH IT MAY BE CITED FOR WHATEVER PERSUASIVE VALUE IT MAY HAVE, SEE *FED. R. APP. P. 32.1*, IT HAS NO PRECEDENTIAL VALUE, SEE 9TH CIR. BAP RULE 8024-1.

**Subsequent History:** Affirmed by *In re Ravasia, 2022 U.S. App. LEXIS 4808 (9th Cir., Feb. 23, 2022)*

**Prior History: [*1]** Appeal from the United States Bankruptcy Court for the Eastern District of Washington. Bk. No. 2:17-bk-00106-FPC, Adv. No. 2:17-ap-80021-FPC. Frederick P. Corbit, Bankruptcy Judge, Presiding.

*Garvin v. Ravasia (In re Ravasia), 2020 Bankr. LEXIS 2176, 2020 WL 4726416 (Bankr. E.D. Wash., Aug. 13, 2020)*

## Core Terms

false oath, schedules, bankruptcy court, expenses, amend, original complaint, amended complaint, fraudulently, knowingly, income and expenses, monthly, discovery, leave to amend, omission, financial affairs, business debt, tax refund, underreported, estimated, false statement, time of filing, postpetition, disclose, refund, cases, monthly income, relates back, credit card, misrepresentations, revocation

## Case Summary

### Overview

HOLDINGS: [1]-Order denying debtors' discharge under *11 U.S.C.S. § 727(a)(4)(A)* for false oaths was affirmed because the debtors' continued false oath as to the husband's income in the Amended Schedule I established an intent to deceive and the advice-of-counsel defense was not available because it should have been, and admittedly was, evident to the debtors by no later than July 2017 that their schedules were inaccurate.

### Outcome
Order affirmed.

## LexisNexis® Headnotes

Bankruptcy Law > ... > Judicial Review > Standards of Review > Abuse of Discretion

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Bankruptcy Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Relation Back

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Commencement of Adversary Proceedings

*HN1*[ ] **Standards of Review, Abuse of Discretion**

An appellate court reviews de novo whether an amended complaint relates back to the original pleading. An appellate court reviews for abuse of discretion the bankruptcy court's decision to allow or deny amendment of pleadings under *Fed. R. Civ. P. 15(c)* and *Fed. R. Bankr. P. 7015*. Whether cause exists

**Exhibit "4"**
**Page 50**

2021 Bankr. LEXIS 1033, *1

to extend the filing deadline to object to a debtor's discharge is reviewed for abuse of discretion.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

Civil Procedure > Appeals > Standards of Review > Questions of Fact & Law

*HN2*[⤓] **Standards of Review, Abuse of Discretion**

A trial court abuses its discretion if it applies the wrong legal standard or if its factual findings were clearly erroneous.

Bankruptcy Law > ... > Judicial Review > Standards of Review > Clear Error Review

Bankruptcy Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

Bankruptcy Law > ... > Discharge & Dischargeability > Liquidations > Denial of Discharge

*HN3*[⤓] **Standards of Review, Clear Error Review**

In an action for denial of discharge under *11 U.S.C.S. § 727*, an appellate court reviews: (1) the bankruptcy court's legal conclusions de novo, (2) factual findings for clear error, and (3) mixed questions of law and fact de novo. Under *§ 727(a)(4)(A)*, whether a debtor made a false oath, whether the false statements were material, and whether the debtor had the requisite fraudulent intent are all questions of fact reviewed under the clearly erroneous standard. Factual findings are clearly erroneous if they are illogical, implausible, or without support in the record.

Civil Procedure > Appeals > Record on Appeal

*HN4*[⤓] **Appeals, Record on Appeal**

An appellate court may affirm on any ground supported by the record, regardless of whether the bankruptcy court relied upon, rejected or even considered that

ground.

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Commencement of Adversary Proceedings

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Relation Back

*HN5*[⤓] **Adversary Proceedings, Commencement of Adversary Proceedings**

A court should freely give leave to amend when justice so requires. *Fed. R. Civ. P. 15(c)* and *Fed. R. Bankr. P. 7015*. The Ninth Circuit applies this rule with extreme liberality. In discharge cases, the opportunity to amend is especially important because of the short time frame under which such a complaint must be filed. *Fed. R. Bankr. P. 4004(a)*.

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Causes of Action

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Relation Back

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Commencement of Adversary Proceedings

*HN6*[⤓] **Adversary Proceedings, Causes of Action**

Under *Fed. R. Civ. P. 15(c)(1)*, made applicable to adversary proceedings by *Fed. R. Bankr. P. 7015*, an amendment to a pleading relates back to the date of the original pleading when it asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading. *Rule 15(c)(1)(B)*; *Rule 7015*. This link will be found when the claim to be added is likely to be proven by the same kind of evidence that would be used to support the original pleading. The focus of the inquiry is on the factual allegations made in the two complaints so as to give the opposing party fair notice of the claims against him.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Relation Back

### HN7[⬇] Amendment of Pleadings, Relation Back

In applying the relation back doctrine in the context of objections to discharge and the dischargeability of certain debts, the basic test is whether the evidence with respect to the second set of allegations could have been introduced under the original complaint, liberally construed; or as a corollary, that in terms of notice, one may fairly perceive some identification or relationship between what was pleaded in the original and amended complaints.

Bankruptcy Law > ... > Bankruptcy > Claims > Objections to Claims

Bankruptcy Law > ... > Discharge & Dischargeability > Liquidations > Revocation of Discharge

### HN8[⬇] Claims, Objections to Claims

_Fed. R. Bankr. P. 4004(b)(2)_ provides for the addition of objection to discharge claims after the time for objection has expired but before discharge is granted when: (A) the objection is based on facts that, if learned after the discharge, would provide a basis for revocation under _11 U.S.C.S. § 727(d)_; and (B) the movant did not have knowledge of those facts in time to permit an objection.

Bankruptcy Law > Discharge & Dischargeability > Exceptions to Discharge > Embezzlement & False Representations

Bankruptcy Law > ... > Discharge & Dischargeability > Liquidations > Revocation of Discharge

### HN9[⬇] Exceptions to Discharge, Embezzlement & False Representations

_11 U.S.C.S. § 727(d)(1)_ provides for revocation of discharge when it is shown that the debtor obtained a discharge through fraud and the plaintiff was not aware of the fraud until after the discharge was entered.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

Evidence > Burdens of Proof > Preponderance of Evidence

### HN10[⬇] Denial of Discharge, False Accounts & Oaths

The bankruptcy court may deny a chapter 7 debtor's discharge if the debtor knowingly and fraudulently, in or in connection with the case-(A) made a false oath or account. _11 U.S.C.S. § 727(a)(4)(A)_. The fundamental purpose of _§ 727(a)(4)(A)_ is to insure that the trustee and creditors have accurate information without having to conduct costly investigations. To prevail on a claim under this section, a plaintiff must show, by a preponderance of the evidence, that: (1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently. A false statement or an omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath. It is crucial to the proper operation of the bankruptcy system that chapter 7 debtors ensure to the greatest extent possible that the information turned over to the bankruptcy court is accurate.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

### HN11[⬇] Denial of Discharge, False Accounts & Oaths

The second element necessary for a _11 U.S.C.S. § 727(a)(4)(A)_ claim is that the false oath relate to a material fact. A fact is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property. An omission or misstatement that detrimentally affects administration of the estate is material.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

### HN12[⬇] Denial of Discharge, False Accounts & Oaths

2021 Bankr. LEXIS 1033, *1

The third element necessary for a *11 U.S.C.S. § 727(a)(4)(A)* claim is that the debtor makes the false oath knowingly. A debtor acts knowingly if he or she acts deliberately and consciously.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

Evidence > Types of Evidence > Circumstantial Evidence

Evidence > Inferences & Presumptions > Inferences

*HN13*[⤓]   **Denial of Discharge, False Accounts & Oaths**

To prevail on a claim under *11 U.S.C.S. § 727(a)(4)(A)*, the objecting party must establish that the debtor's false oath was made fraudulently. Intent is usually proven by circumstantial evidence or by inferences drawn from the debtor's conduct. Reckless indifference or disregard for the truth may be circumstantial evidence of intent, but is not sufficient, alone, to constitute fraudulent intent. But the existence of more than one falsehood, together with a debtor's failure to take advantage of the opportunity to clear up all inconsistencies and omissions, such as when filing amended schedules, can be found to constitute reckless indifference to the truth satisfying the requisite finding of intent to deceive.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

*HN14*[⤓]   **Denial of Discharge, False Accounts & Oaths**

In the context of *11 U.S.C.S. § 727(a)(4)(A)*, nondisclosure of creditors (and debts) can be just as important as nondisclosure of assets. Information regarding business and personal dealings can lead to discovery of assets, potentially avoidable transfers, or other relevant information such as grounds to deny a debtor's discharge. A false statement or omission may be material even if it does not cause direct financial prejudice to creditors. A discharge may be denied if the omission adversely affects the trustee's or creditors' ability to discover other assets or to fully investigate the debtor's pre-bankruptcy dealing and financial condition.

Bankruptcy Law > ... > Bankruptcy > Debtor Benefits & Duties > Debtor Duties

*HN15*[⤓]   **Debtor Benefits & Duties, Debtor Duties**

Generally, a debtor who acts in reliance on the advice of his attorney lacks the intent required to deny him a discharge of his debts. However, the debtor's reliance must be in good faith. The advice of counsel is not a defense when the erroneous information should have been evident to the debtor. The advice of counsel is also not a defense when it is transparently plain that the property should be scheduled.

**Counsel:** For SAJID A. RAVASIA, Appellant: Daniel P. O'Rourke, Esquire, Attorney, SOUTHWELL & O'ROURKE, PS, Spokane, WA.

For DEBRA J. RAVASIA, Appellant: Darren M. Digiacinto, Esquire, AT, Winston & Cashatt, Spokane, WA.

For UST- UNITED STATES, TRUSTEE, SPOKANE, Appellee: James David Perkins, Trial Attorney, Office of the United States Trustee, United States Courthouse, Spokane, WA.

**Judges:** Before: BRAND, TAYLOR, and LAFFERTY, Bankruptcy Judges.

## Opinion

**MEMORANDUM**

**INTRODUCTION**

Chapter 7[2] debtors Dr. Sajid Ravasia and Dr. Debra Ravasia[3] appeal an order denying their discharge under *§ 727(a)(4)(A)* for false oaths. The Ravasias also appeal a prior order granting the U.S. Trustee ("UST") leave to file an amended complaint. We AFFIRM.

_____

[2] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, *11 U.S.C. §§ 101-1532*, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

[3] Because the Ravasias are both physicians, we refer to them individually as Mr. Ravasia and Mrs. Ravasia to avoid any confusion. No disrespect is intended.

2021 Bankr. LEXIS 1033, *1

## FACTS

### A. The bankruptcy filing and the § 727 complaint

The Ravasias are both physicians. Mr. Ravasia is a psychiatrist and at all times relevant was employed by a private health care provider. Mrs. Ravasia is an obstetrician/gynecologist.

The Ravasias filed a joint chapter 7 bankruptcy case on January 19, 2017, after closing **[*2]** a medical clinic they owned and operated. Their debts were primarily business debts. In their schedules and statement of financial affairs signed under penalty of perjury, the Ravasias represented: (1) Mr. Ravasia's estimated monthly gross wages were $26,818.05, and his estimated monthly overtime pay was $0; (2) Mrs. Ravasia was unemployed with estimated monthly gross wages of $0, but an increase in income was expected because she was looking for work; (3) their estimated monthly expenses were $26,805.06, with no indication if any increase or decrease was expected; and (4) there was a "possible tax refund" for 2016 in an "unknown amount" and its value was $0.

At the § 341(a) meeting of creditors, the Ravasias confirmed under oath that they reviewed their bankruptcy petition, schedules, and statement of financial affairs before signing them and that the information contained therein was "truthful and accurate." Mrs. Ravasia testified that, following the closure of their clinic, she was "not terribly employable" as an OB-GYN. To become gainfully employed in that area of practice, she was leaving for seven weeks to do volunteer work in Afghanistan to get recent experience delivering babies. Mrs. **[*3]** Ravasia testified that she was also inquiring about locum tenens (temporary) work in Canada, but there was "nothing really on the horizon" for paid employment, and if she did obtain such work, it would be sporadic and part-time and she could not estimate what the compensation would be.

After two extensions, the chapter 7 trustee filed a timely complaint to deny the Ravasias' discharge. He alleged that the Ravasias knowingly and fraudulently made materially false statements or accounts in their bankruptcy case under § 727(a)(4)(A), including failing to disclose payments made to creditors within 90 days prior to filing bankruptcy and failing to disclose certain prepetition cash withdrawals. Ultimately, the chapter 7 trustee reached a settlement with the Ravasias, but the

UST objected to the portion of the proposed settlement to dismiss the § 727 complaint. The bankruptcy court agreed with the UST and entered an order that preserved the monetary settlement but allowed the § 727 action to proceed with the UST substituted as plaintiff.

Upon completing her volunteer work in Afghanistan in May 2017, Mrs. Ravasia found steady locum work in Canada and the United States for the remainder of the year. For her various **[*4]** locum positions, Mrs. Ravasia grossed $260,462 in 2017. Mr. Ravasia grossed $668,000 in 2017, or about $55,000 per month.[4]

Nearly two years after the § 727 complaint had been filed, the Ravasias filed Amended Schedules I and J. On the Amended Schedule I, the Ravasias represented that Mr. Ravasia's gross monthly wages were $20,630.40, about $6,000 less than originally reported, and that Mrs. Ravasia's income was $0. To explain the $6,000 decrease in Mr. Ravasia's income, the Ravasias represented that, with Mrs. Ravasia leaving the country for an indefinite period of time for employment, Mr. Ravasia would become a solo parent and unable to do his usual extra shift work, if that was still an option given his employer's plan to hire additional psychiatrists. Therefore, Mr. Ravasia expected to earn only his base salary of $250,000 per year.

On the Amended Schedule J, the Ravasias represented that their estimated monthly expenses were $90,955.76, about $64,000 more than originally reported. This figure included more unreported business expenses and student loan payments for their children.

### B. Bankruptcy court grants the UST leave to amend **[*5]** the § 727 complaint

Two years after the § 727 complaint was filed, the UST sought leave to amend. The amended complaint asserted the same claim for relief under § 727(a)(4)(A), but alleged that the Ravasias made additional false oaths by understating their expected income and

---

[4] Mr. Ravasia's W-2's and tax statements for 2013 through 2016 revealed his gross annual wages as follows:

2013: $575,641

2014: $569,946

2015: $530,503.99

2016: $481,268

2021 Bankr. LEXIS 1033, *5

expenses for 2017. For example, Schedule I listed Mr. Ravasia's expected gross income at $27,000 per month, but his gross monthly income for 2016 was $40,000, and his gross monthly income for 2017 was $55,000. Further, Schedule J understated the Ravasias' expected living expenses on non-essentials such as foreign travel, private school and college tuition for their children, frequent spa visits, and extensive dining out.

The UST alleged that the Ravasias knowingly and fraudulently made these (and other) misrepresentations about their financial situation at the time of their filing to mislead the court and creditors about their ability to repay their debts. The UST alleged that had it known the truth about the Ravasias' financial condition, a conversion to chapter 11 would likely have been pursued and granted.

Over the Ravasias' objection, the bankruptcy court granted the UST's motion for leave to amend the § 727 complaint. The Ravasias' appeal **[*6]** of that interlocutory order to the district court was denied.

**C. The § 727 trial and the bankruptcy court's decision**

After a three-day trial, the bankruptcy court entered its order denying the Ravasias' discharge under § 727(a)(4)(A), finding that they made multiple false oaths on their schedules with respect to their income and expenses.

Schedule I and Amended Schedule I both indicated Mr. Ravasia's income was substantially less than what he earned in each of the several years before and after he filed for bankruptcy. The Ravasias also failed to indicate that his income could increase, and in fact had increased substantially, within the year of filing. The court found that Mr. Ravasia's reduced income in January 2017 - the month the Ravasias filed for bankruptcy — was not a representative month for his income, and the use of that month, especially without consideration of his substantial annual July bonus and their failure to amend the schedules to reflect that known bonus, was fraudulent. The court found that the Ravasias' repeated misrepresentations and omissions about Mr. Ravasia's income were materially false. It further found that it was evident to the Ravasias that Mr. Ravasia's income on Schedule **[*7]** I was substantially underreported, and thus their false oaths related to his income were made knowingly, deliberately, and consciously. Finally, the court found that the Ravasias

acted with intent to deceive interested parties about Mr. Ravasia's income given their failure to update their schedules with accurate income information for him and the Amended Schedule I continuing to dramatically underreport it.

While the court did not find the initial reported income for Mrs. Ravasia as $0 materially false, it did find her testimony that she was not employable and that her income was uncertain "not credible." The court found that the Ravasias' failure to amend the schedules with accurate income information for Mrs. Ravasia, and failure to disclose her substantial income in the Amended Schedule I, established that their false oaths about her income were made knowingly and fraudulently and that they had acted with intent to deceive interested parties about her income.

The court also found that the Ravasias made false oaths about their expenses. The evidence established that the Ravasias' combined net income for 2017 was approximately $550,000, and that they spent substantially all of this **[*8]** income, or an average of $45,000 per month, as compared to the $26,000 they reported on Schedule J. The Ravasias acknowledged the underestimated expenses in Schedule J as inaccurate. The court found that the Ravasias' misrepresentation of their expected ongoing expenses was a material fact, made knowingly, deliberately, and consciously. The court found that the Ravasias knowingly and fraudulently provided false information about their expenses and failed to amend their schedules with accurate information.

In summary, the court found that, in what might have been an attempt to prevent conversion of the case to chapter 11, the Ravasias adopted a zealous position regarding their financial reporting. However, their zealous actions amounted to fraud. The Ravasias timely appealed.

**JURISDICTION**

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(J). We have jurisdiction under 28 U.S.C. § 158.[5]

_____

[5] The order granting leave to amend the § 727 complaint was an interlocutory order that merged into the final order denying discharge. Therefore, we have jurisdiction to review that earlier, non-final order. *See Harvey v. Waldron, 210 F.3d 1008, 1012 (9th Cir. 2000), overruled in part on other grounds*

2021 Bankr. LEXIS 1033, *8

## ISSUES

1. Did the bankruptcy court err in granting the UST leave to amend the § 727 complaint?

2. Did the bankruptcy court err in denying the Ravasias' discharge under § 727(a)(4)(A)?

## STANDARDS OF REVIEW

HN1[⬆] We review de novo whether an amended complaint relates back to the original pleading. *Alfaro v. Johnson, 862 F.3d 1176, 1179 (9th Cir. 2017)*; *Magno v. Rigsby (In re Magno), 216 B.R. 34, 37-38 (9th Cir. BAP 1997)*. We review for **[*9]** abuse of discretion the bankruptcy court's decision to allow or deny amendment of pleadings under Civil *Rule 15(c)* and *Rule 7015*. *In re Magno, 216 B.R. at 38*; *First Fed. Sav. Bank v. Gunn (In re Gunn), 111 B.R. 291, 292 (9th Cir. BAP 1990)*. Whether cause exists to extend the filing deadline to object to a debtor's discharge is reviewed for abuse of discretion. *McDermott v. St. George (In re St. George), Nos. 16-8017/8018, 2017 Bankr. LEXIS 1065, 2017 WL 1379321, at *1 (6th Cir. BAP Apr. 17, 2017)*; *Rupp v. Auld (In re Auld), 561 B.R. 512, 515-16 (10th Cir. BAP 2017)*. HN2[⬆] A trial court abuses its discretion if it applies the wrong legal standard or if its factual findings were clearly erroneous. *United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009)* (en banc).

HN3[⬆] In an action for denial of discharge under § 727, we review: (1) the bankruptcy court's legal conclusions de novo, (2) factual findings for clear error, and (3) mixed questions of law and fact de novo. *Searles v. Riley (In re Searles), 317 B.R. 368, 373 (9th Cir. BAP 2004)*, aff'd, *212 F. App'x 589 (9th Cir. 2006)* (citing *Murray v. Bammer (In re Bammer), 131 F.3d 788, 791-92 (9th Cir. 1997)* (en banc)). Under § 727(a)(4)(A), whether a debtor made a false oath, whether the false statements were material, and whether the debtor had the requisite fraudulent intent are all questions of fact reviewed under the clearly erroneous standard. *Retz v. Samson (In re Retz), 606 F.3d 1189, 1197 (9th Cir. 2010)*. Factual findings are clearly erroneous if they are illogical, implausible, or without support in the record. *Id. at 1196*.

HN4[⬆] We may affirm on any ground supported by the

by *Wallace v. Kato, 549 U.S. 384, 393-94, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007)*.

record, regardless of whether the bankruptcy court relied upon, rejected or even considered that ground. *Fresno Motors, LLC v. Mercedes Benz USA, LLC, 771 F.3d 1119, 1125 (9th Cir. 2014)*.

## DISCUSSION

### A. The bankruptcy court did not err in [*10]  granting the UST leave to amend the § 727 complaint.

HN5[⬆] "The court should freely give leave [to amend] when justice so requires." *Civil Rule 15(a)*; *see also Rule 7015*. The Ninth Circuit applies this rule with "extreme liberality." *Brown v. Stored Value Cards, Inc., 953 F.3d 567, 574 (9th Cir. 2020)* (citations omitted). In discharge cases, the opportunity to amend is especially important because of the short time frame under which such a complaint must be filed. *In re Gunn, 111 B.R. at 293*; *Mission Viejo Nat'l Bank v. Englander (In re Englander), 92 B.R. 425, 428 (9th Cir. BAP 1988)*; *Rule 4004(a)*.

HN6[⬆] Under *Civil Rule 15(c)(1)*, made applicable here by *Rule 7015*, an amendment to a pleading relates back to the date of the original pleading when it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading[.]" *Civil Rule 15(c)(1)(B)*; *see also Rule 7015*. This link will be found when the claim to be added is likely to be proven by the same kind of evidence that would be used to support the original pleading. *In re Magno, 216 B.R. at 39*; *see also Dominguez v. Miller (In re Dominguez), 51 F.3d 1502, 1510 (9th Cir. 1995)*. "The focus of the inquiry is on the factual allegations made in the two complaints so as to give the opposing party fair notice of the claims against him." *In re Magno, 216 B.R. at 39-40* (holding that amended complaint alleging a § 523(a)(6) claim did not relate back to original complaint for denial of debtor's discharge under § 727(a)(2)(A) and (a)(4)(A), because mere mention of a $120,040 claim in the original complaint **[*11]** was not enough to put debtor on notice of a § 523(a)(6) claim and original complaint did not allege any facts which would have proven the required elements of a § 523(a)(6) claim).

HN7[⬆] In applying the relation back doctrine in the context of objections to discharge and the dischargeability of certain debts, we have held:

> The basic test is whether the evidence with respect to the second set of allegations could have been

2021 Bankr. LEXIS 1033, *11

introduced under the original complaint, liberally construed; or as a corollary, that in terms of notice, one may fairly perceive some identification or relationship between what was pleaded in the original and amended complaints.

*Gelling v. Dean (In re Dean), 11 B.R. 542, 545 (9th Cir. BAP 1981), aff'd, 687 F.2d 307 (9th Cir. 1982)* (internal citations omitted); *see also In re Gunn, 111 B.R. at 292-94* (allowing amendment of original complaint under *§ 523(a)(2)(A) and (B) and § 727(a)(5)* that added claims under *§ 727(a)(3) and (4),* because "[t]he objection to discharge and dischargeability claims of the original complaint would certainly have put the debtor on notice of the two related theories of the amended complaint.").

It is undisputed that the UST's motion for leave to amend the *§ 727* complaint was filed after the deadline expired for filing such a complaint by two years. *See Rule 4004(a).*[6] The Ravasias argue that the bankruptcy court erred by granting leave to amend because **[*12]** the allegations of false oaths as to income and expenses were new, did not relate back to the original complaint, and were therefore time barred. The Ravasias have not cited a case where a court denied leave to amend a complaint alleging a claim for false oath under *§ 727(a)(4)(A),* when that same claim was alleged in the original complaint but the amended complaint asserted additional false oaths learned in discovery.

We conclude that the amended complaint related back to the original complaint. Both complaints challenged the veracity of the representations the Ravasias made in connection with their bankruptcy case, particularly those made in their schedules and statement of financial affairs. For example, the original complaint alleged that the Ravasias failed to disclose certain credit card debts owed and that those debts were paid shortly before their chapter 7 filing. The amended complaint alleged that the Ravasias made false oaths with respect to their income and expenses including, among other things, these same, undisclosed credit card expenditures. Hence, the Ravasias were on notice that they might have to defend false oath claims, and the evidence of their income and expenses could have **[*13]** been introduced under the original complaint, liberally construed. *In re Dean, 11*

*B.R. at 545.* Further, the original complaint alleged facts which would have proven the required elements for a claim under *§ 727(a)(4)(A). In re Magno, 216 B.R. at 39-40.*

This case is strikingly similar to *Kennicott Brothers Co. v. Fidanovski (In re Fidanovski), 347 B.R. 343 (Bank. N.D. Ill. 2006).* There, the creditor sought leave to amend after filing an original complaint under *§ 727(a)(4)(A)* that listed a single example of a false oath committed by the debtors in their statement of financial affairs. The amended complaint, filed after discovery, set forth "an immense list (some 31 paragraphs, in all) of instances in which [the debtors] committed false oaths in their schedules and statement of financial affairs or at the *[§] 341* meeting." *Id. at 346.* The court concluded that, while the creditor's new claim under *§ 727(a)(3)* did not relate back to the original complaint, the *§ 727(a)(4)(A)* claim did. *Id. at 347-48.* Specifically, the court found that the amendment consisting of additional facts supporting the existing *§ 727(a)(4)(A)* claim related back since the new allegations concerned the same "core of facts" alleged in the original complaint. Thus, the amendment to add these facts was timely. *Id.* [7]

*HN8*[⬆] We also conclude that the amendments to the *§ 727* complaint were permissible under *Rule 4004(b)(2),*[8] which provides for the addition of objection to **[*14]** discharge claims after the time for objection has expired but before discharge is granted when: (A) the objection is based on facts that, if learned after the discharge, would provide a basis for revocation under *§*

---

[6] *Rule 4004(a)* provides, in relevant part, that "[i]n a chapter 7 case, a complaint . . . objecting to the debtor's discharge shall be filed no later than 60 days after the first date set for the meeting of creditors under *§ 341(a).*"

[7] The court in *Fidanovski* ultimately denied leave to amend on the grounds of futility, because it determined that the amendment was unnecessary pursuant to *Civil Rule 8. 347 B.R. at 348.* The court found that the original complaint "gave perfectly adequate notice of its *[§] 727(a)(4)(A)* claim," *id. at 348,* and that "[a]dding 31 more paragraphs of 'false oaths' to the complaint . . . serve[d] no purpose." *Id. at 349.*

[8] *Rule 4004(b)(2)* provides:

A motion to extend the time to object to discharge may be filed after the time for objection has expired and before discharge is granted if (A) the objection is based on facts that, if learned after the discharge, would provide a basis for revocation under *§ 727(d)* of the Code, and (B) the movant did not have knowledge of those facts in time to permit an objection. The motion shall be filed promptly after the movant discovers the facts on which the objection is based.

727(d); and (B) the movant did not have knowledge of those facts in time to permit an objection. *See Heartwood 4, LLC v. Tabor (In re Tabor), Adv. No. 15-01616-EPK, 2016 Bankr. LEXIS 2382, 2016 WL 3598643 (Bankr. S.D. Fla. June 24, 2016)*; *Link v. Mauz (In re Mauz), 513 B.R. 273 (Bankr. M.D. Pa. 2014)* (considering propriety of motion for leave to amend objection to discharge complaint under both *Civil Rule 15(c)(1)(B)* and *Rule 4004(b)(2)*). **HN9**[⬆] *Section 727(d)(1)* provides for revocation of discharge when it is shown that the debtor obtained a discharge through fraud and the plaintiff was not aware of the fraud until after the discharge was entered.

Thus, under *Rule 4004(b)(2)* as relevant to the motion to amend, the UST had to show **[*15]** the amended complaint alleged that the Ravasias committed an act of fraud that would provide a basis for revocation of discharge under *§ 727(d)(1)*, that the UST did not know of the act in time to permit an objection to discharge prior to the expiration of the *Rule 4004(a)* deadline, and that the UST filed the motion to amend promptly upon discovering the facts on which the objection was based. *In re Tabor, 2016 Bankr. LEXIS 2382, 2016 WL 3598643, at *8.*

All three elements were met here. In the amended *§ 727* complaint, the UST alleged that the Ravasias made multiple false oaths about their income and expenses in their schedules and at the *§ 341(a)* meeting in violation of *§ 727(a)(4)(A)*. Those facts, if learned after entry of the discharge, would constitute fraud that would support revocation of discharge under *§ 727(d)(1)*, *Jones v. U.S. Tr., 736 F.3d 897, 900 (9th Cir. 2013)* (material false oath which would have resulted in denial of discharge had it been known at the time can justify subsequent revocation of discharge under *§ 727(d)(1)*) (citing cases). In the motion to amend, the UST asserted that the extent of the Ravasias' false oaths about their income and expenses was not learned until the parties had engaged in formal discovery, which was not until early-mid 2019 - long after the deadline had run under *Rule 4004(a)* - and the delay in discovery was due, in some part, to **[*16]** the Ravasias. The Ravasias filed their Amended Schedules I and J on May 28, 2019, wherein they made further misrepresentations about their income and expenses. The UST promptly filed its motion to amend the *§ 727* complaint on June 4, 2019, to include these additional facts learned in discovery.

Accordingly, because the amended *§ 727* complaint related back to the original *§ 727* complaint, and because the amendments were permissible under *Rule*

4004(b)(2), the bankruptcy court did not abuse its discretion in granting the UST leave to amend.

**B. The bankruptcy court did not err in denying the Ravasias' discharge under *§ 727(a)(4)(A)*.**

**1. Law governing *§ 727(a)(4)(A)***

**HN10**[⬆] The bankruptcy court may deny a chapter 7 debtor's discharge if "the debtor knowingly and fraudulently, in or in connection with the case - (A) made a false oath or account[.]" *§ 727(a)(4)(A)*. "The fundamental purpose of *§ 727(a)(4)(A)* is to insure that the trustee and creditors have accurate information without having to conduct costly investigations." *Fogal Legware of Switz., Inc. v. Wills (In re Wills), 243 B.R. 58, 63 (9th Cir. BAP 1999)* (citation omitted).

To prevail on a claim under this section, a plaintiff must show, by a preponderance of the evidence, that: "(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and **[*17]** (4) the oath was made fraudulently." *In re Retz, 606 F.3d at 1197* (citations omitted).

"A false statement or an omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath." *Khalil v. Devs. Sur. & Indem. Co. (In re Khalil), 379 B.R. 163, 172 (9th Cir. BAP 2007)*, *aff'd, 578 F.3d 1167 (9th Cir. 2009)*; *see also In re Searles, 317 B.R. at 378*. It is crucial to the proper operation of the bankruptcy system that chapter 7 debtors "ensure to the greatest extent possible that the information turned over to the bankruptcy court is accurate." *In re Retz, 606 F.3d at 1199*; *see also In re Searles, 317 B.R. at 378* ("The continuing nature of the duty to assure accurate schedules of assets is fundamental because the viability of the system of voluntary bankruptcy depends upon full, candid, and complete disclosure by debtors of their financial affairs.").

**HN11**[⬆] The second element necessary for a *§ 727(a)(4)(A)* claim is that the false oath relate to a material fact. "A fact is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property. An omission or misstatement that detrimentally affects administration of the estate is material." *In re Retz, 606*

2021 Bankr. LEXIS 1033, *17

*F.3d at 1198* (citations and quotation marks omitted).

*HN12*[↑]  The third element necessary for a *§ 727(a)(4)(A)* claim is that the debtor makes the false oath knowingly. **[\*18]** "A debtor acts knowingly if he or she acts deliberately and consciously." *Id.* (citations and quotation marks omitted) (debtor's signing of schedules when he knew the information was incomplete was sufficient to support a finding that the debtor acted knowingly).

*HN13*[↑]  Finally, to prevail on a claim under *§ 727(a)(4)(A)*, the objecting party must establish that the debtor's false oath was made fraudulently. "Intent is usually proven by circumstantial evidence or by inferences drawn from the debtor's conduct." *Id. at 1199* (citing *Devers v. Bank of Sheridan (In re Devers), 759 F.2d 751, 753-54 (9th Cir. 1985)*; *Roberts v. Erhard (In re Roberts), 331 B.R. 876, 884 (9th Cir. BAP 2005)*, *aff'd and remanded*, *241 F. App'x 420 (9th Cir. 2007))*. "Reckless indifference or disregard for the truth may be circumstantial evidence of intent, but is not sufficient, alone, to constitute fraudulent intent." *Id.* (citing *In re Khalil, 379 B.R. at 172*). But "the existence of more than one falsehood, together with a debtor's failure to take advantage of the opportunity to clear up all inconsistencies and omissions, such as when filing amended schedules, can be found to constitute reckless indifference to the truth satisfying the requisite finding of intent to deceive." *In re Khalil, 379 B.R. at 175* (citation omitted).

## 2. Analysis

The Ravasias raise several challenges to the bankruptcy court's decision to deny discharge. First, they challenge the court's finding of knowing and fraudulent **[\*19]** false oaths about their expenses, arguing that chapter 7 debtors do not have a duty to report expenses that did not exist at the time of the filing. The court found that the Ravasias made a false oath by intentionally underreporting their expenses by nearly $20,000 per month.

The evidence showed that the Ravasias failed to disclose several credit cards on which they were making payments, in addition to other luxury expenses, and that these expenses existed at the time of filing. The chapter 7 trustee testified that the Ravasias continued to use and pay for credit cards and other expenses that were not listed on Schedule J. He testified that he requested their credit card information to see what the

expenditures were, because there was no change in lifestyle yet the bills were getting paid. In addition, the evidence showed that the Ravasias were spending on average $45,000 per month, as compared to the $26,000 they reported on Schedule J. Clearly, the Ravasias did not comply with their duty to provide an accurate account of their monthly expenditures.

The Ravasias argue that, while perhaps Schedule J was inaccurate, their monthly expenditures were difficult to project at the time of filing **[\*20]** given Mrs. Ravasia's extensive travel to obtain employment and the expenses of the failed medical clinic that were being paid off by credit cards. While that may be true, the point is that significant debts were being paid off by credit cards and other means. But it takes income to do that, and the income the Ravasias reported was insufficient to do so given their other debts.

The Ravasias argue that underestimating expenses could not impact the bankruptcy estate or prejudice creditors and should have not resulted in a denial of discharge. In other words, they argue that their underreporting of expenses was not material. We disagree. *HN14*[↑]  "Nondisclosure of creditors (and debts) can be just as important as nondisclosure of assets. Information regarding business and personal dealings can lead to discovery of assets, potentially avoidable transfers, or other relevant information such as grounds to deny a debtor's discharge." *In re Khalil, 379 B.R. at 177*. "'A false statement or omission may be material even if it does not cause direct financial prejudice to creditors.'" *Id.* (quoting *In re Wills, 243 B.R. at 63*). "[A] discharge may be denied if the omission adversely affects the trustee's or creditors' ability to discover other assets or to fully **[\*21]** investigate the debtor's pre-bankruptcy dealing and financial condition." *In re Wills, 243 B.R. at 63* (citation omitted).

The Ravasias' monthly expenses bore a relationship to their business and personal transactions and concerned the discovery of the existence and disposition of their assets. Their underreporting of expenses also adversely affected the trustee's ability to fully investigate their financial condition, detrimentally affected the administration of the estate, and prejudiced creditors. Both the chapter 7 trustee and the UST testified that, had the Ravasias provided accurate income and expenses information, they would have handled the case differently. Specifically, they likely would have sought to convert the case to chapter 11, and the chapter 7 trustee (who also has extensive chapter 11 experience) testified that there would have been a

substantial distribution to creditors through a plan.

Next, the Ravasias argue that in business debt cases, unlike consumer debt cases, there is no legal requirement to provide future averages of net income or gross wages for the months or year following the bankruptcy filing. They argue that the bankruptcy court erred by using postpetition income in hindsight to **[\*22]** find that they made false statements, when Schedule I does not require them to forecast future income or average past fluctuating income. They argue that their statements with respect to income were not false as a matter of law, because they had no obligation to provide anything more than a "snapshot" of their income at the time the petition was filed.

The only case the Ravasias cite in support of their argument is *Westland Architecture & Development Corp. v. Matthews (In re Matthews), Adv. No. 2:12-01499-RK, 2016 Bankr. LEXIS 3609, 2016 WL 5746251 (Bankr. C.D. Cal. Oct. 3, 2016)*, an unreported case from a California bankruptcy court. *Matthews* was not a business debt case. Further, it does not help the Ravasias. While the court stated that a debtor's income as calculated on Schedule I is a "snapshot" of the debtor's income at the time the petition is filed, it also noted that a debtor's income as calculated on Schedule I is an **"estimate of average projected income**." *2016 Bankr. LEXIS 3609, [WL] at \*26* (emphasis in original). In other words, it considers future income.

The bankruptcy court was aware that this was a business debt case. Contrary to the Ravasias' argument, the court did not impose an improper legal requirement with respect to the reporting of income. The court was allowed to consider **[\*23]** Mr. Ravasia's historical income from 2013 to 2016 and what he actually made in 2017, as well as what Mrs. Ravasia made in 2017, to determine the truthfulness of what they reported on their Schedule I and Amended Schedule I.

Further, Schedule I contemplates not simply a "snapshot" of monthly income but the forecasting of such income for the year with question 13, which asks if the debtor expects an increase or decrease "within the year" after the bankruptcy filing. And the publicly available instructions for filling out bankruptcy forms instruct debtors to "give details about the monthly income you currently expect to receive," i.e., in the future, and to "show all totals as monthly payments, even if income is not received in monthly payments," and if the "income is received in another time period, such as daily, weekly, quarterly, annually, or irregularly,"

i.e., irregular overtime/ bonus income, "calculate how much income would be by month." *See* Instructions: Bankruptcy Forms for Individuals at 28, available at https:// www.uscourts.gov/sites/default/files/instructions_individuals.pdf (last visited Apr. 16, 2021). Finally, Attachment 1 to the Amended Schedule I — where the Ravasias stated their expectation that postpetition income would **[\*24]** be less than it was prepetition — demonstrates that they understood the instruction in Part 2 of Schedule I to "[e]stimate monthly income as of the date you file this form" to mean expected income going forward, not a snapshot on the day of filing.

The Ravasias also argue that, in a chapter 7 case, there is no duty to amend to update postpetition changes in income or to retroactively add income that was not earned and did not exist at the time of the filing. They argue that the bankruptcy court could not have found a false oath with respect to their income or that one was made knowingly and fraudulently for failure to perform a non-existent duty.

The Ravasias' argument misses the point. Regardless of any duty to update postpetition changes in income, they did have a duty to assure accurate schedules. The evidence showed that Mr. Ravasia made substantially more money in 2017 than what the Ravasias reported, and that they knew such income existed at the time of filing. At minimum, the Ravasias were required to amend and report a more accurate figure for Mr. Ravasia's income once the inaccuracy became apparent. *See In re Searles, 317 B.R. at 378* ("Postpetition discovery of rights that actually existed at the time of **[\*25]** filing must be addressed in the schedules. This implies a duty to amend."). They did not do so, at least not until over two years later and only after the UST started asking questions. *See id. at 377* (failure to amend schedules promptly upon noting the discrepancy supports an inference of intent). When the Ravasias did amend, they falsely reported that Mr. Ravasia made even less money in 2017 than what they reported before. Their continued false oath as to Mr. Ravasia's income in the Amended Schedule I further established an intent to deceive.

The Ravasias next argue that their reliance on their counsel's advice for filling out their schedules was reasonable, and that the bankruptcy court erred in finding that reliance was not in good faith because the "erroneous" information "should have been evident." *HN15*[⬆] "Generally, a debtor who acts in reliance on the advice of his attorney lacks the intent required to

2021 Bankr. LEXIS 1033, *25

deny him a discharge of his debts. However, the debtor's reliance must be in good faith. The advice of counsel is not a defense when the erroneous information should have been evident to the debtor." *In re Retz, 606 F.3d at 1199* (internal citations omitted). The advice of counsel is also not a defense "'when it is transparently **[*26]** plain that the property should be scheduled.'" *Shoemaker v. U.S. Tr. (In re Shoemaker), BAP No. CC-18-1020-KuFL, 2019 Bankr. LEXIS 1966, 2019 WL 2774265, at \*15 (9th Cir. BAP July 1, 2019)* (quoting *In re Mascolo, 505 F.2d 274, 277 n.4 (1st Cir. 1974))*.

The bankruptcy court found that the advice-of-counsel defense was not available because it should have been, and admittedly was, evident to the Ravasias by no later than July 2017 that their schedules were inaccurate. We see no error in that finding. Further, the Ravasias did not present any evidence at trial that their attorney advised them to make the specific false oaths they made. *See id.* (affirming denial of discharge under *§ 727(a)(2)(A)* and *(a)(4)(A)* where there was no evidence that counsel had advised debtor not to disclose assets). Accordingly, the bankruptcy court did not err in rejecting the reliance on counsel defense in this case.

Lastly, the Ravasias argue that the bankruptcy court improperly relied on standards relating to an overall "means" analysis in determining whether they made false oaths. The Ravasias argue that by analyzing pre- or postpetition income and expenses, as well as bank deposits and withdrawals, the court was applying the "means test" or "totality of the circumstances test" used to dismiss or convert a chapter 7 case to chapter 11 or 13. They argue that such **[*27]** tests apply only in consumer debt cases.

While these tests do apply in consumer debt cases under *§ 707(b)*, the Ravasias do not cite any authority that it was error for the court to consider some of this same type of evidence in a business debt case to determine a false oath and deny discharge under *§ 727(a)(4)(A)*. In the usual corporate-type business debt case under chapter 7, a discharge of debts is not at issue. But in this case it was. The fact that this was a business debt case did not insulate the Ravasias from making false statements in their schedules or at the *§ 341(a)* meeting or from abusing the bankruptcy system. Therefore, we do not believe that the bankruptcy court erred in considering the income and expense evidence to find a false oath and deny discharge. The Ravasias' underreported expenses, especially when combined with their underreported income, supported the bankruptcy court's ultimate finding that their misrepresentations and omissions about their income and expenses were an intentional and material false oath.

The bankruptcy court declined to address the additional allegation that the Ravasias made a false oath related to their 2016 income tax refund. We conclude that they did, and that this **[*28]** is an additional basis to affirm.

The UST presented evidence that the Ravasias knew when they filed their chapter 7 case that they were getting a refund of at least $28,000 (and maybe as much as $100,000), yet they represented in their schedules that any potential refund was "unknown" and valued it at $0. Emails between the Ravasias and their accountant in December 2016 revealed that such a refund was likely, that the chapter 7 trustee would inquire about the amount of the refund anticipated, and that Mrs. Ravasia was searching for ways to prevent the bankruptcy estate from getting it.

Mrs. Ravasia testified that she did not disclose at the *§ 341(a)* meeting that she had spoken to her accountant about the tax refund and that it could range from $28,000 to $100,000, because she was trying to answer "yes" or "no" to the questions being asked. The chapter 7 trustee testified that, based on the schedules and the Ravasias' testimony at the *§ 341(a)* meeting, he was led to believe that a refund, if any, would be de minimis. However, he testified, had he known that a minimum of $28,000 was coming to the cash-poor estate, he might have litigated against (as opposed to settling with) Mr. Ravasia's employer over **[*29]** whether Mr. Ravasia's deferred employee compensation plan — which was a significant asset — was an estate asset, and the outcome may have been more favorable to the estate and creditors. In any case, he said he certainly would have done more follow up had the extent of the tax refund been disclosed. Ultimately, the Ravasias received a tax refund of $177,000. The chapter 7 trustee only learned about the refund after reviewing a copy of the UST's deposition of Mrs. Ravasia. It does not appear that the Ravasias ever filed an amended Schedule A/B to correct the false information about the tax refund.

Accordingly, the evidence established that the Ravasias' false statements and omissions about their 2016 income tax refund constituted a false oath, that it was material, and that it was made knowingly and fraudulently.

**CONCLUSION**

2021 Bankr. LEXIS 1033, *29

For the reasons stated above, we AFFIRM.

---

**End of Document**

Exhibit "5"

 Caution

As of: September 16, 2023 4:13 PM Z

## *Retz v. Samson (In re Retz)*

United States Court of Appeals for the Ninth Circuit

March 3, 2010, Argued and Submitted, Portland, Oregon; June 4, 2010, Filed

No. 08-60023

### Reporter

606 F.3d 1189 *; 2010 U.S. App. LEXIS 11357 **; Bankr. L. Rep. (CCH) P81,776; 50 A.L.R. Fed. 2d 763

In re: BRENDON KEITH RETZ, Debtor, BRENDON KEITH RETZ, Appellant, v. RICHARD J. SAMSON, Chapter 7 Trustee; DONALD G. ABBEY; THOMAS TORNOW; AMERICAN EXPRESS CENTURION BANK; WHITEFISH CREDIT UNION; GLACIER BANK OF WHITEFISH; UNITED STATES TRUSTEE/GREAT FALLS, Appellees.

**Prior History: [**1]** Appeal from the Ninth Circuit Bankruptcy Appellate Panel. BAP No. MT-07-1443-DJuPa. Bk. No. 04-60302-7-RBK. Adv. No. 05-00018. Pappas, Dunn, and Jury, Bankruptcy Judges, Presiding.

*Retz v. Abbey (In re Retz), 2008 Bankr. LEXIS 4749 (B.A.P. 9th Cir., Mar. 31, 2008)*

## Core Terms

bankruptcy court, Schedules, fraudulent intent, transfers, false oath, state court, omissions, Resort, advice, defraud a creditor, intent to hinder, bankruptcy petition, incomplete, knowingly, defraud, hinder, credible, argues, market value, fraudulently, indifference, belonging, purchases, inform

## Case Summary

### Procedural Posture

Appellant debtor challenged a ruling of the Ninth Circuit Bankruptcy Appellate Panel, that affirmed a bankruptcy court judgment denying him a discharge under *11 U.S.C.S. § 727(a)(2)(A)*, *(a)(2)(B)*, *(a)(4)(A)*, and *(a)(5)*, and finding in favor of appellees, the chapter 7 trustee, debtor's former business partner, and several banks, who had filed an adversary proceeding against the debtor.

### Overview

The debtor's corporation and the former business partner went into business together. The partner contributed money, and the debtor agreed to abide by the terms of an operating agreement to run the business. The partner chanced to run into the debtor at a Las Vegas casino, and discovered that the debtor had entered into partnerships, self-dealing, and loan agreements in violation of the operating agreement, without the partner's consent. The partner initiated litigation, and the debtor filed bankruptcy. When the trustee sought financial records to explain the debtor's convoluted financial affairs, the debtor essentially dumped 28,000 pages of unorganized documents on the trustee after repeated requests. The bankruptcy court's finding that the debtor had the requisite fraudulent intent to deny his discharge was not illogical, implausible, or without support in the record. The debtor's alleged reliance on his attorney's advice was insufficient to vitiate the fraudulent intent evidenced by the badges of fraud. The attorney had never been fully informed by the debtor. The debtor had also disposed of property to family members during the preference period.

### Outcome

The judgment was affirmed.

## LexisNexis® Headnotes

Bankruptcy Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

**HN1**[ ] **Standards of Review, De Novo Standard of Review**

An appellate court reviews decisions of a bankruptcy appellate panel (BAP) de novo and applies the standard

of review applied by the BAP to the bankruptcy court's decision.

Bankruptcy Law > ... > Judicial Review > Standards of Review > Clear Error Review

Bankruptcy Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

**HN2[ ] Standards of Review, Clear Error Review**

A bankruptcy court's determinations of the historical facts are reviewed for clear error; the selection of the applicable legal rules under *11 U.S.C.S. § 727* is reviewed de novo; and the application of the facts to those rules requiring the exercise of judgments about values animating the rules is reviewed de novo.

Bankruptcy Law > ... > Judicial Review > Standards of Review > Clear Error Review

**HN3[ ] Standards of Review, Clear Error Review**

A court's factual determination is clearly erroneous if it is illogical, implausible, or without support in the record.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > General Overview

**HN4[ ] Liquidations, Denial of Discharge**

Parties objecting to discharge bear the burden of proving by a preponderance of the evidence that the debtor's discharge should be denied. In keeping with the fresh start purposes behind the Bankruptcy Code, courts should construe *11 U.S.C.S. § 727* liberally in favor of debtors and strictly against parties objecting to discharge. This does not alter the burden on the objector, but rather means that actual, rather than constructive, intent is required on the part of the debtor. When factual findings are based on determinations regarding the credibility of witnesses, a reviewing court gives great deference to the bankruptcy court's findings, because the bankruptcy court, as the trier of fact, had the opportunity to note variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

**HN5[ ] Denial of Discharge, False Accounts & Oaths**

See *11 U.S.C.S. § 727(a)(4)(A)*.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

**HN6[ ] Denial of Discharge, False Accounts & Oaths**

A false statement or an omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath. The fundamental purpose of *11 U.S.C.S. § 727(a)(4)(A)* is to insure that the trustee and creditors have accurate information without having to conduct costly investigations.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

**HN7[ ] Denial of Discharge, False Accounts & Oaths**

To prevail on a false oath claim, a plaintiff must show, by a preponderance of the evidence, that: (1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently. A finding of fraudulent intent is a finding of fact reviewed for clear error.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

**HN8[ ] Denial of Discharge, False Accounts & Oaths**

The first element that must be proven to deny discharge under *11 U.S.C.S. § 727(a)(4)(A)* is the existence of a false oath in connection with the bankruptcy case.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

606 F.3d 1189, *1189; 2010 U.S. App. LEXIS 11357, **1

**HN9**[⬇] **Denial of Discharge, False Accounts & Oaths**

*11 U.S.C.S. § 727(a)(4)(A)* requires that the relevant false oath relate to a material fact. A fact is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property. An omission or misstatement that detrimentally affects administration of the estate is material.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

**HN10**[⬇] **Denial of Discharge, False Accounts & Oaths**

*11 U.S.C.S. § 727(a)(4)(A)* requires that a debtor act knowingly in making the false oath. A debtor acts knowingly if he or she acts deliberately and consciously.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

**HN11**[⬇] **Denial of Discharge, False Accounts & Oaths**

*11 U.S.C.S. § 727(a)(4)(A)* requires a showing of fraudulent intent, which may be established by a pattern of falsity, his reckless indifference to and disregard of the truth, and demonstrated by his course of conduct.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > False Accounts & Oaths

**HN12**[⬇] **Denial of Discharge, False Accounts & Oaths**

To demonstrate fraudulent intent, a party must show that: (1) the debtor made the representations (a false statement or omission in bankruptcy schedules); (2) at the time he or she knew they were false; and (3) he or she made them with the intention and purpose of deceiving the creditors. Intent is usually proven by circumstantial evidence or by inferences drawn from the debtor's conduct. Reckless indifference or disregard for the truth may be circumstantial evidence of intent, but is not sufficient, alone, to constitute fraudulent intent.

Criminal Law & Procedure > Defenses > Reliance on Advice of Counsel

Legal Ethics > Client Relations > General Overview

**HN13**[⬇] **Defenses, Reliance on Advice of Counsel**

Generally, a debtor who acts in reliance on the advice of his attorney lacks the intent required to deny him a discharge of his debts. However, the debtor's reliance must be in good faith. The advice of counsel is not a defense when the erroneous information should have been evident to the debtor. A debtor cannot, merely by playing ostrich and burying one's head deeply enough in the sand, disclaim all responsibility for statements which was made under oath.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

**HN14**[⬇] **Denial of Discharge, Concealment & Fraudulent Transfers**

See *11 U.S.C.S. § 727(a)(2)*.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

**HN15**[⬇] **Denial of Discharge, Concealment & Fraudulent Transfers**

A party seeking denial of discharge under *11 U.S.C.S. § 727(a)(2)* must prove two things: (1) a disposition of property, such as transfer or concealment, and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act of disposing of the property.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

**HN16**[⬇] **Denial of Discharge, Concealment & Fraudulent Transfers**

A debtor's intent need not be fraudulent to meet the requirements of *11 U.S.C.S. § 727(a)(2)*. Because the language of the statute is in the disjunctive it is sufficient

606 F.3d 1189, *1189; 2010 U.S. App. LEXIS 11357, **1

if the debtor's intent is to hinder or delay a creditor. Furthermore, lack of injury to creditors is irrelevant for purposes of denying a discharge in bankruptcy.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

**HN17**[⤓] **Denial of Discharge, Concealment & Fraudulent Transfers**

In examining the circumstances of a transfer under *11 U.S.C.S. § 727(a)(2)*, certain badges of fraud may support a finding of fraudulent intent. Those factors, not all of which need be present, include (1) a close relationship between the transferor and the transferee; (2) that the transfer was in anticipation of a pending suit; (3) that the transferor-debtor was insolvent or in poor financial condition at the time; (4) that all or substantially all of the debtor's property was transferred; (5) that the transfer so completely depleted the debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and (6) that the debtor received inadequate consideration for the transfer.

Criminal Law & Procedure > Defenses > Reliance on Advice of Counsel

Legal Ethics > Client Relations > General Overview

**HN18**[⤓] **Defenses, Reliance on Advice of Counsel**

A client reasonably relies on an attorney's advice only when the client provides to the attorney all of the pertinent facts in the client's possession.

Bankruptcy Law > ... > Bankruptcy > Debtor Benefits & Duties > Debtor Duties

**HN19**[⤓] **Debtor Benefits & Duties, Debtor Duties**

A debtor in bankruptcy proceedings has a duty to share full information with the trustee, completely separate from any other duty owed to the trustee.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

**HN20**[⤓] **Denial of Discharge, Concealment & Fraudulent Transfers**

*11 U.S.C.S. § 727(a)(2)(B)* allows a court to deny discharge when a debtor has permitted to be transferred property of the estate.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Asset Loss & Insolvency

**HN21**[⤓] **Denial of Discharge, Asset Loss & Insolvency**

See *11 U.S.C.S. § 727(a)(5)*.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Asset Loss & Insolvency

**HN22**[⤓] **Denial of Discharge, Asset Loss & Insolvency**

Under *11 U.S.C.S. § 727(a)(5)* an objecting party bears the initial burden of proof and must demonstrate: (1) debtor at one time, not too remote from the bankruptcy petition date, owned identifiable assets; (2) on the date the bankruptcy petition was filed or order of relief granted, the debtor no longer owned the assets; and (3) the bankruptcy pleadings or statement of affairs do not reflect an adequate explanation for the disposition of the assets.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Asset Loss & Insolvency

**HN23**[⤓] **Denial of Discharge, Asset Loss & Insolvency**

Whether a debtor has satisfactorily explained a loss of assets is a question of fact for the bankruptcy court, overturned only for clear error. A debtor's failure to offer a satisfactory explanation when called on by the court is a sufficient ground for denial of discharge under *11 U.S.C.S. § 727(a)(5)*.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Failure to Preserve Records

606 F.3d 1189, *1189; 2010 U.S. App. LEXIS 11357, **1

**HN24[⤓]** **Denial of Discharge, Failure to Preserve Records**

A petitioner cannot omit items from his or her schedules, force the trustee and the creditors, at their peril, to guess that he or she has done so, and hold them to a mythical requirement that they search through a paperwork jungle in the hope of finding an overlooked needle in a documentary haystack.

**Counsel:** Ward E. Taleff (argued), Taleff Law Offices, P.C., Great Falls, Montana; Harold Dye, Dye & Moe, PLLP, Missoula, Montana, for debtor-appellant Brendon Keith Retz.

Michael G. Black (argued), Black Law Office, Missoula, Montana; Edward A. Murphy, Murphy Law Offices, PLLC, Missoula, Montana, for appellee Donald G. Abbey.

**Judges:** Before: Richard A. Paez, Richard C. Tallman, and Milan D. Smith, Jr., Circuit Judges. Opinion by Judge Tallman.

**Opinion by:** Richard C. Tallman

# Opinion

 **[*1193]**  TALLMAN, Circuit Judge:

Debtor-Appellant Brendon Keith Retz ("Retz") filed for Chapter 7 bankruptcy on February 12, 2004. On March 8, 2005, Bankruptcy Trustee Richard J. Samson ("Trustee") and Retz's former business partner Donald G. Abbey ("Abbey"), along with several banks, filed this adversary proceeding in bankruptcy court seeking to stop Retz's discharge. After a five-day trial, the bankruptcy court found for the plaintiffs and denied Retz's discharge under _11 U.S.C. § 727(a)(2)(A)_, _(a)(2)(B)_, _(a)(4)(A)_, and _(a)(5)_. Retz then appealed to the Ninth Circuit Bankruptcy  **[**2]**  Appellate Panel ("BAP"), which affirmed on all four grounds, any of which would have been sufficient to deny the discharge.

Retz now appeals, arguing that the bankruptcy court and BAP erred in denying him a general discharge because: (1) there is insufficient evidence of his intent to hinder, delay, or defraud his creditors because he relied in good faith on the advice of counsel in his actions during the bankruptcy proceeding; (2) any missing documents were easily obtainable by the Trustee; (3) one of the improper transfers did not involve an asset of

the debtor; and (4) Retz's failure to file his tax returns was not his fault. We affirm the bankruptcy court's denial of Retz's discharge.

I

Retz formed Timberland Construction, Inc. ("TCI") in 1994 soon after graduating from college with a degree in business management. He was the sole shareholder of TCI, which performed development and construction work in the White-fish, Montana, area. For the first few years of operations Retz kept the books for TCI and became proficient with the business's accounting software, Master Builder.

Abbey has been a successful California real estate investor for over thirty-five years. He has taken part in  **[**3]**  approximately 10,000 real estate transactions and has interests in over sixty companies. In 2001, Abbey decided to build a multi-million dollar residence in Montana (the "Shelter Island  **[*1194]**  Project"). [1] In order to maintain control of the construction process and save money on the project, Abbey decided to form a new construction and development company with Retz.

In early 2001, Retz and TCI entered into an oral agreement with Abbey to form Timberland Construction, LLC ("TCLLC"). TCLLC began operations in 2001. The TCLLC Operating Agreement, which had an effective date of July 1, 2001, was finalized and executed in March 2002 after extensive negotiations. Abbey and TCI were the governing members of TCLLC. The Operating Agreement provided that Abbey would contribute $ 300,000 to TCLLC, while TCI would contribute all its assets and liabilities. Abbey provided the first $ 100,000 in approximately March 2001 and provided the remaining $ 200,000 upon the execution of the Operating Agreement in 2002.

Abbey testified that he would not have provided the final $ 200,000, and in fact would have demanded  **[**4]**  the return of the original $ 100,000, if the Operating Agreement had not been signed. In contrast, Retz testified that Abbey told him the Operating Agreement was "only for the file," and that they did not actually have to operate within its parameters. [2] Abbey insists that he never told Retz that he did not have to abide by

---

[1] Shelter Island is located in Flathead Lake, approximately forty miles south of Whitefish, Montana.

[2] Retz admitted later that he thought the Operating Agreement was enforceable at least to the extent of the tax consequences of the transaction.

606 F.3d 1189, *1194; 2010 U.S. App. LEXIS 11357, **4

the terms of the Operating Agreement.

In May 2003, Abbey ran into Retz on the "comp" floor of the Bellagio Resort & Casino in Las Vegas, Nevada. Abbey testified that he was shocked that someone who earned only $ 40,000 a year had been given a complimentary room at the Bellagio, and became suspicious about Retz's behavior. He traveled to Montana in July 2003 and spoke with representatives at several local banks about Retz and TCLLC. Abbey discovered that TCLLC had entered into partnerships and loan agreements in violation of the Operating Agreement, which required Abbey's written permission.

In August 2003, Abbey brought William Matteson, an accountant with whom Abbey had worked in California, to Montana for the purpose of assessing **[**5]** TCLLC's financial condition and operations, ensuring Retz's compliance with the Operating Agreement, verifying that TCI had made the required contributions to TCLLC, and investigating a draft audit report prepared by Deloitte & Touche regarding potential overcharges on the Shelter Island Project. Matteson found numerous accounting irregularities in the TCLLC books and suspicious transfers between Retz and TCLLC. Retz testified that the transfers were short term loans that he made to TCLLC so that the company could meet its payroll obligations, followed by repayment of the loans. However, the loans and repayments were not clearly identified in the accounting system, and Matteson could not confirm that the amounts in and out of the business account matched. Due to Matteson's discoveries, Abbey began withdrawing financial support from TCLLC and shutting down the Shelter Island Project.

Soon thereafter, Retz learned that Abbey was planning to file litigation against him and decided to preemptively file a lawsuit against Abbey in state court. Abbey countersued Retz and his brother Ryan. [3] The state court appointed a receiver **[*1195]** for TCLLC, effective September 3, 2003. The state court litigation **[**6]** was stayed when Retz filed a voluntary Chapter 7 bankruptcy petition on February 12, 2004.

Following the filing of his bankruptcy petition, Retz filed what purported to be the required financial Schedules and Statement of Financial Affairs ("SOFA"). Retz acknowledged at trial that the Schedules and SOFA he

filed were incomplete, but explained that he intended to amend them at some point, when he obtained additional information about his debts and assets. He attended the first Meeting of Creditors mandated by _11 U.S.C. § 341_ (" _§ 341_ Creditors' Meeting") on March 19, 2004, and answered questions posed by the Trustee and the attending creditors. The second _§ 341_ Creditors' Meeting took place on July 8, 2004. Retz again attended and answered some questions posed by the Trustee and other creditors.

On March 8, 2005, the Trustee and Abbey filed an adversary proceeding in bankruptcy court seeking denial of Retz's discharge pursuant to various subsections of _11 U.S.C. §§ 523_ and _727_. The bankruptcy **[**7]** court held a five-day trial, April 10 and 11, and June 1, 4, and 5, 2007. Many witnesses testified, including Retz, Abbey, the Trustee, Ryan, David Schultz (the Retz family accountant), Matteson, and Retz's bankruptcy attorneys Bruce Measure and Harold Dye. At the time of trial, nearly three years after Retz filed his bankruptcy petition, Retz still had not filed amendments to either the Schedules or the SOFA. [4]

In its written memorandum of decision the bankruptcy court found, "after observing [Retz's] demeanor while testifying under oath and cross examination, and examination of the transcripts of the state court hearing . . . that [Retz] is not a credible witness." The court then denied Retz's discharge on four independent grounds: (1) Retz "knowingly and fraudulently, in or in connection with the case[,] made a false oath or account" on his Schedules and SOFA by failing to disclose income, assets, and transfers in violation of _§ 727(a)(4)(A)_; (2) Retz sold a house allegedly **[**8]** belonging to TCLLC to his brother Ryan for $ 60,000 under market value within one year before filing for bankruptcy, with the intent to hinder, delay, or defraud a creditor in violation of _§ 727(a)(2)(A)_; (3) Retz participated in the transfer, after the date of the filing of the bankruptcy petition, of North Forty Resort Corp. ("NFRC") assets to North Forty Resort, LLC, which greatly reduced the value of the bankruptcy estate's 6% ownership of the Corporation, with the intent to hinder, delay, or defraud a creditor in violation of _§ 727(a)(2)(B)_; and (4) Retz "failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet [his] liabilities" in violation of _§ 727(a)(5)_.

---

[3] Several members of the Retz family are involved in the events underlying this adversary proceeding. We refer to them by their first names to avoid confusion with the Debtor-Appellant Brendon Retz.

[4] Retz finally amended the Schedules and SOFA on August 7, 2007, after the end of the bankruptcy court trial. The amended Schedules and SOFA are, therefore, not part of the trial record in the adversary proceeding.

606 F.3d 1189, *1195; 2010 U.S. App. LEXIS 11357, **8

5  The BAP affirmed on all four grounds. Retz timely appealed. We have jurisdiction pursuant to *28 U.S.C. § 158(d)*, and we affirm.

**[*1196] II**

*HN1*[↑] We review decisions of the BAP de novo and apply the standard of review applied by the BAP to the bankruptcy court's decision. *Boyajian v. New Falls Corp. (In re Boyajian), 564 F.3d 1088, 1090 (9th Cir. 2009)*. The BAP reviewed the bankruptcy court decision in this case using the following standards:

*HN2*[↑] (1) the [bankruptcy] court's determinations of the historical facts are reviewed for clear error; (2) the selection of the applicable legal rules under *§ 727* is reviewed de novo; and (3) the application of the facts to those rules requiring the exercise of judgments about values animating the rules is reviewed de novo.

*Searles v. Riley (In re Searles), 317 B.R. 368, 373 (B.A.P. 9th Cir. 2004)* (relying upon *Murray v. Bammer (In re Bammer), 131 F.3d 788, 791-92 (9th Cir. 1997)* (en banc)). *HN3*[↑] A court's factual determination is clearly erroneous if it is illogical, implausible, or without support in the record. *United States v. Hinkson, 585 F.3d 1247, 1261-62 & n.21 (9th Cir. 2009)* (quoting *Anderson v. City of Bessemer City, 470 U.S. 564, 577, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985)* **[**10]** (explaining that the clearly erroneous standard of review is an element of the clarified abuse of discretion standard).

*HN4*[↑] Those objecting to discharge "bear[ ] the burden of proving by a preponderance of the evidence that [the debtor's] discharge should be denied." *Khalil v. Developers Sur. & Indem. Co. (In re Khalil), 379 B.R. 163, 172 (B.A.P. 9th Cir. 2007)*, aff'd, *578 F.3d 1167, 1168 (9th Cir. 2009)* (expressly adopting the BAP's statement of applicable law). "In keeping with the 'fresh start' purposes behind the Bankruptcy Code, courts

_____

5 These statutory bases for denial correspond with the adversary proceeding's second amended complaint: Count 9 (false oaths), Count 13 (transfer of assets before filing), Count 14 (transfer of assets after filing), and Count 11 (failure to explain). The remaining counts under *§ 727* were dismissed. Counts 1 through 8 were brought under *§ 523*; however, the bankruptcy **[**9]** court found it unnecessary to reach those counts because it denied Retz's discharge under *§ 727*. Only *§ 727* is at issue in this appeal.

should construe *§ 727* liberally in favor of debtors and strictly against parties objecting to discharge." *Bernard v. Sheaffer (In re Bernard), 96 F.3d 1279, 1281 (9th Cir. 1996)*. This does not alter the burden on the objector, but rather means that "actual, rather than constructive, intent is required" on the part of the debtor. *In re Khalil, 379 B.R. at 172*. When factual findings are based on determinations regarding the credibility of witnesses, we give great deference to the bankruptcy court's findings, because the bankruptcy court, as the trier of fact, had the opportunity to note "variations in demeanor and tone of voice that bear so heavily on **[**11]** the listener's understanding of and belief in what is said." *Anderson, 470 U.S. at 575*.

**III**

**A**

*Section 727(a)(4)(A)* states: *HN5*[↑] "The court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case[,] made a false oath or account." *11 U.S.C. § 727(a)(4)(A)*. *HN6*[↑] "A false statement or an omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath." *In re Khalil, 379 B.R. at 172*. "The fundamental purpose of *§ 727(a)(4)(A)* is to insure that the trustee and creditors have accurate information without having to conduct costly investigations." [6] *Id.* (quoting *Fogal Legware of Switz., Inc. v. Wills (In re Wills), 243 B.R. 58, 63 (B.A.P. 9th Cir. 1999))*.

**[*1197]** *HN7*[↑] To prevail on this claim, a plaintiff must show, by a preponderance of the evidence, that: "(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently." *Roberts v. Erhard (In re Roberts), 331 B.R. 876, 882 (B.A.P. 9th Cir. 2005)* (citing *In re Wills, 243 B.R. at 62*). A finding of fraudulent intent is a finding of fact reviewed for clear error. *First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1342 (9th Cir.*

_____

6 We note that this purpose is alone sufficient to rebut Retz's argument on appeal that the Trustee could have obtained the missing documents and tracked the missing funds on his own. Retz essentially dumped 28,000 pages of largely unorganized documents on the Trustee after repeated requests to explain his convoluted financial affairs. The Trustee should not have to conduct his own costly and ultimately fruitless investigation without the debtor's **[**12]** help.

*1986).*

**1**

HN8[⬆] The first element that must be proven to deny discharge under § 727(a)(4)(A) is the existence of a false oath in connection with the bankruptcy case. *In re Roberts, 331 B.R. at 882; see also 11 U.S.C. § 727(a)(4)(A).* The bankruptcy court found numerous errors and omissions in Retz's Schedules and SOFA, which can qualify as false oaths under § 727(a)(4)(A). *See In re Khalil, 379 B.R. at 172.* The parties are familiar with the facts of the case and both the lengthy bankruptcy court opinion and the BAP opinion contain more complete discussions of the false oaths in the Schedules and SOFA. We discuss only some of the more significant errors and omissions **[**13]** here.

There is no real dispute in this case that at the time Retz signed his incomplete Schedules and SOFA declaring, under penalty of perjury, that they were true and correct, he well knew that they were not true and correct. Retz admitted that he knew the Schedules and SOFA were incomplete when they were signed and filed, as did his attorney. Further, he did not even read the Schedules and SOFA before signing them.

Retz omitted from his Schedules valuable watches, a bank account, a 1984 Cadillac, a 2002 Audi purchased through TCI, and the sale of a helicopter and hangar. He also failed to list any income from 2003 or the beginning of 2004. Retz argues on appeal that he was unable to establish his income for 2003 and 2004 because TCLLC had yet to complete its tax returns for those years. As this issue is not dispositive, we have not considered the missing income information in our decision.

Retz conceded at trial that, three years later, he still had not made a complete response to the Trustee with respect to SOFA Question 3a, payments to creditors, Question 3b, payments to insiders, and Question 10, other transfers. Information that should have been listed in response to Question 3a **[**14]** includes the disclosure of Retz's prepayment of his home mortgage with the proceeds from the sale of his helicopter and hangar just before he petitioned for bankruptcy. In response to Question 3b, Retz should have listed at least two pre-petition transactions involving his father, Robert Retz: a check to Robert dated March 17, 2003, for $ 38,287.30; and a check to Robert dated September 23, 2003, in the amount of $ 12,181.00.

There were also a series of transfers in September 2003

from Retz's credit cards to NFRC, a corporation owned and operated by the Retz family, totaling approximately $ 160,000. Retz later took this money from the NFRC account for his personal and business use, was advised by counsel that such an action was likely in violation of the credit card companies' merchant agreements, and paid the money back with the help of his father, who loaned him $ 80,000 to make up the amount that Retz had apparently already spent. Retz was unable to explain where the missing $ 80,000 went. He testified that he may have written a $ 30,000 check to himself, and that he "might have cashed it, or something." He also speculated that some of the money went into TCI for payroll and business **[**15]** expenses, while some of it **[*1198]** likely went to his and his wife Misty's monthly expenses, which were high. The Trustee testified that to the extent these transfers might have been preferential, the failure to timely disclose them permitted the statute of limitation to run on the Trustee's ability to attempt to avoid those actions.

As to Question 10, numerous contributions Retz made to, and distributions he received from, TCI and TCLLC were not listed. As discussed above, it was impossible to determine whether the amounts Retz had received from TCI and TCLLC matched the amounts he had provided to the companies. This evidence is sufficient to support the bankruptcy court's finding that Retz made false oaths on his Schedules and SOFA.

**2**

HN9[⬆] *Section 727(a)(4)(A)* requires that the relevant false oath relate to a material fact. *In re Roberts, 331 B.R. at 882;* see also *11 U.S.C. § 727(a)(4)(A).* "A fact is material 'if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property.' " *In re Khalil, 379 B.R. at 173* (quoting *In re Wills, 243 B.R. at 62*). An omission or misstatement **[**16]** that "detrimentally affects administration of the estate" is material. *In re Wills, 243 B.R. at 63* (citing 6 Lawrence P. King et al., *Collier on Bankruptcy P 727.04[1][b]* (15th ed. rev. 1998)).

Retz's errors and omissions in his Schedules and SOFA related to his assets, property, and business dealings. Further, the Trustee testified that Retz's incomplete and erroneous Schedules and SOFA interfered with administration of the estate, making it almost impossible to reconstruct his financial affairs. The bankruptcy court correctly concluded that Retz's false oaths related to

606 F.3d 1189, *1198; 2010 U.S. App. LEXIS 11357, **16

material facts.

**3**

*HN10*[⬆] The third element required by *§ 727(a)(4)(A)* is that the debtor act knowingly in making the false oath. *In re Roberts, 331 B.R. at 882*; *see also* *11 U.S.C. § 727(a)(4)(A)*. "A debtor 'acts knowingly if he or she acts deliberately and consciously.'" *In re Khalil, 379 B.R. at 173* (quoting *In re Roberts, 331 B.R. at 883*). Retz deliberately and consciously signed the Schedules and SOFA knowing that they were incomplete. Furthermore, he admitted at trial that even if all the information from his worksheets had been included in the Schedules and SOFA still would have been incomplete. [7] This is sufficient **[**17]** to support the bankruptcy court's finding that Retz acted knowingly.

**4**

Finally, the bankruptcy court found that Retz's *HN11*[⬆] fraudulent intent, establishing the fourth element of a *§ 727(a)(4)(A)* violation, was shown "by a pattern of falsity, his reckless indifference to and disregard of the truth, and demonstrated by his course of conduct." Retz challenges this finding, arguing that he did not intend to defraud his creditors and that his good faith reliance on the advice of his counsel demonstrates his lack of fraudulent intent.

*HN12*[⬆] To demonstrate fraudulent intent, Abbey and the Trustee bore the burden of showing that: "(1) [Retz] made the representations [e.g., a false statement or omission in bankruptcy schedules]; (2) . . . at the time *he knew they were false*; [and] (3) . . . he made them with the *intention* **[**1199]** *and purpose of deceiving the creditors.*" *In re Khalil, 379 B.R. at 173* (quoting *In re Roberts, 331 B.R. at 884*) (second and third alterations in original). Intent is usually proven by circumstantial evidence or by inferences drawn from the **[**18]** debtor's conduct. *Devers v. Bank of Sheridan, Mont. (In re Devers), 759 F.2d 751, 753-54 (9th Cir. 1985)*; *see also* *In re Roberts, 331 B.R. at 884*. Reckless indifference or disregard for the truth may be circumstantial evidence of intent, but is not sufficient, alone, to constitute fraudulent intent. *In re Khalil, 379 B.R. at 173-75*.

*HN13*[⬆] "Generally, a debtor who acts in reliance on

---

[7] Retz's attorney acknowledged that some items that were listed in Retz's worksheets did not make it to the Schedules and SOFA through clerical error.

the advice of his attorney lacks the intent required to deny him a discharge of his debts." *In re Adeeb, 787 F.2d at 1343*. "However, the debtor's reliance must be in good faith." *Id.* The advice of counsel is not a defense when the erroneous information should have been evident to the debtor. *Boroff v. Tully (In re Tully), 818 F.2d 106, 111 (1st Cir. 1987)*. "A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath." *Id.*

Retz argues that he was unaware of many of the errors and omissions in his Schedules and SOFA because he signed the forms in blank and relied upon his attorney to fill in the correct information. Retz cannot escape the bankruptcy court's finding of fraudulent intent by his reliance on the advice **[**19]** of his counsel. First, Retz's attorney, Harold Dye, testified that he did not advise Retz to sign the Schedules and SOFA without reading them. Retz's argument highlights the reason that the debtor is required to attest that he has read the Schedules and SOFA: to ensure to the greatest extent possible that the information turned over to the bankruptcy court is accurate. See *In re Searles, 317 B.R. at 378* ("The continuing nature of the duty to assure accurate schedules of assets is fundamental because the viability of the system of voluntary bankruptcy depends upon full, candid, and complete disclosure by debtors of their financial affairs.").

More importantly, the bankruptcy court explicitly found that Retz did not rely on Dye's advice in good faith. This finding is not clearly erroneous. The court properly noted that the significant number of falsehoods and omissions, together with the failure to amend the Schedules and SOFA in the three years between the petition and trial, can constitute reckless indifference to the truth, which is evidence of fraudulent intent. See *In re Khalil, 379 B.R. at 173-75*; *see also* *Martin Marietta Materials Sw., Inc. v. Lee (In re Lee), 309 B.R. 468, 477 (Bankr. W.D. Tex. 2004)*. **[**20]** The fact that Retz signed the forms in blank reflects this same reckless indifference to the truth, which adds to the circumstantial evidence of fraudulent intent. See *Kavanagh v. Leija (In re Leija), 270 B.R. 497, 504 (Bankr. E.D. Cal. 2001)* (finding that signing of forms in blank was "at best, recklessly indifferent"). Considering the significant number of omissions and errors, the large monetary value of many of the omitted transfers, and the fact that Retz signed the Schedules and SOFA without reading them, the bankruptcy court's finding that Retz had the requisite fraudulent intent was not illogical, implausible, or without support in the record. See *Anderson, 470*

606 F.3d 1189, *1199; 2010 U.S. App. LEXIS 11357, **20

*U.S. at 577*.

The bankruptcy court correctly held that Retz made many false oaths on his Schedules and SOFA, that the false oaths related to material facts, and that they were made knowingly and fraudulently. *See 11 U.S.C. § 727(a)(4)(A)*; *see also In re Roberts, 331 B.R. at 882*. We, therefore, affirm the bankruptcy court's denial **[*1200]** of Retz's discharge pursuant to *§ 727(a)(4)(A)*.

**B**

The bankruptcy court also denied Retz's discharge under both subsections of *§ 727(a)(2)*. That section states:

> *HN14*[↑] The court shall grant the debtor a **[**21]** discharge, unless . . . the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed[,] (A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition.

*11 U.S.C. § 727(a)(2)*. *HN15*[↑] A party seeking denial of discharge under *§ 727(a)(2)* must prove two things: "(1) a disposition of property, such as transfer or concealment, and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act [of] disposing of the property." *Hughes v. Lawson (In re Lawson), 122 F.3d 1237, 1240 (9th Cir. 1997)*.

*HN16*[↑] A debtor's intent need not be fraudulent to meet the requirements of *§ 727(a)(2)*. Because the language of the statute is in the disjunctive it is sufficient if the debtor's intent is to hinder or delay a creditor. *In re Bernard, 96 F.3d at 1281*. Furthermore, "lack of injury to creditors is irrelevant for purposes of denying a discharge in bankruptcy." **[**22]** *Id. at 1281-82* (quoting *In re Adeeb, 787 F.2d at 1343*).

*HN17*[↑] In examining the circumstances of a transfer under *§ 727(a)(2)*, certain "badges of fraud" may support a finding of fraudulent intent.

> These factors, not all of which need be present, include (1) a close relationship between the transferor and the transferee; (2) that the transfer was in anticipation of a pending suit; (3) that the transferor Debtor was insolvent or in poor financial

condition at the time; (4) that all or substantially all of the Debtor's property was transferred; (5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and (6) that the Debtor received inadequate consideration for the transfer.

*Emmett Valley Assocs. v. Woodfield (In re Woodfield), 978 F.2d 516, 518 (9th Cir. 1992)*.

**1**

The bankruptcy court held that Retz's sale of the house at 650 Woodside Lane, Whitefish, Montana, to his brother Ryan constituted a transfer of property, within one year prior to the filing of the bankruptcy petition, with an intent to hinder, delay, or defraud creditors sufficient to deny discharge under *§ 727(a)(2)(A)*. Retz argues that he arranged **[**23]** the sale more than a year before filing for bankruptcy and that he had no intent to defraud his creditors.

The facts surrounding the transfer of 650 Woodside are relatively complex and support the bankruptcy court's finding that Retz's actions regarding TCLLC, his creditors, and his properties evidenced Retz's fraudulent intent. Lot 6 of the Woodside subdivision, commonly referred to as 650 Woodside, was one of the properties that TCI should have contributed to TCLLC pursuant to Retz's business arrangement with Abbey and the TCLLC Operating Agreement. Retz testified that although he did not transfer the deed from TCI to TCLLC, the property was placed on TCLLC's books in July 2001.

In the fall of 2001, once construction was finished on the house, Retz and Misty moved into 650 Woodside. They did not **[*1201]** pay rent. Retz testified that he spoke with Abbey about paying rent and Abbey allegedly told him not to worry about it, stating: "Don't be ridiculous. Just put a cup at the back door and stick a quarter in it for your uncle Don every now and then." Abbey testified to the contrary that he told Retz that the house should be sold for a profit and that if Retz wanted to live in it, he should pay **[**24]** rent.

On July 3, 2002, TCI--not TCLLC, the purported owner of the property--deeded 650 Woodside to Retz and Misty. Retz explained that he exchanged 650 Woodside, at cost, for a piece of property across the street that he owned personally, 665 Woodside. Later, Retz and Misty decided they wanted to build a house at 665 Woodside so they purchased it back from TCLLC at the same

606 F.3d 1189, *1201; 2010 U.S. App. LEXIS 11357, **24

price for which it had been exchanged a few months before. Retz testified that Abbey verbally consented to the transfer of 650 Woodside. However, he concedes that Abbey never consented in writing, as required by the Operating Agreement. Abbey testified that he had no knowledge of the transfer until long after it was complete.

The bankruptcy court found that Abbey did not tell Retz he could live at 650 Woodside without paying rent and that Abbey had not consented to the transfer of 650 Woodside from TCLLC to Retz. In rejecting Retz's version of the facts, the bankruptcy court observed that the "testimony by [Retz] regarding Abbey's nonchalance about his business affairs is fantastic, and wholly inconsistent with the evidence of Abbey's business practices in dozens of companies." The bankruptcy court also noted that **[\*\*25]** Retz's testimony that the two men had a verbal agreement not to abide by the Operating Agreement was in direct contradiction to the Agreement's integration clause. [8]

In May 2002, Retz invited his brother Ryan to move back to Whitefish from Boise, Idaho, to work for TCLLC. As an inducement for Ryan to accept the job, Retz promised to sell him 650 Woodside for a good price. Ryan moved into 650 Woodside in July 2003. Retz ordered an appraisal so that Ryan could secure financing; the appraised value as of July 25, 2003, was $ 220,000. Retz and Ryan then executed a buy-sell agreement for 650 Woodside in November 2003, which they backdated to July 20, 2003. The sale price was $ 160,000.

The bankruptcy court made several adverse findings of fact relating to the sale of 650 Woodside. First, **[\*\*26]** the court found that the sale was within one year of Retz filing his petition for bankruptcy, relying on the date of the buy-sell agreement, rather than the date Retz told Ryan he could get him a good deal on the house. Relying on the date of the buy-sell agreement is rational and supported by the record, particularly because the bankruptcy court found Retz's testimony generally not credible. Second, the bankruptcy court

held that the sale was unquestionably a transfer within the meaning of § 727(a)(2). Retz does not appear to challenge this finding on appeal. Third, the court described four badges of fraud present in the transaction: that Retz (1) had a close relationship with the transferee, Ryan; (2) sold the house during pending state court litigation involving one of his most significant creditors, Abbey; (3) was in poor financial condition at the time of the sale; and (4) received inadequate **[\*1202]** consideration by selling the house for $ 60,000 less than the appraised value. See In re Woodfield, 978 F.2d at 518.

Retz's reliance on attorney Dye's advice that the sale was legally proper is insufficient to vitiate the fraudulent intent evidenced by these badges of fraud. Dye testified **[\*\*27]** that Retz told him the state court had authorized the sale to go forward, but Retz failed to tell Dye that the state court did not know that the sale was to Retz's brother for $ 60,000 under market value. Furthermore, although Dye was aware that Ryan was purchasing 650 Woodside, he did not know that it had been appraised at $ 60,000 over the sale price. Reliance on the advice of counsel is not a viable defense to a claim of fraud when the debtor has not made full disclosure of the relevant facts to counsel. See Adell v. John Richards Homes Bldg. Co. (In re John Richards Homes Bldg. Co.), 439 F.3d 248, 260 (6th Cir. 2006) HN18[⬆] ("[A] client reasonably relies on an attorney's advice only when the client provides to the attorney all of the pertinent facts in the client's possession."). The bankruptcy court's decision is also supported by Retz's lack of candor with the state court and with his own attorney regarding the sale of 650 Woodside, which is further evidence of his fraudulent intent.

The bankruptcy court's determination that the sale of 650 Woodside was a transfer within a year before filing for bankruptcy, made with the intent to hinder, delay, or defraud a creditor is not clearly erroneous. **[\*\*28]** The record demonstrates that Retz improperly purchased 650 Woodside from TCLLC for cost, rather than selling it for profit to benefit the business. He then sold it to his brother for $ 60,000 under market value only a few months before he filed for bankruptcy. Retz failed to inform the state court investigating the propriety of the transfer of 650 Woodside that the arranged sale was to his brother for well below market value. It is hard to believe that an educated and experienced business owner like Retz would have found this information irrelevant to the state court's concerns regarding TCLLC's financial losses related to the house. Retz also failed to tell his attorney that the sale was for well below

---

[8] The integration clause reads: "This Agreement and the other written agreements entered into concurrently herewith constitute the complete and exclusive statement of agreement among the Members and Governing Members with respect to the subject matter herein and therein and replace and supercede all prior written and oral agreements or statements by and among the Members and Governing Members or any of them."

606 F.3d 1189, *1202; 2010 U.S. App. LEXIS 11357, **28

market value. This evidence supports a finding of fraudulent intent in the transfer of 650 Woodside, and we affirm the bankruptcy court's denial of Retz's discharge under § 727(a)(2)(A).

**2**

The bankruptcy court also denied Retz's discharge under § 727(a)(2)(B) due to his participation in the transfer of NFRC assets belonging to the bankruptcy estate, without notice to the Trustee, with the intent to hinder, delay, and defraud creditors.

The Retz family owned a bed and breakfast resort called **[**29]** North Forty Resort, which was owned by NFRC. Retz's parents, Robert and JoEllen, owned 82% of NFRC, and Retz, Ryan, and their brother Eric each owned 6%. Retz was a director and vice president of NFRC from its inception in 1993. When they first opened the resort, Retz performed the bookkeeping, maintained the ledger, wrote checks, paid bills, and compiled financial statements and balance sheets for its operation. Although he claimed that he later had no role in the finances of the resort, Retz had access to NFRC's bank accounts in September 2003 when he removed cash from the accounts for his personal use.

On July 6, 2004, the Trustee requested by letter that Retz provide him with information regarding NFRC. Retz responded more than three months later in a letter dated October 27, 2004, that the Trustee's request was very broad and that he would respond only to more specific questions the Trustee might have about NFRC. In the interim, NFRC sold all of its assets on **[*1203]** September 17, 2004, to North Forty Resort, LLC. Retz's mother, JoEllen, is the sole member of North Forty Resort, LLC. As a result of the transfer, NFRC now holds as its only asset a promissory note in the amount of $ 850,000, **[**30]** payable in thirty years with interest at 6%. The Trustee learned of the transfer on September 20, 2004, even though the estate held Retz's 6% of NFRC, and should have been consulted before the transfer.

Retz and several of his family members testified that the purpose of the NFRC sale was to protect his father's capital loss carryover that would be lost on his father's death. Because Robert was suffering from terminal cancer, the time for completing the transfer was necessarily short. However, the Retzes did hire an accountant, David Schultz, to advise them regarding the transfer. Schultz prepared a draft document discussing the financial and tax goals of the Retz family related to the transfer. At trial, he testified that Retz was involved

in the discussions regarding the memorandum. One of the listed goals of the transfer was to: "Minimize exposure to possible creditors of Brendon that survive the bankruptcy."

The **[**31]** bankruptcy court acknowledged that the transfer of the NFRC assets included a legitimate purpose, preserving Robert's tax loss benefits. However, the court stated that Retz's 6% interest in NFRC was unquestionably property of the estate and the sale was a disposition of property.

Finally, the court found that Retz had the requisite intent to hinder, delay, or defraud his creditors. Both Schultz and Eric testified that Retz was involved in the discussions leading up to Schultz's memorandum, which listed as a goal of the transfer minimizing NFRC's exposure to Retz's creditors. The court found that this goal alone was sufficient to satisfy the intent requirement.

The bankruptcy court also found that Retz's delay in responding to the Trustee's questions regarding NFRC and his evasiveness in giving the Trustee full information regarding NFRC was evidence of fraudulent intent. The court found three badges of fraud in the NFRC transaction: (1) Retz's close relationship with the transferee, an entity owned and controlled by his mother; (2) the transfer occurred during the pendency of Retz's bankruptcy; and (3) Retz was insolvent at the time of the transfer. See In re Woodfield, 978 F.2d at 518.

Retz **[**32]** presents several arguments on appeal contesting the bankruptcy court's findings. First, Retz argues that he was not involved in the transfer of the NFRC assets, which was spearheaded by his father Robert. Second, he contends that it was NFRC's attorney, not Retz, who had a duty to inform the Trustee, a minority shareholder, of the sale. Third, Retz states that the Trustee lost no value after the transfer because NFRC retained assets equal in value to those it transferred. Finally, he argues that he no longer held an interest in NFRC at the time of the transfer because the shares belonged to the estate. This argument appears to relate to the requirement under § 727(a)(2) that the relevant property have been transferred. However, as discussed more fully below, § 727(a)(2)(B) specifically governs transfers of property belonging to the estate.

Retz's effort to disclaim responsibility for the transfer is unavailing. Two witnesses testified that Retz was involved in planning the transfer with his father. Only

606 F.3d 1189, *1203; 2010 U.S. App. LEXIS 11357, **32

Retz's self-serving testimony rebutted the adverse evidence presented at trial. The bankruptcy court found his testimony not credible, and we give great deference to the bankruptcy court's [**33] determinations regarding the credibility of [*1204] witnesses. *See Anderson, 470 U.S. at 575.* The evidence, thus construed against him, supports the bankruptcy court's determination that Retz was involved in the transfer.

Regarding Retz's responsibility to inform the Trustee of the transfer of NFRC assets, it is true that NFRC's attorney likely had a duty to inform the Trustee, as a minority shareholder, of the transfer. However, the Trustee had specifically asked Retz for information regarding NFRC, which Retz failed to provide in a timely fashion. *HN19*[↑] As a debtor in bankruptcy proceedings, Retz had a duty to share full information with the Trustee, completely separate from any duty owed to the Trustee as a minority shareholder. *See generally Grogan v. Garner, 498 U.S. 279, 286-87, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991)* (stating that the Bankruptcy Act "limits the opportunity for a completely unencumbered new beginning to the honest but unfortunate debtor" (internal quotation marks omitted)); *see also In re Wills, 243 B.R. at 63* ("[T]he opportunity to obtain a fresh start is . . . conditioned upon truthful disclosure." (quoting *Aubrey v. Thomas (In re Aubrey), 111 B.R. 268, 274 (B.A.P. 9th Cir. 1990))).* Further, Retz's failure [**34] to inform the Trustee of the transfer is circumstantial evidence of his intent to hinder, delay, or defraud creditors, because there is no other reasonable explanation for Retz's delay.

Retz's argument that the Trustee lost no value as a result of the transfer of NFRC's stock is unrelated to whether there was a transfer and whether Retz intended to hinder, delay, or defraud the Trustee and his creditors by engaging in the transfer. Furthermore, "lack of injury to creditors is irrelevant for purposes of denying a discharge in bankruptcy." [9] *In re Bernard, 96 F.3d at 1281-82* (quoting *In re Adeeb, 787 F.2d at 1343*).

Finally, Retz's statement that he no longer owned an interest in NFRC and that the transfer, therefore, cannot be held against him, is nonsensical. *HN20*[↑] *Section 727(a)(2)(B)* allows a court to deny discharge when a debtor "has permitted to be transferred . . . property of the [**35] estate." *11 U.S.C. § 727(a)(2).* Thus, it makes no difference that the NFRC stock belonged to the estate, rather than to Retz. Retz can be held responsible for any transfer of that property that is accomplished in order to hinder, delay, or defraud the Trustee or a creditor. [10] *See id.*

Considering [**36] all the evidence presented at trial regarding the transfer of NFRC assets, the bankruptcy court's finding that Retz intended to hinder, delay, or defraud his creditors by completing the transfer is not illogical, implausible, or without support in the record. [*1205] *See Anderson, 470 U.S. at 577.*

**C**

The final ground upon which the bankruptcy court rested its denial of Retz's discharge is *§ 727(a)(5).* *Section 727(a)(5)* states: *HN21*[↑] "The court shall grant the debtor a discharge, unless . . . the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." *11 U.S.C. § 727(a)(5).*

> *HN22*[↑] Under *§ 727(a)(5)* an objecting party bears the initial burden of proof and must demonstrate: (1) debtor at one time, not too remote from the bankruptcy petition date, owned identifiable assets; (2) on the date the bankruptcy petition was filed or order of relief granted, the debtor no longer owned the assets; and (3) the bankruptcy pleadings or statement of affairs do not reflect an adequate explanation for the disposition of the assets.

---

[9] The transfer likely did cause NFRC's stock to lose value, because the only property held by NFRC after the transfer was an unsecured promissory note on which no principal payment was due for thirty years, and on which interest was due, beginning at the end of the sixth year, "only as Buyer's net profits allow."

---

[10] A single sentence in Retz's opening brief on appeal implies that the transfer of NFRC's assets to the North Forty Resort, LLC, was not a transfer of property under *Hansen v. Moore (In re Hansen), 368 B.R. 868 (B.A.P. 9th Cir. 2007).* The only explication of this argument is that "*Hansen* did not hold a transfer of the assets of a corporation in which a debtor is a minority shareholder is a transfer of the debtor's property." The fact that *Hansen* dealt with a different factual scenario than the current case is hardly support for an argument that there was no transfer of assets in this case. In fact, the briefing itself describes the actions taken by NFRC as a transfer of assets. We are satisfied, based on the facts found by the bankruptcy court, that Retz was sufficiently involved in the transfer of the NFRC assets for this transaction to qualify as a disposition of estate property under *§ 727(a)(2).*

606 F.3d 1189, *1205; 2010 U.S. App. LEXIS 11357, **36

*Olympic Coast Invest., Inc. v. Wright (In re Wright), 364 B.R. 51, 79 (Bankr. D. Mont. 2007)*; **[**37]** *see also In re Devers, 759 F.2d at 754* (concluding that debtors could be denied discharge under *§ 727(a)(5)* where they failed to offer a "satisfactory explanation" for the "disappearance" of a tractor they had owned that they did not produce for repossession). Once the creditor has made a prima facie case, the debtor must offer credible evidence regarding the disposition of the missing assets. *In re Devers, 759 F.2d at 754*.

*HN23*[↑] Whether a debtor has satisfactorily explained a loss of assets is a question of fact for the bankruptcy court, overturned only for clear error. *Hawley v. Cement Indus., Inc. (In re Hawley), 51 F.3d 246, 248 (11th Cir. 1995)* (per curiam) (citing *Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 619 (11th Cir. 1984)* (per curiam)). "A debtor's failure to offer a satisfactory explanation when called on by the court is a sufficient ground for denial of discharge under *[§] 727(a)(5)*." *In re Devers, 759 F.2d at 754*.

The inadequacy of Retz's Schedules and SOFA is discussed above. In particular, large amounts of money were transferred into and out of Retz's personal bank accounts, and he very rarely had any explanation for where the money went. There is also evidence in the **[**38]** record that Retz went on a spending spree just before filing for bankruptcy to benefit both himself and TCI, purchasing computers, office furniture, servers, luxury cars, a helicopter and hangar, and making gambling trips where he lost thousands of dollars. The purchases for TCI are particularly troubling, because Retz indicated at the first *§ 341* Creditors' Meeting that the company was essentially inactive once his business relationship with Abbey broke down. Furthermore, after describing the purchases made on behalf of TCI at trial, Retz stated that he did not know where excess loan proceeds and credit card funds purportedly used to effect these purchases went.

Retz argues that he should not be penalized for the lack of records because all the documents were in the hands of the Receiver or Trustee, or were readily obtainable by them. Retz is essentially contending that the Trustee is obligated to investigate complex financial transactions and unfinished books without any help from the debtor. He also implies that he was unable to obtain documents held by the Receiver and Trustee. However, he had the right to compel production of any necessary documents under *Federal Rule of Bankruptcy Procedure 2004(c)*.

Retz **[**39]** fails to explain how the Trustee should have found the relevant information, if Retz himself was unable to discover **[*1206]** it in the 28,000-plus pages of records he provided to the Trustee. *HN24*[↑] "A petitioner cannot omit items from his schedules, force the trustee and the creditors, at their peril, to guess that he has done so--and hold them to a mythical requirement that they search through a paperwork jungle in the hope of finding an overlooked needle in a documentary haystack." *In re Tully, 818 F.2d at 111*. As the BAP so succinctly noted, "In the end, there simply is no basis in the voluminous but nevertheless woefully incomplete record before the bankruptcy court from which *anyone* could explain satisfactorily Retz's deficiency of assets to meet his liabilities. Retz certainly has not done so." The record amply supports the judgment entered against Retz.

## IV

The decision of the bankruptcy court and the BAP to deny Retz's discharge is **AFFIRMED**.

---

**End of Document**

Exhibit "6"

 Neutral
As of: September 16, 2023 4:11 PM Z

# *Schoenmann v. Chen (In re Chen)*

United States Bankruptcy Court for the Northern District of California

November 9, 2009, Decided; November 9, 2009, Filed; November 10, 2009, Entered on Docket

Bankruptcy Case No. 03-32157DM, Chapter 7, Adversary Proceeding No. 07-3108DM

**Reporter**
2009 Bankr. LEXIS 3636 *; 2009 WL 3788898

In re GEORGE QUINN CHEN, Debtor. E. LYNN SCHOENMANN, as Trustee of the Chapter 7 Estate of George Quinn Chen, Debtor, Plaintiff, v. GEORGE QUINN CHEN, an individual, CYNTHIA WONG, an individual, SHANGHAI 1930 LLC, a California limited liability company, and SHANGHAI 1930 RESTAURANT PARTNERS, L.P., a California limited partnership, Defendants.

**Prior History:** *Schoenmann v. Chen, 2009 Bankr. LEXIS 2534 (Bankr. N.D. Cal., Aug. 4, 2009)*

## Core Terms

Restaurant, Distributions, property of the estate, claim for relief, post-petition, bookkeeper, Partnership, Partner, posted, tips, reimbursements, sales, estate's interest, advances

## Case Summary

**Procedural Posture**

Plaintiff Chapter 7 trustee filed a complaint against defendants, a debtor, his wife, a limited liability corporation (LLC), and a limited partnership (LP). The LLC and LP were eliminated as defendants by an unopposed motion for summary judgment. The only issues remaining for consideration were the avoidance and recovery of postpetition transfers and revocation of the debtor's discharge under *11 U.S.C.S. 727(d)*.

**Overview**

The trustee sought to avoid and recover numerous postpetition transfers made by the LP, under the control and direction of the debtor and his wife, during the period between the petition date and the date of sale of the estate's ownership interest in a restaurant to the debtor's wife. With the approval of the court, the trustee

had sold all of the estate's interest in the LLC and the LP to the debtor's wife. As of the petition date, there was an outstanding amount owed by the LP to the debtor. The trustee was unaware of the existence of the loan because the debtor did not list it on his schedules. The trustee was entitled to judgment on its claim to recover postpetition transfers in amounts representing repayments of the loan to the debtor and certain partnership distributions. The debtor's discharge was revoked under *§ 727(d)* because he failed to disclose the substantial loan owed to him and he did not disclose the partnership distributions that he received. The debtor possessed the necessary intent because he procured his discharge by fraud or knowingly and fraudulently failed to schedule debt, report the payments, or deliver the monies to the trustee.

**Outcome**

The trustee was awarded judgment on her claims to avoid and recover postpetition transfers. The trustee was also awarded a judgment revoking the debtor's discharge.

## LexisNexis® Headnotes

Contracts Law > ... > Discharge & Payment > Payments > General Overview

*HN1*[⬇] **Discharge & Payment, Payments**

When payment is made on an obligation, unless there is some indication to the contrary, the practical and ordinary interpretation must undoubtedly be that payment is to be applied to the part first coming due to be paid.

2009 Bankr. LEXIS 3636, *3636

Bankruptcy Law > ... > Bankruptcy > Estate Property > Contents of Estate

*HN2*[⤓] **Estate Property, Contents of Estate**

Property of a bankruptcy estate includes money that a debtor has a right to receive.

Bankruptcy Law > ... > Discharge & Dischargeability > Liquidations > Revocation of Discharge

*HN3*[⤓] **Liquidations, Revocation of Discharge**

The benefit of discharge is reserved for the honest but unfortunate debtor. If *11 U.S.C.S. § 727(d)* is satisfied, a debtor has been less than honest and deserves no discharge.

Bankruptcy Law > ... > Discharge & Dischargeability > Liquidations > Revocation of Discharge

*HN4*[⤓] **Liquidations, Revocation of Discharge**

To warrant revocation under *11 U.S.C.S. § 727(d)*, a trustee must show that (1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge; (2) the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee. *§ 727(d)(1)-(2)*.

Bankruptcy Law > ... > Discharge & Dischargeability > Liquidations > Revocation of Discharge

Evidence > Types of Evidence > Circumstantial Evidence

*HN5*[⤓] **Liquidations, Revocation of Discharge**

*11 U.S.C.S. § 727(d)* does not require direct evidence of intent.

**Counsel:** [*1] For George Quinn Chen, Debtor: Cynthia L. Cox, Law Offices of Cynthia Cox, Oakland, CA; Trevor Caudle, Rubinstein Law Group PC, San Francisco, CA.

For E. Lynn Schoenmann, Trustee: Daniel M. Linchey, Goldberg, Stinnett, Davis and Linchey, San Francisco, CA; Kathy Quon Bryant, Merle C. Meyers, Meyers Law Group, PC, San Francisco, CA.

U.S. Trustee: William T Neary, San Francisco, CA.

**Judges:** DENNIS MONTALI, U.S. Bankruptcy Judge.

**Opinion by:** DENNIS MONTALI

# Opinion

*MEMORANDUM DECISION ON COMPLAINT TO REVOKE DISCHARGE AND TO RECOVER MONEY*

*I. INTRODUCTION.*

E. Lynn Schoenmann, the Chapter 7 [1] trustee ("Trustee"), initiated this adversary proceeding by filing a complaint (the "Complaint") against George Q. Chen ("Debtor"), his wife, Cynthia Wong ("Wong"), Shanghai 1930 LLC ("Shanghai LLC"), and Shanghai 1930 Restaurant Partners, L.P. ("Shanghai LP") on September 24, 2007. The Complaint sought declaratory relief regarding Debtor's ownership interest in Shanghai LLC, the avoidance of postpetition transfers and revocation of the Debtor's discharge.

More specifically, the Complaint sought a determination that as of July 23, 2003, the date of commencement of this bankruptcy case (the "Petition Date"), the Debtor was the sole member of Shanghai LLC. The Debtor contended that as of the Petition Date, Wong owned a 51% membership interest in Shanghai LLC, by way of transfer from the Debtor. On this claim for relief the parties brought cross motions for summary judgment and the Court granted summary judgment in favor of the

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, *11 U.S.C. §§ 101-1532*, and to the *Federal Rules of Bankruptcy Procedure, Rules 1001-9037* [*2] in effect prior to October 17, 2005, the effective date of most of the provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, April 20, 2005, 119 Stat. 23, as Debtor's case was filed prior to its effective date.

Trustee on November 14, 2008, determining that all membership interests in Shanghai LLC were owned by the Debtor as of the Petition Date.

On October 21, 2008, Shanghai LLC and Shanghai LP were eliminated as defendants by way of their summary judgment motion that was not opposed by the Trustee.

On April 20, 2009, the Debtor and Wong, the only remaining defendants, filed a motion seeking reconsideration of the court's ruling in favor of the Trustee on the first claim **[*3]** for relief. On August 4, 2009, the court issued its Memorandum Decision on Motion to Reconsider, stating its reasons for denying the motion. That denial will be incorporated into the Final Judgment to be issued.

By the second claim for relief, the Trustee seeks to avoid and recover numerous postpetition transfers made by Shanghai LP (under the Debtor's and Wong's control and direction) to the Debtor and Wong during the period between the Petition Date and the date of sale of the estate's ownership interest in the Restaurant (as hereafter defined) to Wong.

In the third claim for relief, the Trustee seeks revocation of Debtor's discharge.

The matter was tried to the court on June 1 & 2, 2009; appearances were noted in the record. Having considered the testimony of the witnesses, the documentary evidence, and the arguments of counsel, the court now issues it decision, subject to further consideration of the evidence as discussed below.

For the reasons to be explained, on the second claim for relief the court will award Trustee damages in the sum of $ 38,806.84 against Debtor based upon his receipt of that amount by way of two equity distributions that were property of the estate and in the **[*4]** sum of $ 729,044.19 based upon proof that he received at least that amount on account of a prepetition loan owed to him that also was property of the estate. The court will award Trustee damages in the sum of no less than $ 11,000 against Wong based upon her receipt of a portion of the debt owed to Debtor. It will not award damages against Wong based upon her receipt of two equity distributions.

On the third claim for relief, Debtor's discharge will be revoked.

## II. FACTS. [2]

The Debtor filed for chapter 13 relief on July 25, 2003 (the "Petition Date"). The Debtor's case was converted to chapter 11 on August 13, 2003, and Trustee was appointed. Then on July 15, 2005, the Debtor's case was converted to chapter 7; the Trustee continues to serve as trustee. The court entered an order discharging the Debtor on October 26, 2005.

Debtor founded a restaurant known as "Shanghai 1930" in 1997 in San Francisco, California (the "Restaurant"). It has operated **[*5]** ever since, and is owned and operated by Shanghai LP, the general partner of which is Shanghai LLC. Debtor was the 100% separate property owner of Shanghai LLC. Debtor and Wong are also limited partners in Shanghai LP.

On April 25, 2007, Debtor filed a motion seeking the estate's abandonment of his interest in Shanghai LP. His expert appraisal witness concluded that that interest had a nominal or no value as of February 28, 2007.

In opposition the Trustee located a third-party buyer willing to buy the estate's interest for $ 25,000. Wong objected to the sale and ultimately purchased the estate's interest for $ 50,000.

With the approval of the court, Trustee sold all of the estate's interests in Shanghai LP and Shanghai LLC to Wong on November 14, 2007 (the "Sale Date"). The sale did not include any claims held by the estate against the Debtor or Wong with respect to payments made by either Shanghai LP or Shanghai LLC prior to the Sale Date. At issue before the court are activities that occurred between the Petition Date and the Sale Date (the "Subject Period").

As of the Petition Date there was an outstanding amount owed by Shanghai LP to the Debtor of no less than $ 935,709.98 (the "Chen **[*6]** Loan"). The Chen Loan is reflected in Shanghai's general ledger as a liability account (Loan from George Chen - Account 2300, or "Chen Loan Account"). Most, if not all, of the Chen Loan represents cash advances Debtor made prior to the Petition Date to help the Restaurant deal with cash flow needs, including covering employees' tips, cash purchases, etc. The Trustee was unaware of

---

[2] The following discussion constitutes the court's findings of fact and conclusions of law. *Fed. R. Bankr. P. 7052(a)*. Some of the findings are based upon the parties' Stipulation Of The Parties To Undisputed Facts filed May 29, 2009 (docket # 76).

2009 Bankr. LEXIS 3636, *6

the existence of or the outstanding balance on the Chen Loan until conducting discovery involving the sale of the estate's interest in Shanghai LP because the Debtor did not list it on his schedules. The Trustee has received no payments from Shanghai or anyone else on account of the Chen Loan.

A. *Equity Distributions.*

During the Subject Period, and disregarding management fees and salary payments, $ 20,880 was paid to the Debtor in December, 2005 and $ 17,926.84 more in April 2007. The same amounts were paid to Wong on the same dates, and all four payments were distributions on equity interests in Shanghai LP (the "Partner Distributions"). The Partner Distributions to Debtor were property of the estate, as the estate owns the entirety of Shanghai LLC and Debtor's limited partnership interest in Shanghai LP. **[*7]** Trustee did not prove that Wong's Partner Distributions were on account of her own interest as a limited partner in Shanghai LP.

Debtor attempts to justify his Partnership Distributions on the basis of his apparent belief that Trustee told him after entry of his discharge that he could build the Restaurant. The Trustee did not authorize him to withdraw and keep any Partner Distributions as Debtor never asked Trustee about them.

B. *Payments on the Chen Loan.*

Trustee contends that during the Subject Period the Debtor and Wong caused Shanghai LP to repay the entire balance of the Chen Loan to the Debtor and Wong, in the amount of $ 935,709.98. She maintains that Shanghai had sufficient cash to make those payments from its cash sales to customers. Debtor contends that these payments to him were on account of post-petition loans or alternatively that the Restaurant lacked sufficient cash to make any payments on the Chen Loan. He contends that the Restaurant's outside bookkeeper simply used the Chen Loan Account to post transactions that were not otherwise documented, primarily cash the Restaurant needed to pay weekly to its servers as tips that were given by customers via credit card charges. **[*8]** The bookkeeper, only a few weeks prior to trial, came to realize that cash used to pay those tips to the servers should have been posted as such, rather than shown as advances by Debtor, increasing the Chen Loan. These were described at trial as "unsubstantiated entries." Similarly, she maintains that reductions in the Chen Loan account were not that at all, but were simply incorrect postings.

The Trustee's accounting expert prepared a report that demonstrated that Debtor received transfers during the Subject Period by checks to various payees, including the Debtor, Wong, "cash," and "Shanghai 1930." Some of those payments were debited to sales and sales tax accounts, resulting in a reduction of reported sales.

If the journal entries that resulted in an increase to the Chen Loan account actually reflected reimbursements to the Debtor, such reimbursements would be posted as costs in the "costs of sale" or "operating expenses" accounts.

Although the Chen Loan account balance increased during the Subject Period, the increases were largely based on the unsubstantiated entries made by the bookkeeper on the books. Basically, because she was not aware of the Restaurant's recording of tips, she **[*9]** increased the Chen Loan balance for any otherwise undocumented receipts. Actual restaurant sales were reported to her on a reliable point-of-sale system; credit card receipts, representing 95% of all Restaurant revenues, were greater than reported sales because customers included sales taxes and tips; sales taxes were easily calculated and paid by the bookkeeper, but since she did not know about the tips, she assumed the additional cash came from Debtor and posted it accordingly. In fact, five percent of the Restaurant's sales revenues came from cash-paying customers.

When she had more money on hand than was reported in sales of the Restaurant, the bookkeeper automatically attributed that excess to monies that came from Debtor by posting increases in Account 2300, using it as a balancing account because of the lack of credible documentation. However, the Debtor, Wong nor the bookkeeper provided documents to substantiate such a practice.

Debtor's claims that he advanced monies to the Restaurant post-petition, but he has offered no documentary evidence or entries in the Restaurant's books and records to support that contention. The evidence establishes that what the bookkeeper posted as **[*10]** postpetition payments on the Chen Loan should have been booked as expenses. Further, Trustee's expert examined the records and concluded, convincingly, that Debtor did not make any significant advances to increase the Chen Loan. They cannot be verified through corresponding bank deposits.

The court is faced with the task of determining whether there were in fact payments to Debtor and/or Wong on

2009 Bankr. LEXIS 3636, *10

the Chen Loan during the Subject Period. On the Trustee's side there is an expert report (Exhibit 14), modified by and adjusted after accepting the bookkeeper's concessions of erroneous postings of unsubstantiated transactions and cash payments (Exhibit 19); on the Debtor's side there is no expert witness, inconclusive and somewhat confusing financial accounting, and capable counsel's creative arguments and speculation about large amounts of unproven tip receipts that do not amount to evidence. On balance, the preponderance of the evidence supports the court's acceptance of the Trustee's accountant's opinion that *at least* $ 729,044.19 of the Chen Loan was paid to Chen or Wong during the Subject Period. The court rejects the Trustee's suggestion that under a last-in, first out theory, Chen should **[*11]** be liable for the entire amount of the prepetition Chen Loan, $ 935,709.98.

At the minimum, Chen is liable to the estate in this amount of repayments of the Chen Loan. As to Wong, the specific evidence alluded to by Trustee's counsel during argument is found in Exhibit 1, p. 1147. There the court notes a total of $ 11,000 paid to Wong and booked as payments on the Chen Loan. As such, Wong had no right to that money, has not proven that she was otherwise entitled to it, and must reimburse the estate for it.

Whether Wong received more than $ 11,000 on the Chen Loan may have been established in the documentary evidence, but the court will not wade through that detailed evidence to find other similar entries to make out the case against Wong. But to the extent the admitted evidence does show similar disbursements, the court will permit the Trustee to point out such disbursements and add them to the amount of Wong's liability, as discussed in the Conclusion to this Memorandum Decision.

Postpetition, the Debtor claims that he has had an ongoing relationship with the Restaurant whereby he purchases wine, restaurant supplies and other merchandise and is reimbursed for it. These "reimbursements" **[*12]** are reflected on the Restaurant's books and records as payments on the Chen Loan. There is no indication to which debt the payment is applied. Accordingly, *HN1*[⬆] when payment is made on an obligation, unless there is some indication to the contrary, the practical and ordinary interpretation must "undoubtedly be that payment is to be applied to the part first coming due to be paid." *Smith v. Renz, 122 Cal. App. 2d 535, 538, 265 P.2d 160 (Cal. App. 1st Dist. 1954)*.

The Petition Date balance of the Chen Loan of $ 935,709.98 is an earlier obligation than any postpetition advances, and therefore any pay-down of the Chen Loan must be credited to the prepetition debt. No logical reason has been offered as to why, in the ordinary course of events, it should be approached in inverse order. Therefore, it must be assumed that if the parties intended to "depart from the ordinary" they would have specifically so provided. *Id.*

Because general credits on open accounts stand as payments on the oldest items of such accounts, the Debtor's contention that the payments made were post-petition reimbursements for post-petition advances is incorrect. *Jessup Farms v. Baldwin, 33 Cal. 3d 639, 190 Cal. Rptr. 355, 660 P.2d 813 (Cal. 1983)*.

The Trustee's counsel **[*13]** asked that all of the amounts repaid Chen Loan during the Subject Period be declared as a joint and several liability of Chen and Wong. Absent facts and law to support such a result, the court will not do that. Wong's liability is limited to distributions to her on the Chen Loan.

C. *Revocation of Discharge*.

The Debtor was aware of the Chen Loan when he filed his bankruptcy petition, related schedules and statement of financial affairs, but he failed to disclose this substantial debt owed to him. His Schedule B declared no debt owing. It showed $ 228,141.17 in personal property, $ 200,000 of which was stock in an unrelated company that has since been sold. Debtor also knew that payments on the Chen Loan and the Partnership Distributions made during the Subject Period belonged to the estate, but he knowingly failed to report them or turn them over to the Trustee.

Debtor also misled the Trustee when he argued that the estate's interest in Shanghai LLP had a nominal value at best and the Restaurant was operating at a loss when in the same year he and received a Partnership Distribution of $ 17,926.,84, having earlier received a Partnership Distribution of $ 20,880.

*HN2*[⬆] Property of the estate includes **[*14]** money that a debtor has a right to receive. *In re Crysen/Montenay Energy Co., 902 F.2d 1098, 1101 (2d Cir. 1990)* (debtor's right to collect accounts receivable is "property of the estate"). An outstanding loan that a debtor expects to be repaid is property of the debtor's bankruptcy estate. *In re Martin, 141 B.R. 986, 993 (Bankr. N. D. Ill. 1992)*. The Chen Loan and the right to collect it became property of the Estate as of the

2009 Bankr. LEXIS 3636, *14

Petition Date. All payments made on account of that loan prior to the Sale Date, therefore, belonged to the estate. Debtor and Wong had no right to retain the payments on the Chen Loan that they received.

Similarly, the two Partner Distributions to Chen made prior to the Sale Date constituted property of the estate as well and Debtor has no right to retain them.

HN3[↑] The benefit of discharge is reserved for "the honest but unfortunate debtor." *In re Holstein, 299 B.R. 211, 233 (Bankr. N.D. Ill. 2003)*. If *section 727(d)* is satisfied, the debtor has been less than honest and deserves no discharge. *In re Barr, 207 B.R. 160, 165 (Bankr. N.D. Ill. 1997)*.

HN4[↑] To warrant revocation under *section 727(d)*, the Trustee must show that (1) such discharge was obtained through the fraud **[*15]** of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge; (2) the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee. *11 U.S.C. § 727(d)(1)-(2)*.

Debtor failed to report the Chen Loan on his schedules when his petition was filed and at no point did he amend his schedules to reflect the debt. The evidence shows that the Trustee did not learn of the Chen Loan until it was revealed in through discovery in 2007. This was after the court discharged the Debtor. By then, a substantial portion of the Chen Loan outstanding as of Petition Date had already been paid to the Debtor. Debtor also made no attempt to disclose the 2005 and 2007 Partnership Distributions he received. These facts establish all the necessary elements under both *Sections 727(d)(1)* and *(2)*.

The Debtor possessed the necessary intent because he procured his discharge by "fraud" or that he "knowingly and fraudulently" failed to schedule the **[*16]** debt, report the payments or deliver the monies to the Trustee. HN5[↑] *Section 727(d)* does not require direct evidence of intent.

The Debtor's fraudulent intent is clear from the fact that he was aware of the omitted assets and knew his failure to list the assets could seriously mislead the Trustee; in the alternative, Debtor acted so recklessly in not reporting the asset that fraud is implied.

Based on the behavior of the Debtor, his discharge should be revoked pursuant to *Section 727(d)*.

*IV. CONCLUSION.*

Trustee is entitled to a judgment on the second claim for relief against Debtor in the amount of $ 729,044.19 (for repayments of the Chen Loan) and $ 38,806.84 (for the Partnership Distributions), plus costs. She is entitled to judgment against Wong in the amount of at least $ 11,000, plus costs.

At the time her counsel submits a form of judgment he may also submit (without argument) a list of citations to the appropriate exhibit number, page and entries where additional payments on the Chen Loan to Wong have been documented. The list should include a total dollar amount Trustee contends the judgment against Wong should be. Counsel for Wong will then have ten days to file a designation (also **[*17]** without argument) of any of the Trustee's citations to the record he believes do not show a payment to Wong on the Chen Loan. The court will determine whether Trustee is entitled to a judgment against Wong in excess of $ 11,000.

On the third claim for relief, Trustee is entitled to a judgment revoking Chen's discharge.

Counsel for the Trustee should submit and serve in accordance with *B.L. R. 9021-1* a form of final judgment consistent with the foregoing and for the reasons stated in this Memorandum Decision (with the amount to be awarded against Wong left blank so the court may insert an amount) and consistent with the court's denial of the motion to reconsider the grant of summary judgment in her favor on the first claim for relief.

Signed and Filed: November 09, 2009

/s/ Dennis Montali

**DENNIS MONTALI**

**U.S. Bankruptcy Judge**

End of Document

Exhibit "7"

 Neutral

As of: September 16, 2023 4:11 PM Z

## *Spaich v. Smith (In re Spaich)*

United States Bankruptcy Appellate Panel for the Ninth Circuit

October 20, 2005, Argued and Submitted at Sacramento, California; December 9, 2005, Filed

BAP No. EC-05-1071-SBMa

**Reporter**

2005 Bankr. LEXIS 3431 *

In re: GAVRILO SPAICH, Debtor. GAVRILO SPAICH, Appellant, v. SUSAN K. SMITH, Trustee, Appellee.

**Notice:** This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see *Fed. R. App. P. 32.1*), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

**Prior History: [*1]** Appeal from the United States Bankruptcy Court for the Eastern District of California. Honorable Jane Dickson McKeag, Bankruptcy Judge, Presiding. Bk. No. 04-24880-B11. Adv. No. 04-02294.

**Disposition:** AFFIRM.

## Core Terms

confirmation, bankruptcy court, liquidating

## Case Summary

**Procedural Posture**

Appellant debtor challenged a judgment of the United States Bankruptcy Court for the Eastern District of California denying him a discharge under *11 U.S.C.S. § 727*.

**Overview**

On appeal, the court noted that there was no dispute that the bankruptcy court made findings under *§ 727(a)*, in satisfaction of *11 U.S.C.S. § 1141(d)(3)(C)* in the adversary proceeding, but made no findings regarding the nature of a confirmed chapter 11 plan, or debtor's future business plans, in satisfaction of *§§ 1141(d)(3)(A)* and *(B)*. Further, *§ 727(a)* findings alone were insufficient to deny the debtor's discharge under *§ 1141(d)(3)*. However, after entry of the *§ 727* judgment,

and after the commencement of the appeal, the bankruptcy court entered an order confirming the chapter 11 trustee's liquidating plan. In that regard, the bankruptcy court found that pursuant to *§ 1141*, confirmation of the plan did not discharge debtor because (1) the plan was a liquidating plan; (2) the debtor was not continuing in business as defined in *§ 1141(d)(3)(B)*; and (3) the debtor would be denied a discharge under *§ 727(a)* if the case were a case under chapter 7. Thus, to the extent that the entry of the judgment denying discharge was premature due to the absence of findings under *§ 1141(d)(3)(A)* and *(B)*, that infirmity had been adequately cured by the subsequent findings.

**Outcome**

The court affirmed the bankruptcy court's order with instructions that the bankruptcy court enter an amended judgment denying discharge under *§ 1141(d)(3)*.

## LexisNexis® Headnotes

Bankruptcy Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

*HN1*[⤓] **Standards of Review, De Novo Standard of Review**

The appellate court reviews issues of law de novo.

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Causes of Action

Bankruptcy Law > Discharge & Dischargeability > Liquidations > General Overview

2005 Bankr. LEXIS 3431, *1

**HN2**[⬇] **Adversary Proceedings, Causes of Action**

There is nothing in the Bankruptcy Code or the Rules which suggest that only creditors with proven claims may file an action challenging a debtor's discharge, and case law suggests the contrary. *11 U.S.C.S. § 727(c)(1)*. The fact that a proof of claim is challenged and the claim is disputed would not detract from the status of an entity as a creditor until the claim is ultimately disallowed.

Bankruptcy Law > Procedural Matters > Judicial Review > General Overview

**HN3**[⬇] **Procedural Matters, Judicial Review**

"Rule-making" is beyond the bankruptcy appellate panel's province and authority.

Bankruptcy Law > ... > Plans > Postconfirmation Effects > Effects of Confirmation

Bankruptcy Law > ... > Liquidations > Denial of Discharge > General Overview

**HN4**[⬇] **Postconfirmation Effects, Effects of Confirmation**

With certain limitations, an individual chapter 11 debtor receives a discharge upon confirmation of a chapter 11 plan. *11 U.S.C.S. § 1141(d)(1)*. The confirmation of a plan does not, however, discharge a debtor if (A) the plan provides for the liquidation of all or substantially all of the property of the estate; (B) the debtor does not engage in business after consummation of the plan; and (C) the debtor would be denied a discharge under *11 U.S.C.S. § 727(a)* if the case were a case under chapter 7. *§ 1141(d)(3)*.

Bankruptcy Law > ... > Plans > Postconfirmation Effects > Effects of Confirmation

Bankruptcy Law > ... > Liquidations > Denial of Discharge > General Overview

**HN5**[⬇] **Postconfirmation Effects, Effects of Confirmation**

The three subparts of *11 U.S.C.S. § 1141(d)(3)* are

written in the conjunctive, meaning that an individual chapter 11 debtor will only be denied a discharge if, in addition to the existence of grounds for denial of discharge under *11 U.S.C.S. § 727(a)*, the confirmed plan is a liquidating one and the debtor does not engage in business after the plan has been consummated.

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Causes of Action

Bankruptcy Law > Discharge & Dischargeability > Liquidations > General Overview

Bankruptcy Law > ... > Plans > Postconfirmation Effects > Effects of Confirmation

**HN6**[⬇] **Adversary Proceedings, Causes of Action**

*Fed. R. Bankr. P. 4004(a)*, which establishes the procedure for the filing of *11 U.S.C.S. § 727* complaints objecting to discharge, provides that in a chapter 7 liquidation case a complaint objecting to the debtor's discharge under *§ 727(a)* shall be filed no later than 60 days after the first date set for the meeting of creditors under *11 U.S.C.S. § 341(a)*. In a chapter 11 reorganization case, the complaint shall be filed no later than the first date set for the hearing on confirmation.

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Causes of Action

Bankruptcy Law > Discharge & Dischargeability > Liquidations > General Overview

Bankruptcy Law > ... > Plans > Postconfirmation Effects > Effects of Confirmation

**HN7**[⬇] **Adversary Proceedings, Causes of Action**

In a chapter 7 case, a complaint objecting to discharge under *11 U.S.C.S. § 727(a)* must be filed not more than 60 days after the *11 U.S.C.S. § 341(a)* meeting of creditors, but in a chapter 11 case, such a complaint (under *§ 727(a)*) must be filed by the first date set for confirmation of the chapter 11 plan. Though *Fed. R. Bankr. P. 4004(a)* clearly governs the filing of *§ 727* complaints in chapter 11 cases, it makes no reference to *11 U.S.C.S. § 1141(d)(3)*. The denial of a chapter 11 debtor's discharge under 1141(d)(3) only comes into play upon confirmation of a plan. Yet, under R. 4004(a),

2005 Bankr. LEXIS 3431, *1

the *§ 727* complaint must be filed before plan confirmation. Thus, while a creditor seeking denial of a chapter 11 debtor's discharge must obtain findings warranting denial under *§ 727(a)*, the creditor need not plead allegations under *§ 1141(d)(3)(A)* and *(B)* in the *§ 727(a)* complaint; findings regarding the latter may be sought as part of the plan confirmation process.

**Judges:** Before: SMITH, BRANDT and MARLAR, Bankruptcy Judges.

## Opinion

### MEMORANDUM

Gavrilo Spaich ("Debtor") appeals a final judgment by the bankruptcy court, entered February 5, 2005, which denied him a discharge under *§ 727*.[2] We AFFIRM.

### I. FACTS

Debtor is the president and sole shareholder of Spaich Farms, Inc. ("Spaich Farms"). Spaich Farms filed a chapter 11 bankruptcy, and Susan K. Smith ("Smith") was duly appointed the trustee. On May 12, 2004, Debtor filed his own chapter 11 petition, which is the subject of this appeal. Debtor did not schedule Smith, or Spaich Farms, as a creditor. On November 16, 2004, after the claims bar date had passed, Smith filed a proof of claim.[3]

On August 10, 2004, Smith initiated an adversary proceeding objecting to Debtor's discharge under *§§ 727(a)(2)-(a)(7)*. On January 26, 2005, the day before the adversary was set to go to trial, Debtor filed an objection to the proof of claim asserting that the claim was untimely, lacked adequate documentation, and failed to specify a precise amount.

At trial, Debtor orally moved the court to either dismiss

the complaint on the ground that the claim objection deprived Smith of standing to prosecute, or alternatively, to postpone the trial until Smith's status as a creditor could be determined. The court denied both requests, and the trial went forward.

Following trial, the court issued a memorandum decision which found Smith to have had standing to bring a discharge action, and on the merits, the discharge was denied. A separate judgment denying discharge was also entered into the docket.

Debtor appeals.

### II. JURISDICTION

The bankruptcy court had jurisdiction under *28 U.S.C. § 1334* and *§§ 157(b)(1)* and *(b)(2)(J)*. We have jurisdiction under *28 U.S.C. § 158(c)(1)*.

### III. ISSUES

1. Whether the bankruptcy court erred in finding that Smith had standing as a creditor to object **[*3]** to discharge under *§ 727*.

2. Whether the bankruptcy court erred in denying a chapter 11 debtor a discharge under *§ 727* without making findings under *§§ 1141(d)(3)(A)* and *(B)*.

### IV. STANDARD OF REVIEW

This appeal presents *HN1*[⬆] issues of law only, which we review *de novo*. *In re Madigan, 122 B.R. 103, 105 (9th Cir. BAP 1991)*; *In re Cole, 93 B.R. 707, 708 (9th Cir. BAP 1988)*.

### V. DISCUSSION

A. Standing

In his opening brief, Debtor challenges Smith's standing to bring the *§ 727* action, arguing that because Smith is the trustee in the Spaich Farms bankruptcy case and is not the trustee in his personal bankruptcy, she lacked standing to object to his discharge. However, at oral argument before this panel, Debtor conceded that Smith had standing as a creditor to bring the discharge action.

---

[2] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, *11 U.S.C. §§ 101-1330*, and to the *Federal Rules of Bankruptcy Procedure, Rules 1001-9036*.

[3] The claims bar date expired on September 16, 2004. Subsequent to the filing of this appeal, on July 7, 2005, the bankruptcy court deemed Smith's **[*2]** proof of claim to be timely.

2005 Bankr. LEXIS 3431, *3

Therefore, we find that the issue is moot.[4]

Debtor also complains that standing to object to a discharge, in general, is too broad. He argues that anyone can have standing to object to discharge by simply filing a claim, or as in this case, a late filed proof of claim. In this regard, Debtor requests that we fashion a new rule that would require the adjudication of a claim before its holder is permitted to file an action challenging a debtor's discharge. We decline to do so.

First, HN2[⬆] there is nothing in the Code or the Rules which suggest that only creditors with proven claims may file such an action, and case law suggests the contrary. See § 727(c)(1); See In re O'Callaghan, 304 B.R. 500, 511 (Bankr. M.D. Fla. 2003)("the fact that a proof of claim is challenged and the claim is disputed would not detract from the status of an entity as a creditor until the claim is ultimately disallowed."). Second, and most importantly, HN3[⬆] "rule-making" is beyond our province and authority.

B. Judgment Denying Discharge

HN4[⬆] ] With certain limitations, an individual chapter 11 debtor receives [*5] a discharge upon confirmation of a chapter 11 plan. § 1141(d)(1). The confirmation of a plan does not, however, discharge a debtor if

(A) the plan provides for the liquidation of all or substantially all of the property of the estate;

(B) the debtor does not engage in business after consummation of the plan; and

(C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

§ 1141(d)(3)(emphasis added).

HN5[⬆] ] The three subparts of § 1141(d)(3) are written in the conjunctive, meaning that an individual chapter 11 debtor will only be denied a discharge if, in addition to the existence of grounds for denial of discharge under §

_____

[4] Debtor also contends in his brief that an unscheduled creditor who files a late proof of claim lacks standing to bring a § 727 action. We need not address this issue since, according to the docket, the bankruptcy court has entered an order deeming Smith's claim to be timely. Moreover, even if that order were before us - which it is not - the complaint objecting to discharge, [*4] filed prior to the expiration of the bar date, would likely qualify as a timely filed "informal claim." See In re Hayes, 327 B.R. 453, 461-62 (Bankr. C.D. Cal. 2005).

727(a), the confirmed plan is a liquidating one and the debtor does not engage in business after the plan has been consummated. In re Williams, 227 B.R. 589, 593 (D.R.I. 1998).

According to Debtor, the complaint should have included allegations under §§ 1141(d)(3)(A) and (B) and the absence of such allegations, as well as any supporting evidence at trial, deprived the court of authority to enter the judgment denying discharge.

Debtor's position is not supported by either § 1141(d)(3) or Rule 4004(a), HN6[⬆] Rule 4004(a), [*6] which establishes the procedure for the filing of § 727 complaints objecting to discharge, provides

In a chapter 7 liquidation case a complaint objecting to the debtor's discharge under § 727(a) of the Code shall be filed no later than 60 days after the first date set for the meeting of creditors under § 341(a). In a chapter 11 reorganization case, the complaint shall be filed no later than the first date set for the hearing on confirmation.

Fed. R. Bank. P. 4004(a)(emphasis added).

To rephrase Rule 4004(a), HN7[⬆] in a chapter 7 case, a complaint objecting to discharge under § 727(a) must be filed not more than 60 days after the § 341(a) meeting of creditors, but in a chapter 11 case, such a complaint (under § 727(a)) must be filed by the first date set for confirmation of the chapter 11 plan. Though Rule 4004(a) clearly governs the filing of § 727 complaints in chapter 11 cases, it makes no reference to § 1141(d)(3). This makes sense because the denial of a chapter 11 debtor's discharge under 1141(d)(3) only comes into play upon confirmation of a plan. Yet, as indicated above, under Rule 4004(a), the § 727 complaint must be filed before plan confirmation. Thus, while a creditor seeking denial [*7] of a chapter 11 debtor's discharge must obtain findings warranting denial under § 727(a), the creditor need not plead allegations under § 1141(d)(3)(A) and (B) in the § 727(a) complaint; findings regarding the latter may be sought as part of the plan confirmation process.

There is no dispute that the bankruptcy court made findings under § 727(a)(1)(in satisfaction of § 1141(d)(3)(C)) in the adversary proceeding, but made no findings regarding the nature of a confirmed chapter

2005 Bankr. LEXIS 3431, *7

11 plan,[5] or Debtor's future business plans (in satisfaction of *§§ 1141(d)(3)(A)* and *(B)*, respectively). Further, Debtor is correct that *§ 727(a)* findings alone are insufficient to deny his discharge under *§ 1141(d)(3)*. Smith concedes this point. If this were the end of the story, remand to the bankruptcy court for additional findings under *§§ 1141(d)(3)(A)* and *(B)* would be appropriate. However, this is not the case.

After entry of the *§ 727* judgment, and after the commencement of this appeal, the court entered an order confirming the chapter 11 trustee's liquidating plan. **[*8]** In this regard, the court made the following specific findings under *§ 1141(d)(3)*:

> Pursuant to *11 U.S.C. § 1141*, confirmation of the Plan does not discharge Debtor because:
> a. The Plan is a liquidating plan;
>
> b. The Debtor is not continuing in business as defined in *11 U.S.C. § 1141(d)(3)(B)*;
>
> c. The Debtor would be denied a discharge under *section 727(a) of the Bankruptcy Code* if the case were a case under Chapter 7 of the Bankruptcy Code.

See Findings of Fact and Conclusions of Law in Support of Order Confirming Trustee's First Amended Plan of Reorganization.[6]

## VI. CONCLUSION

To the extent that the entry of the judgment denying discharge was premature due to the absence of findings under *§§ 1141(d)(3)(A)* and *(B)*, that infirmity has been adequately cured by the subsequent findings noted above. It would be an exercise in futility to remand the matter back to the bankruptcy court to make findings that have already been made. Therefore, we AFFIRM with instructions that the court enter an amended judgment denying discharge under *§ 1141(d)(3)*.

---

**End of Document**

---

[5] As of the time of the trial, Debtor had filed a disclosure statement and a chapter 11 plan, but had not obtained approval or confirmation of either.

[6] The order confirming the trustee's plan was not submitted as part of the record.

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this District Court proceeding. My business address is: 870 Roosevelt, Irvine, CA 92620.

A true and correct copy of the foregoing document entitled: **UNPUBLISHED AUTHORITY IN SUPPORT OFAPPELLEE'S RESPONSIVE BRIEF** will be served or was served **(a)** on the judge in chambers in the form and manner required by L.R. 5-4 in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and L.R 5-3.3, the foregoing document will be served by the court via NEF and hyperlink to the document. On **September 16, 2023**, I checked the CM/ECF docket for this case and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On **September 16, 2023**, I served the following persons and/or entities at the last known addresses in this case by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**: Pursuant to F.R.Civ.P. 5 (d)(3) and/or controlling L.R. 5-4, on **September 16, 2023**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| September 16, 2023 | Cynthia Bastida | /s/ Cynthia Bastida |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:
   - **ATTORNEY FOR APPELLEE HOUSER BROS. CO.; APPELLEE ERIC HOUSER; AND APPELLEE CRAIG HOUSER:** Bradford Nathan Barnhardt
     bbarnhardt@marshackhays.com, kfrederick@ecf.courtdrive.com, cbastida@marshackhays.com
   - **ATTORNEY FOR TRUSTEE JEFFREY I GOLDEN:** Eric P. Israel
     eisrael@danninggill.com, eisrael@ecf.inforuptcy.com, DanningGill@gmail.com

2. **SERVED BY UNITED STATES MAIL**: CONTINUED:

   **APPELLANT**
   Jamie Lynn Gallian
   16222 Monterey Lane Unit 376
   Huntington, CA 92649

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**: CONTINUED:

   **VIA PERSONAL DELIVERY:**
   **MANDATORY CHAMBERS COPY**
   HONORABLE WESLEY L. HSU
   FIRST STREET COURTHOUSE
   350 WEST 1ST STREET, COURTROOM 9B
   LOS ANGELES, CA 90012

4866-9137-6512, v. 1

146786v1/9999-403